TRIAL - BECKWITH

1    you testified -- just testified he was thrusting your --

2    himself on your car, and then you testified that you

3    attempted to search him again?

4        A    I was attempting to search him the whole time.

5        Q    Okay.  So you were attempting to search him at

6    your -- at -- when you got to the side of your squad car;

7    correct?

8        A    Correct.

9        Q    Did you find anything?

10       A    Other than the clear plastic bag, I did not find

11   anything.

12       Q    Okay.  Was he searched again subsequent to --

13   after he got to your squad car?  You said you attempted to

14   search again; right?  So was he searched again after that?

15       A    There was one long search.  There's no break in

16   between searches.  So I'm trying to search him the whole

17   time.  And then when I was done, the search was completed.

18       Q    Did Officer Breen search him as well?

19       A    He did not.

20       Q    So you said that you recovered that clear sandwich

21   bag from his waistband; is that right?

22       A    Yes.

23       Q    Okay.  And that was while he was thrusting himself

24   against the car or --

25       A    That was prior to him thrusting himself against

TRIAL - BECKWITH

1    the car.

2        Q    Okay.  So how did -- did you reach inside his

3    pants to retrieve that clear plastic bag?

4        A    Again, I did not.

5        Q    So it was just sticking out from his waistband?

6        A    Yes, as that was the item he was attempting to

7    shove behind him while I was asking him to show me his

8    hands.

9        Q    Did you say that you found them between his

10   underwear and his buttocks?

11       A    Yes.

12       Q    Are you aware that he was -- he had -- he was

13   taken to Upstate University Hospital after that?

14       A    Yeah, I was aware about five -- at least five

15   hours later he was.

16       Q    Do you know why he was taken to Upstate?

17       A    He had claims of, I think, something with

18   testicles being in pain and pain to his anus.

19       Q    Have you ever done a roadside search outside

20   someone's clothing in the crotch area?

21       A    A frisk outside their clothing?  Yes.

22       Q    So you actually reach between someone's legs and

23   you -- you -- you touch the crotch area?

24       A    I pat their upper thigh.

25       Q    Okay.  But you don't reach between their legs in

TRIAL - BECKWITH

1  the areas of their testicles to see whether or not there is

2  any contraband there?

3      A    No.

4      Q    Now, do you -- did you learn, if you know, did you

5  learn the -- the results of his -- his visit to the

6  hospital?

7      A    I'm not sure.

8      Q    So you didn't learn that there were two abrasions

9  just left to his anus -- to the left of his anus?

10     A    Okay.

11     Q    Did you learn that or no?

12     A    I learned that he went to hospital and the ET or

13 evidence technician had to go there and photograph him.

14     Q    Okay.  One of your evidence technicians?

15     A    An evidence technician for Syracuse Police

16 Department.

17            MS. FLORES:  Okay.  Can you give me a moment,

18     Judge?

19            THE COURT:  Mm-hmm.

20            MS. FLORES:  I have no further questions,

21     your Honor.

22            THE COURT:  Mr. Centra?

23            MR. CENTRA:  Nothing further, your Honor.

24            THE COURT:  All right.  Thank you very much.

25            THE WITNESS:  Thank you.

TRIAL - BECKWITH

1          THE COURT:  You may depart.

2          (Whereupon the witness was excused.)

3          THE COURT:  Who would you like to call next?

4          MR. CENTRA:  Officer Jacob Breen.

5          THE COURT:  Very good.

6          (Whereupon the witness entered the courtroom.)

7          THE COURT:  State and spell your first and

8   last name.

9          THE WITNESS:  It's Jacob Breen.  It's

10  J-A-C-O-B  B-R-E-E-N.

11          O F F I C E R   J A C O B   B R E E N, called as a

12  witness and being duly sworn, testifies as follows:

13          DIRECT EXAMINATION BY MR. CENTRA:

14  Q     Morning, Officer.

15  A     Morning.

16  Q     Could you state where you're employed.

17  A     The Syracuse Police Department.

18  Q     And what is your position there?

19  A     I'm a police officer.

20  Q     And could you describe what your duties and

21  responsibilities are as a police officer.

22  A     Currently, I'm assigned to the Crime Reduction

23  Team.  So my current duties involve conducting traffic stops

24  and addressing drug complaints and taking 911 calls.

25  Q     And how long have you been with Syracuse Police?

TRIAL - BECKWITH

1     A    Six years.

2     Q    Officer, I'm going to draw your attention to

3 September 6th of 2016.  You recall this date?

4     A    I do.

5     Q    And were you working in your capacity with

6 Syracuse Police on that date?

7     A    Yes, I was.

8     Q    And at any point on that date did you become

9 involved in a -- a potential drug investigation?

10    A    Yes, I did.

11    Q    And can you describe how you became involved in

12 this investigation?

13    A    Yes.  It stemmed from a traffic stop we conducted

14 in the 200 block of West Kennedy Street.

15    Q    You said "we."  Who were you with?

16    A    Officer Irvine.

17    Q    And the traffic stop, do you recall the vehicle

18 you had stopped?

19    A    Yes.  It was a 2009 Honda Accord.

20    Q    And what was your reason for stopping that

21 vehicle?

22    A    Basically, because it had failed to stop at a stop

23 sign and it had inadequate headlamps.  One of -- the

24 driver's side headlamp wasn't properly functioning.

25    Q    And you stated that you eventually pulled that

TRIAL - BECKWITH

1    vehicle over on West Kennedy Street?

2        A    Yes.

3        Q    The city of Syracuse?

4        A    Yes.

5        Q    And when you and Officer Irvine stopped that

6    vehicle, what did you do?

7        A    I radioed our location to let the dispatcher know

8    where we were, and then I walked up to the passenger side of

9    the vehicle.

10        Q    Did you see how many occupants were in that

11    vehicle?

12        A    Yes.  There was two.

13        Q    And were you able to identify the individual in

14    the passenger seat?

15        A    Yes, I was.

16        Q    And who was that?

17        A    I believe her name was Rayshell Johnson.

18        Q    And were you able to see who was in the driver's

19    seat of that vehicle?

20        A    Yes.

21        Q    And were you able to identify him?

22        A    Yes.

23        Q    And who was that?

24        A    Davonne Beckwith.

25        Q    And do you see him here in court today?

TRIAL - BECKWITH

1    A    Yes, I do.

2    Q    And could you point to him and describe an article

3    of clothing that he's wearing?

4    A    He's wearing a purple button-up long-sleeve shirt

5    (indicating).

6              MR. CENTRA:    Let the record reflect that the

7         witness has identified the defendant.

8              THE COURT:    Yes.

9    Q    Now, what happened when you approached the

10   passenger window after the stop?

11   A    Basically, I began speaking with the passenger,

12   and I could immediately smell there was burnt marijuana

13   within the vehicle.

14   Q    Have you smelled burnt marijuana before in your

15   years in law enforcement?

16   A    Yes, I have.

17   Q    Do you know approximately how many times?

18   A    Hundreds if not thousands of times.

19   Q    Now, after you approached the vehicle and -- and

20   smelled marijuana, what did you do next during the course of

21   this stop?

22   A    I began interviewing the passenger and I --

23   requested her identification.  And I noticed she was holding

24   a clear, I guess, for lack of a better term, like, a

25   Dixie -- like, a clear Dixie cup.  And she smelled like she

TRIAL - BECKWITH

1   had been drinking, so I had asked her what was in the cup.

2       Q   And did she answer you?

3       A   She told me it was a mixed drink.

4       Q   Now, as you were speaking with Ms. Johnson, were

5   you able to observe the driver of the vehicle?

6       A   Yes, I was.

7       Q   Could you see what he was doing?

8       A   He was talking with Officer Irvine, and he was

9   just kind of -- had his right hand kind of balled into his

10  fist kind of tucked between his upper leg and the center

11  console.

12      Q   And this is when you were positioned at the

13  passenger window?

14      A   Yes.

15      Q   Now, what did you do next during the course of

16  your investigation into this matter as you were standing at

17  the passenger window talking to Ms. Johnson?

18      A   I asked her if I could see the cup she was holding

19  on her lap, and she handed it to me.  I smelled it, and it

20  was very clear to me that it was, in fact, some sort of

21  alcoholic-based drink.  So I placed that on the hood of the

22  vehicle -- I'm sorry, the roof of the vehicle.  And then I

23  overheard Officer Irvine requesting, you know, different

24  types of documentation like his driver's license and

25  insurance and registration for the driver.  And he had

TRIAL - BECKWITH

1    informed Officer Irvine that he did not have a license and

2    that his license was suspended.

3        Q    And at any point did you actually make your way

4    over to the driver's side of the vehicle?

5        A    Yes, I did.

6        Q    And why did you end up going over to that side of

7    the vehicle?

8        A    Because Officer Irvine had requested that

9    Mr. Beckwith exit his vehicle and Mr. Beckwith had told

10   Officer Irvine affirmatively that he was not going to get

11   out of his car.

12       Q    And was Ms. Johnson still seated in the passenger

13   seat when you approached the driver's side?

14       A    Yes, she was.

15       Q    All right.  Were you able to, I guess, see what

16   her demeanor was like just physically?

17       A    Ms. Johnson?

18       Q    Yes.

19       A    She was impaired by alcohol.  She was --

20   definitely appeared intoxicated.  She admitted to me during

21   our initial conversation that she had had Mr. Beckwith drive

22   her vehicle because she did not believe she could drive

23   because of her level of intoxication.

24       Q    And now, what happened when you walked over to the

25   driver's side of that vehicle?

Ashley M. Knights
Court Reporter
315-671-2058

SYR002226

TRIAL - BECKWITH

1    A    I walked over and Officer Irvine basically

2  explained to Mr. Beckwith, like, all the different reasons

3  why he was having to come out of the vehicle.  I mean, he,

4  you know, had admitted to being -- consuming alcohol, he

5  didn't have a license, you know, there was marijuana within

6  plain view to us in the vehicle in a cigar there, and the

7  car smelled like marijuana.  It was obviously a safety

8  issue.  We had to ask him to step out of the vehicle, and

9  Mr. Beckwith became more and more, like, verbally

10  confrontational with us.  And you could kind of tell that

11  something wasn't right, so I radioed for another unit to

12  assist us.

13    Q    And what did you personally do at the point that

14  you're witnessing Mr. Beckwith and Detective Irvine's

15  interactions?

16    A    At some point, you know, after we basically told

17  Mr. Beckwith after so many attempts to reason with him, we

18  told him, like, "Listen, you're now, you know, under arrest.

19  You need to step out of the vehicle."  And he started

20  yelling at us and telling us no.  So Officer Irvine opened

21  up the car door and I tried to grab onto his left arm, and

22  he kind of, like, swung it back at me and just sort of kind

23  of balled up his, you know, like he was going to hit me or

24  something, kind of took, like, a fighting sort of stance.

25  And you could see he was trying to put something to his --

Ashley M. Knights
Court Reporter
315-671-2058

SYR002227

TRIAL - BECKWITH

1   the rear of his waistband, so I pulled out my gun and I

2   aimed it at him.  I told him to show us his hands.

3          Q    And is that something you normally do when

4   somebody's reaching into their waistband?

5          A    Well, yes.  That's pretty common movement you'd

6   see for someone that's arming themselves or secreting a

7   weapon.

8          Q    So after you witnessed this, what happened next

9   during the course of this investigation?

10          A    I noticed that Officer Irvine had also drawn his

11   firearm, and we were both yelling for him to show us his

12   hands.  I also carry a Taser with me sometimes on patrol.

13   So I reholstered my gun and I pulled out my Taser, and I

14   told Mr. Beckwith if he didn't show his hands, I was going

15   to Tase him.

16          Q    At that point were you or Detective Irvine

17   attempting to physically remove Mr. Beckwith from the

18   vehicle before you -- you drew your Taser -- Taser?

19          A    Yes.  I was trying to basically remove him from

20   the vehicle before that.

21          Q    And were either of you successful in removing him

22   from the vehicle?

23          A    No.

24          Q    Do you know approximately how long this struggle

25   had occurred before you drew your Taser?

TRIAL - BECKWITH

1    A    I would say -- I mean, it was very fast.  I'd say

2    one or two minutes, no longer than that.

3    Q    Now, did you actually deploy your Taser?

4    A    Yes, I did.

5    Q    All right.  Now, you said that Mr. Beckwith's hand

6    was balled up, I guess, into kind of a fist, you said?

7    A    Yes.

8    Q    Did you at any point see anything in -- in that

9    hand?

10    A    When I was on the passenger's side, no, I did not.

11    Q    Okay.  At any point during your investigation did

12    you?

13    A    No, I did not.

14    Q    Now, but you stated that he was reaching his hand

15    into his back waistband?

16    A    Yes.

17    Q    All right.  And so you stated you drew your --

18    your Taser.  At any point did you discharge your Taser?

19    A    Yes, I did.

20    Q    And what happened when you discharged the Taser?

21    A    Mr. Beckwith said, "Are you serious, bro?"  And

22    you could kind of tell because of his reaction that the

23    Taser didn't fully incapacitate his neuromuscular system

24    because that's not -- typically -- I've been Tased a few

25    times, and you can't -- you're usually not able to speak or

TRIAL - BECKWITH

1    anything like that.  So you could tell it really wasn't

2    taking effect, but it seemed to distract him enough that we

3    were able to kind of grab onto his arms and sort of force

4    him out of the vehicle at that point.

5         Q    And did you bring him to the ground as you took

6    him out of the vehicle?

7         A    Yes, we did.

8         Q    And were you trying to take him -- continue to

9    take him into custody at that point?

10        A    Yes.  Yes, we were.

11        Q    And what happened when you got Mr. Beckwith out of

12   the car and onto the -- onto the ground?

13        A    Basically, we repeatedly told him to put his hands

14   behind his back and stop resisting arrest and that he was

15   under arrest.  And he just continued to ignore all of our

16   commands, and he was kind of pleading with us in different

17   ways to get out of the situation.  And we were just

18   basically trying to bring his arms to the front of him, but

19   he was continuously pushing his hands, like, his left arm

20   underneath his body like he was trying to stand up and he

21   kept pushing his right hand into like the back of his pants.

22        Q    So approximately how long did this struggle take

23   place?

24        A    I would say, again, probably a minute or two.

25        Q    And I know there was two of you there, but how

Ashley M. Knights
Court Reporter
315-671-2058

SYR002230

TRIAL - BECKWITH

1  difficult is it to -- to handcuff a person who doesn't want

2  to be handcuffed?

3      A    It's pretty difficult.  I mean, it's -- it's --

4  you can't do it by yourself.  I mean, even if you have

5  someone that's smaller than you, it's extremely difficult to

6  handcuff someone by yourself who doesn't want to comply, I

7  should say.

8      Q    And you were eventually able to handcuff

9  Mr. Beckwith?

10     A    Yes.

11     Q    And was he cuffed in front or behind his back?

12     A    I actually think that what ended up happening

13 because he was moving around so much, Officer Irvine ended

14 up cuffing up one of his hands, but then we weren't really

15 able to secure that hand.  So we would, you know, roll

16 around with him a little bit more, then he got his other

17 hand handcuffed.  And eventually, I was able to kind of link

18 those two sets of handcuffs together.

19     Q    And at any point did you or Officer Irvine search

20 Mr. Beckwith?

21     A    Yes.

22     Q    And was it -- was it you or Mr. -- Officer Irvine?

23     A    It was Officer Irvine.

24     Q    And were you present for that?

25     A    Yes, I was.

TRIAL - BECKWITH

1    Q    Do you recall if you witnessed anything being

2    recovered during that search?

3    A    Yes.  Officer Irvine grabbed, like, a knotted bag.

4    It looked like it had some rice and some tan powder and what

5    looked like crack cocaine in it.  And he handed it to me.

6    Q    I'm going to show you what's been marked for

7    identification as Exhibit 1.  Can you take a look at that

8    exhibit and tell me, do you recognize it?

9    A    Yes, I do.

10    Q    How do you recognize that?

11    A    This is the evidence bag which I put the bag with

12    the tan powder and the rice in.  And you can see that it's

13    the same bag because it's marked with my evidence seal at

14    the top, and this is the sticker that I placed on it

15    (indicating).

16    Q    Are the items in that bag in the exact same

17    condition -- the exact same condition when you put them in

18    there, or are they slightly different?

19    A    They're -- they're slightly different.

20    Q    Now I'm going to show you what's been marked for

21    identification as Exhibit 2.

22    A    Thank you.

23    Q    Do you recognize Exhibit 2?

24    A    Yes, I do.

25    Q    And how do you recognize Exhibit 2?

TRIAL - BECKWITH

1    A    I recognize it as the bag that I placed the

2    suspected crack cocaine in.

3    Q    And how do you recognize that?

4    A    Again, by the labeling at the top and the sticker

5    that I placed on it.

6    Q    Now, you stated that you witnessed Officer Irvine

7    retrieve the bags from Mr. Beckwith?

8    A    Yes.

9    Q    And do you recall exactly where he retrieved

10   those -- that bag from?

11   A    It was basically, like, tucked into, like, his

12   underwear because his pants were halfway down his butt.

13   Q    Now, at any point did you see Detective Irvine

14   cavity search Mr. Beckwith?

15   A    No.

16   Q    At any point did you cavity search Mr. Beckwith?

17   A    No.

18   Q    Did you witness Detective Irvine at any point put

19   his hand in Mr. Beckwith's rectum?

20   A    No.

21   Q    Did you at any point put your hand in Davonne

22   Beckwith's rectum?

23   A    No.

24   Q    Now, how long is it that you said that you've been

25   a police officer?

TRIAL - BECKWITH

1      A    Six years.

2      Q    And would you ever check a suspect's rectum for

3   evidence during a roadside stop?

4      A    No.

5      Q    Is -- does your, I guess, police protocol,

6   Syracuse Police protocol allow you to do a cavity search of

7   a suspect on the side of a road?

8      A    No.

9      Q    Now, you stated that you had smelled and seen what

10  you believed to be marijuana in -- in that vehicle that day;

11  correct?

12     A    Yes.

13     Q    Now I'm going to show you what's been entered into

14  evidence as Exhibit 3.  Do you recognize Exhibit 3?

15     A    Yes, I do.

16     Q    And what is Exhibit 3?

17     A    This is the marijuana blunt that we recovered from

18  the vehicle.

19     Q    Now, do you recall if you or anybody in your

20  presence field tested the substance in the bag that was

21  found on Mr. Beckwith's person?

22     A    Yes.  I -- I tested it.

23     Q    All right.  And have you received, I guess,

24  training, narcotics identification training before?

25     A    Yes.

TRIAL - BECKWITH

1    Q    And are you trained to field test potential

2    narcotics?

3    A    Yes, I am.

4    Q    And can you just kind of describe what you -- the

5    test that you administered on these substances?

6    A    The marijuana I had tested with a 908

7    Duquenois-Levine field test kit, which test positive or

8    negative for presence of tetrahydrocannabinol, which is THC.

9    And the tan powder was suspected to be heroin, so we tested

10   it with a 924 Mecke's reagent, which will test positive or

11   negative for the presence of heroin.  And the suspected

12   crack cocaine was tested with a 904B reagent for cocaine

13   base and salts, which tests positive or negative for the

14   presence of cocaine.

15   Q    And to your knowledge, is it possible for those

16   tests to result in a false positive?

17   A    Yes, it is.

18   Q    Now, do you know if further testing is normally

19   done on narcotics that you find during the course of your

20   investigations?

21   A    Yes.  Typically, we submit them to the crime lab

22   for further analysis.

23   Q    And I guess, when you're on patrol and you find

24   narcotics, marijuana during an investigation, where do you

25   normally store it while you're on patrol?

Ashley M. Knights
Court Reporter
315-671-2058

TRIAL - BECKWITH

1    A    Typically, we'll put it -- I'm sorry, what --

2  where do we normally store it, like, after we turn it in as

3  evidence or ...

4    Q    When you're on patrol, let's say you don't make an

5  arrest and you continue on patrol after finding some

6  narcotics.

7    A    Like, if we release something on an appearance

8  ticket or something and we're not going to the building to

9  physically lodge the person, we would typically store

10 whatever evidentiary items we have either in the glove box

11 of our vehicle or the trunk of our vehicle.

12   Q    Now, is it normal for you to have narcotics

13 contraband from other investigations in your glove

14 compartment at any given time?

15   A    Yes.

16   Q    Now, do you recall on that night if you had any

17 other evidence in your glove compartment separate from this

18 investigation?

19   A    Yes, we did.

20   Q    Now, you stated that the substances found on

21 Mr. Beckwith were field tested.  And to your knowledge, was

22 subsequent testing actually done on those?

23   A    Yes, they were.

24   Q    And do you know what the results of the subsequent

25 testing was?

TRIAL - BECKWITH

1    A    Yes.  They were negative for controlled

2  substances.

3    Q    All right.  Now, did yourself or anybody in your

4  presence on that night, did you see anybody plant

5  Exhibits 1, 2, or 3 --

6    A    No.

7    Q    -- on Mr. Beckwith or in the vehicle?

8    A    No.

9    Q    Do you know if there would be any consequences for

10  an officer planting evidence on a suspect?

11    A    Well, yes.  You would probably be arrested and

12  lose your job.

13        MR. CENTRA:  I have no further questions.

14    Thank you, Officer.

15        THE COURT:  Okay.  Ms. Flores, you may not

16    finish, but we do have a few minutes for you to start.

17    CROSS-EXAMINATION BY MS. FLORES:

18    Q    Hello, Officer.

19    A    Hello.

20    Q    Okay.  So after you and Officer Irvine pulled

21  Mr. Beckwith's vehicle over, you parked behind his vehicle

22  or Officer Irvine parked behind his vehicle; correct?

23    A    Yes.

24    Q    Okay.  And you approached the vehicle on the

25  passenger's side --

Ashley M. Knights
Court Reporter
315-671-2058

SYR002237

TRIAL - BECKWITH

1    A    Yes.

2    Q    -- is that correct?  Okay.  Did you overhear or

3  did you hear Officer Irvine what -- what -- do you recall

4  the first thing that Irvine -- Officer Irvine said or asked

5  my client after he got to the window?

6    A    I don't know word for word, but I would presume

7  that he probably asked him for his license, registration,

8  and insurance.

9    Q    Okay.  He asked him for his license and

10  registration.  Did he -- did you overhear him tell

11  Mr. Beckwith why he was pulled over?

12    A    I -- no, I did not.

13    Q    Is it standard operating procedure after you pull

14  someone over, a motorist over, for you to let them know why

15  you pulled them over?

16    A    No, not necessarily.  No.

17    Q    So if -- if Mr. Beckwith -- I think there was

18  testimony that he -- that he -- there was a stop sign by --

19  stop sign violation; correct?

20    A    Yes.

21    Q    So --

22            THE COURT:  Hold on.  See, he wasn't here to

23        hear the testimony that there was a stop sign

24        violation.  You can ask him if there was a stop sign

25        violation.

Ashley M. Knights
Court Reporter
315-671-2058

SYR002238

TRIAL - BECKWITH

1    Q    Yeah.  Did you observe a violation of the stop

2    sign law, I guess, where you're supposed to come to a full

3    stop?

4    A    Yes, I did.

5    Q    On Mr. Beckwith's part?

6    A    Yes.

7    Q    Okay.  So after you pull someone over for a

8    violation like that, it's not standard operating procedure

9    to let them know that they were violating the stop sign rule

10   or law?

11   A    I mean --

12   Q    When you pulled them over.

13   A    I would say no.  Not necessarily, no.

14   Q    Okay.  So you pulled them over and you asked them

15   for their license and registration?  Is that generally what

16   your operating procedure is or protocol?

17   A    Yes.  We typically would ask for your license and

18   your registration.

19   Q    Okay.  But you don't tell them why they're pulled

20   over?

21   A    No, we typically would, I mean, at some point

22   during the stop advise them of why they were pulled over.

23   But usually we would make sure the person has a license and

24   that the vehicle is legitimate first.

25   Q    Do you ever ask a motorist, "Do you know why I

Ashley M. Knights
Court Reporter
315-671-2058                    SYR002239

TRIAL - BECKWITH

1    pulled you over?"

2        A    Yeah, I've asked that before.

3        Q    Did you ask -- did you hear Officer Irvine ask my

4    client that?

5        A    No, I did not specifically --

6        Q    Okay.

7        A    -- hear him ask that question.

8        Q    So did you observe any other violations of the

9    Vehicle and Traffic Law besides the stop sign violation?

10       A    Yes, I did.

11       Q    And I believe you testified it was something about

12   the headlights --

13       A    Yes.

14       Q    -- one brighter than the other?

15       A    Yes.

16       Q    And is that an actual violation of the Vehicle and

17   Traffic Law?

18       A    Yes, it is.

19       Q    Okay.  Any other violations that you observed by

20   Mr. Beckwith that night?

21       A    Yeah.  I think he had two signal violations where

22   he had waited until he had approached the intersection where

23   he was going to turn, and then he used his signal instead of

24   signaling before he approached the intersection.

25       Q    Okay.  Normally, in general, do violations like a

TRIAL - BECKWITH

1    stop sign violation or a turn signal violation or the

2    headlight violation, would that authorize you to search the

3    vehicle?

4        A    No.

5        Q    Would that authorize you to search the motorist?

6        A    No.

7        Q    You o -- did you overhear him tell Officer Irvine

8    that -- did you overhear Mr. Beckwith tell Officer Irvine

9    that he did not have a license?

10       A    Yes, I did.

11       Q    You overheard that while you were on the passenger

12   side of the vehicle?

13       A    Yes.

14       Q    Okay.  Are you aware that he was not indicted for

15   aggravated unlicensed operation?

16       A    No, I'm not aware of that.

17       Q    Now, were you -- you and Officer Irvine, were you

18   part of a special detail, or were you routine patrol

19   persons?

20       A    We -- I'm sorry?

21       Q    Go ahead.

22       A    We were routine patrol.

23       Q    Okay.  So you were not tasked with any -- at

24   any -- with any duties to be proactive in regards to

25   criminal activity?

TRIAL - BECKWITH

1    A    Well, I mean, that's typically your normal job
2  would be proactive, but no, I wouldn't say anything
3  particularly.  We were assigned to a double car that night.
4    Q    Okay.  So as far as being proactive, would you
5  agree with me that you don't anticipate a traffic violation
6  before you pull someone over?
7    A    I guess I don't understand the question.
8    Q    Do you -- you have to wait until someone violates
9  the Vehicle and Traffic Law before you pull him over;
10  correct?
11    A    Yes, that's true.
12    Q    So you would agree that's not proactive --
13  proactive duty; correct?
14    A    To pull someone over is not proactive?
15    Q    Well --
16        THE COURT:  I think you're arguing with him.
17        MS. FLORES:  Okay.
18    A    I'm sorry, I got -- I don't understand.
19        THE COURT:  Hold on.  Don't answer.  Next
20    question.
21        THE WITNESS:  Sorry.
22    Q    Okay.  Now, you testified that you field tested
23  two substances; correct?
24    A    Yes.
25    Q    And they tested positive for heroin and for

TRIAL - BECKWITH

1    cocaine; correct?

2        A    Yes.

3        Q    And then you tested -- you tested the blunt that

4    was found in the car as well; correct?

5        A    Yes.

6        Q    And you -- according to you, it tested positive

7    for the presence of marijuana; is that correct?

8        A    For THC, yes.

9        Q    And THC is what?

10       A    It's the chemical component in -- it's the

11   psychoactive ingredient in marijuana.

12       Q    Did -- was that item tested by the Lab as well?

13       A    I do not know.

14       Q    Now, do -- you smelled alcohol on -- on the

15   passenger's breath; correct?

16       A    Yes, that's true.

17       Q    Now, do you recall my client mentioning about

18   whether or not he was drinking that night?

19       A    Yes, I do.

20       Q    Did -- do you recall whether you or Officer Irvine

21   smelled alcohol on his breath?

22       A    I did not smell alcohol on him until after we had

23   removed him from the vehicle.

24       Q    Did you ticket him with DWI?

25       A    No, I did not.

TRIAL - BECKWITH

1    Q    Okay.  So to remove him from the car, you had to

2    deploy your Taser?

3                THE COURT:  All right.  I'll tell you what.

4         I think this is a good -- let's stop there because you

5         were getting to a next segment about the car removal.

6                MS. FLORES:  Okay.

7                THE COURT:  So, members of the jury, I'm

8         going to give you an hour and a half for lunch.  Don't

9         discuss the case.  Don't form any opinions.  Follow all

10        the written rules.  Please be in the jury room ready to

11        go at 1:15.  Thank you.  And enjoy your lunch.

12               Please be back at 1:15, Officer.  Court is in

13        recess.

14            (Whereupon a luncheon recess was taken.)

15               THE COURT:  All right.  The jury has rejoined

16        us.  Officer Breen is on the stand.  And the last

17        segment that Ms. Flores was introducing was the use of

18        the Taser.

19               Go ahead, please.

20    Q    Okay.  Officer, you were the one who Tased

21    Mr. Beckwith during that arrest; is that correct?

22    A    Yes.

23    Q    And why was it necessary to Tase him?

24    A    Basically, I was fearful that he was grabbing a

25    weapon and that he was going to potentially use it against

TRIAL - BECKWITH

1    us.

2        Q    Did you ever find a weapon on him?

3        A    No, we did not.

4        Q    Okay.  Was he -- do you recall whether or not he

5    was actually asking the passenger to record the arrest?

6        A    I do not recall that.

7        Q    You don't recall him trying to pass a cell phone

8    to her in order to record the arrest?

9        A    No, I do not.

10       Q    Do you know whether or not the sandwich bag

11   that -- that you testified was removed from Mr. Beckwith's

12   underwear, do you recall whether or not that was tested for

13   DNA --

14       A    I do not.

15       Q    -- or latent prints?

16            MR. CENTRA:  Judge, I'd object.  Has

17       knowledge of that?

18            MS. FLORES:  I'm asking if he knows.

19            THE COURT:  You're asking if he knows whether

20       it was or was not?

21            MS. FLORES:  I'm asking --

22       Q    Well, do you know whether or not the baggie was

23   tested for latent prints?

24            THE COURT:  If you know.  If you don't know,

25       then say you don't know.

TRIAL - BECKWITH

1      A     I don't know.

2      Q     And how about for DNA?

3      A     I don't know.

4      Q     Did you at any point pat search Mr. Beckwith?

5      A     No.

6      Q     So -- so it's your testimony that it was Officer

7   Irvine who searched -- who searched -- pat searched

8   Mr. Beckwith?

9      A     Yes.

10      Q     So at no time did you actually put your hands on

11   his body after you Tased him?

12      A     No -- I'm sorry, no, that's -- that's incorrect.

13   I did.

14      Q     You did?

15      A     After I Tased him, we struggled with him on the

16   ground for a minute or two.

17      Q     What did -- I'm sorry, I didn't hear the last

18   part.

19      A     He resisted arrest for quite a while after I

20   deployed my Taser.

21      Q     Did you tell him he was under arrest?

22      A     Yes.

23      Q     When did you tell him he was under arrest?

24      A     While we were moving him from the vehicle before

25   we actually got him out of the vehicle.

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR002246

TRIAL - BECKWITH

1    Q    So did you tell him he was under arrest before or
2    after you Tased him?
3    A    Before.
4    Q    Did you tell him why he was under arrest?
5    A    No, not at that time.
6    Q    Okay.  So you said that he was struggling, you
7    Tased him, and eventually the struggle went to the ground;
8    is that correct?
9    A    Yes.
10   Q    Okay.
11   A    No, I'm -- yes.  Yes, that's accurate.  He -- we
12   were trying to remove him from the vehicle, and then I
13   deployed my Taser, and then we pulled him onto the ground
14   outside the vehicle.
15   Q    Okay.  So he was on the ground?
16   A    Yes.
17   Q    Were you on the ground as well?
18   A    Yes, I was.
19   Q    Okay.  So at one point did you make contact with
20   his person, his -- any parts of his body?
21   A    Oh, yes.  I was on top of him.  He was on top of
22   me at one point.
23   Q    Okay.
24   A    I mean, we were wrestling with him, for lack of
25   better words.

TRIAL - BECKWITH

1    Q    Okay.  So did -- did you and Officer Irvine

2  eventually force him to stand up?

3    A    Yes.  We brought him up off the ground.  But it

4  wasn't -- I believe I actually left at that point and I

5  secured the female passenger, Ms. Johnson.

6    Q    So after -- after he stood up, you left?

7    A    I'm sorry, while he was still on the ground I

8  walked over to the female and I handcuffed and pat searched

9  her.

10   Q    Wait.  You handcuffed her?

11   A    Yes.

12   Q    Okay.  And what was the reason you handcuffed her?

13   A    Basically, because Officer Irvine had indicated to

14  me that he believed that Mr. Beckwith was trying to hand

15  over drugs to the female occupant.

16   Q    So you at no time reached inside Mr. Beckwith's

17  waistband?

18   A    No.

19        THE COURT:  You mean yes?

20   A    Oh, yes.

21   Q    At no time -- okay.  Let me see if I can -- did

22  you reach into Mr. Beckwith's waistband that night?

23   A    No.

24   Q    Okay.  Now, after he was pulled -- after he was

25  pulled from the car and Tased, he was pat searched; right?

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR002248

                         TRIAL - BECKWITH

1      A    Yes.

2      Q    Was anything found when he was pat searched after

3   he was Tased?

4      A    Yes.  I believe that's when he recovered the

5   drugs.

6      Q    The drugs?

7      A    Or suspected drugs, I should say.

8      Q    Okay.  Was he pat searched at any time after that?

9      A    Yes.  I would assume that before we placed him in

10  our vehicle, we would pat search him again just to double

11  check, make sure he didn't have anything that we may have

12  missed.

13     Q    Did you find anything on him when you pat searched

14  him before you placed him in your vehicle?

15     A    I did not specifically pat search him, but I

16  don't --

17     Q    But do you know?

18     A    I guess I'm assuming that would have been done.

19     Q    Oh, but you don't know for a fact?

20     A    I did not place him in the vehicle.

21     Q    Okay.  So you don't know if Mr. Beckwith was

22  actually pat searched before being placed in the vehicle?

23     A    He was during the time of the initial search, but

24  I don't know if he was -- I would assume that he would be

25  checked at least one more time --

                         Ashley M. Knights
                         Court Reporter
                         315-671-2058                      SYR002249

TRIAL - BECKWITH

1    Q    Okay.

2    A    -- before he was placed in the back of the car.

3  But to be fair, I do not know --

4    Q    Okay.

5    A    -- specifically who did it or ...

6    Q    Were you -- so he -- was he placed in the rear,

7  the back of your -- your squad car?

8    A    Yes.

9    Q    And you eventually got -- you eventually went to

10  the front seat of your car; correct?

11    A    Yes.

12    Q    Is that where you tested the substances which you

13  said tested positive for marijuana and cocaine?

14    A    I actually did it right outside the vehicle.  I

15  had placed the drugs on the front seat and I had the door

16  open, and I tested them in front of Officer Irvine and in

17  front of Officer Tharrett and Officer Buske.

18    Q    So there were -- eventually two other officers

19  came to the scene?

20    A    That's correct.

21    Q    And you tested the drugs in front of Officer

22  Irvine and the other two officers?

23    A    Yes.

24    Q    Who were the two officers that came?  Officer --

25    A    I specifically remember Officer Buske was there

TRIAL - BECKWITH

1   because he was in field training at the time and I was

2   trying to show him how to conduct a field test.

3       Q    You don't remember who the other officer was?

4       A    Officer Tharrett was there at one point because

5   she assisted with the search of the female occupant.

6       Q    Okay.  Did you discuss this case with Officer

7   Irvine after my client was booked into the Justice Center?

8       A    Did I discuss the case with him?

9       Q    Yes.

10      A    I mean, yes, we lodged him together.

11      Q    You lodged him together at the Justice Center?

12      A    Yes.

13      Q    But subsequent to that, did you discuss the

14  details of this arrest with Officer Irvine?

15      A    Yes.

16      Q    How many times?

17      A    I mean, obviously, like, any time you have

18  something that's kind of like a -- I guess, like, high

19  intensity incident, you're going to have, like, a small

20  debriefing.  You're going to be, like, what could we have

21  done better, what could we have done worse, and, you know,

22  we go to our respective computers and type up our reports.

23      Q    Okay.  So debriefing, who would be present during

24  the debriefing?

25      A    I believe it would just be me and Officer Irvine,

TRIAL - BECKWITH

1  and I think Sergeant Mahar came to the scene as well to

2  interview Mr. Beckwith about the use of force involved.

3      Q    Do you recall whether or not you at any time --

4  did you ever ask Mr. Beckwith on that night whether or not

5  there were guns or drugs in the car?

6      A    I did not specifically ask him, I don't think so.

7      Q    You did not ask him that?

8      A    Specifically me, myself, I did not ask him that.

9           MS. FLORES:  May I have a moment, Judge?

10          THE COURT:  Sure.

11          MS. FLORES:  No further questions, your

12  Honor.

13          THE COURT:  Anything further, Mr. Centra?

14          MR. CENTRA:  No, your Honor.

15          THE COURT:  Okay.  Thank you.  You may

16  depart.

17          THE WITNESS:  Thank you.

18      (Whereupon the witness was excused.)

19          THE COURT:  Who would you like to call next?

20          MR. CENTRA:  Next witness is Patricia Dineen.

21      (Whereupon the witness entered the courtroom.)

22          THE COURT:  State your name and spell your

23  last name, please.

24          THE WITNESS:  Patricia Dineen, D-I-N-E-E-N.

25          P A T R I C I A  D I N E E N, called as a witness

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR002252

TRIAL - BECKWITH

1    and being duly sworn, testifies as follows:

2                   THE COURT:  Go ahead.

3                   DIRECT EXAMINATION BY MR. CENTRA:

4        Q    Good afternoon.

5        A    Good afternoon.

6        Q    Could you state what you do for a living?

7        A    I'm a court reporter up in the Onondaga County

8    District Attorney's Office.

9        Q    Is that here in this building?

10       A    Yes.

11       Q    And do you have to go through any sort of

12   schooling to become a -- a court reporter?

13       A    Yes.  I have a two-year associate's degree.

14       Q    And can you kind of go through what you go through

15   during your -- your two years of schooling?

16       A    It's two years of learning our court reporting

17   machine, and then we also have an internship where we go and

18   sit in on different court proceedings and shadow a senior

19   court reporter and do a transcription.

20       Q    And how long have you been a court reporter?

21       A    I graduated in 1994.

22       Q    And you've been working ever since?

23       A    I've been with the District Attorney's Office

24   since 1996.

25       Q    Now, I know you briefly just touched on this.  Can

                        Ashley M. Knights
                        Court Reporter
                        315-671-2058                    SYR002253

TRIAL - BECKWITH

1    you describe the equipment that you use when you transcribe

2    a proceeding, specifically before a grand jury?

3         A    Well, we use the grand jury -- I'm sorry, a court

4    reporting machine.  It's sort of a unique machine.  It's not

5    like a typewriter.  So we're trained on that.  We use that.

6    And then we also have an SD card that goes into that

7    machine.  And when we produce a transcript, that goes into

8    our computer and it will transcribe everything that it

9    recognizes.  And then we go through and fill in proper

10   nouns, punctuation, spellings, et cetera.

11        Q    So the machine that you're describing, I know you

12   just walked past the court reporter here today, is it a

13   machine that looks similar to the machine that she's using?

14        A    It's similar, yes.

15        Q    Is yours a little different?

16        A    A little bit.

17        Q    Now, you stated it -- it records it electronically

18   onto an SD card?

19        A    Yes.

20        Q    And does it also record it onto notes onto paper?

21        A    Yes.  I have paper notes, yes.

22        Q    Now, can you describe kind of what your personal

23   process is when you're transcribing a grand jury

24   presentation?

25        A    I attend grand jury proceedings upstairs in the

TRIAL - BECKWITH

1   DA's Office.  So any time a transcript is required, I do the

2   steps that I just mentioned where I take down the

3   proceeding, I put it into my computer, and transcribe the

4   proceeding and produce the transcript, if needed.

5       Q    And when you make a transcription, is there some

6   sort of certification that you -- you place with that?

7       A    Yes.  On the last page we certify to it.

8       Q    Ms. Dineen, I'm going to draw your attention to

9   September 9th of 2016.  Do you recall this date?

10      A    Yes.

11      Q    And were you working as a court reporter on that

12  date?

13      A    Yes.

14      Q    With the District Attorney's Office?

15      A    Yes.

16      Q    Now, did you transcribe a grand jury presentation

17  pertaining to a drug possession charges against Davonne

18  Beckwith?

19      A    Yes.

20      Q    And did Davonne Beckwith, in fact, testify during

21  that grand jury presentation?

22      A    He did.

23      Q    And if you recall, do you see Davonne Beckwith

24  here in court today?

25      A    Yes.

TRIAL - BECKWITH

1    Q    Could you point to him and describe an article of

2    clothing that he's wearing?

3    A    The gentleman in the purple shirt.

4         MR. CENTRA:  Let the record reflect the

5    witness has identified the defendant.

6         THE COURT:  Yes.

7    Q    Now, before Mr. Beckwith testified before the

8    grand jury, did he take an oath swearing to tell the truth?

9    A    Yes.

10    Q    Similar to the oath that you took before you sat

11    down here today?

12    A    Correct.

13    Q    And who was that oath administered by?

14    A    By the foreperson of the grand jury.

15    Q    And at some point did you prepare a transcription

16    of that grand jury presentation?

17    A    Yes.

18    Q    Did that include Davonne Beckwith's testimony from

19    that day?

20    A    It did.

21    Q    I'm going to show you what's been marked as

22    People's Exhibit 4.  I'm going to ask you to take a look at

23    Exhibit 4 and ask you do you recognize that exhibit?

24    A    Yes, I do.

25    Q    And what is that?

TRIAL - BECKWITH

1      A    That is the transcript that I prepared from grand
2   jury for that date.
3      Q    Is that Davonne Beckwith's testimony from that
4   date?
5      A    It is.
6      Q    And is that a fair and accurate copy of the
7   transcription that you prepared?
8      A    Yes.
9           MR. CENTRA:  I move to enter Exhibit 4 into
10      evidence.
11           MS. FLORES:  May I see it, please?
12           May I voir dire, Judge?
13           THE COURT:  Go ahead.
14      VOIR DIRE EXAMINATION BY MS. FLORES:
15      Q    Exhibit 4, was this part -- was this part of the
16   transcription of the rest of the proceedings?
17      A    That was part of it, yes.  There were other
18   witnesses.
19      Q    And -- and you -- and when you prepare a
20   transcript, you usually prepare a certification for the --
21   at the end of the transcript; correct?
22      A    Yes.
23      Q    Okay.  And do you see a certification at the back
24   of that one?
25      A    No, there's not.

TRIAL - BECKWITH

1    Q    But your testimony is that is a fair and accurate

2    representation of the transcript you prepared in conjunction

3    with Mr. Beckwith's grand jury testimony?

4    A    For his portion of it, yes.

5    Q    His portion of it; correct?

6    A    Yes.

7         MS. FLORES:  Okay.  I have no objection.

8         THE COURT:  Exhibit 4 is received.

9         (Whereupon People's Exhibit No. 4 was received

10        into evidence.)

11        CONTINUED DIRECT EXAMINATION BY MR. CENTRA:

12    Q    Now, Ms. Dineen, I'm going to ask you to take a

13    look at Exhibit 4, and I'm going to ask you to turn to

14    page 42 of Davonne Beckwith's testimony.  And I'd ask you to

15    read line 9 and 10 of his sworn testimony.

16    A    "He went in my rectum, slid his hand in my pants

17    and rectum to see if I have anything.  He stood me up."

18    Q    And I'm now going to ask you to go down to line 16

19    of that same page and ask you to read Davonne Beckwith's

20    sworn testimony starting with "After he just did."

21    A    "After he just did three searches on me, did a

22    cavity search and everything, he didn't find nothing."

23    Q    And I'm now going to ask you to turn to page 53 of

24    Exhibit 4, and I'm going to ask you to read line 15 of

25    Davonne Beckwith's sworn testimony.

TRIAL - BECKWITH

1    A    "I never possessed these drugs, sir."

2    Q    And finally, I'm going to ask you to turn to

3    page 54.  I'm going to ask you to read lines 9 and 10 of

4    Davonne Beckwith's testimony starting with "I don't know."

5    A    "I don't know the reason for him planting that on

6    me at all, sir."

7    Q    Now, during that grand jury presentation, did

8    Officer Terrell Irvine testify, if you recall?

9    A    Yes, he did.

10    Q    And was his recitation of the search of Davonne

11    Beckwith consistent with the testimony that Davonne Beckwith

12    gave before the grand jury on that date?

13    A    No, it was not.

14    Q    Now, did Officer Jacob Breen also testify during

15    the grand jury on this date?

16    A    Yes, he did.

17    Q    And was his recitation of the search of Davonne

18    Beckwith consistent with Davonne Beckwith's testimony?

19    A    No, it was not.

20        MR. CENTRA:  I have no further questions.

21    Thank you, Ms. Dineen.

22        THE COURT:  Okay.  Can you just remind me of

23    the last excerpt, the page and line number you asked

24    her to read from.

25        MR. CENTRA:  The last excerpt was page 54,

TRIAL - BECKWITH

1        lines 9 and 10.

2                    THE COURT:  Okay.  Thank you.  I'm sorry, did

3        you say that you had -- had no further questions?

4                    MR. CENTRA:  Yes, Judge.

5                    THE COURT:  Okay.  All right.  Ms. Flores?

6            CROSS-EXAMINATION BY MS. FLORES:

7        Q     Ms. Dineen, when you testified that Mr. Beckwith's

8        grand jury testimony was -- you testified that

9        Mr. Beckwith's grand jury testimony was not consistent with

10       the grand jury testimonies of Officers Irvine and Breen; is

11       that correct?

12       A     That's correct.

13       Q     So you recalled that from reviewing the transcript

14       or just from what you remember?

15       A     From what I remember.

16       Q     Okay.  But are you vouching for the credibility of

17       either -- any of these witnesses?

18       A     I can only go with what I heard in grand jury.

19                    MS. FLORES:  Okay.  I have no --

20       A     I don't know any of them personally.

21                    MS. FLORES:  Okay.  I have no further

22       questions.

23                    THE COURT:  Okay.  If nothing further, thank

24       you.  You may depart.

25                    THE WITNESS:  Thank you.

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR002260

TRIAL - BECKWITH

1      (Whereupon the witness was excused.)

2      THE COURT:  Who would you like to call next?

3      MR. CENTRA:  Judge, I have John Witzigman.  I

4  believe him as well as David Tate are -- are on their

5  way.  I'm not sure if he's here yet.

6      THE COURT:  Okay.  Members of the jury, go

7  down to your jury room.  Don't discuss the case.

8  Follow all the written rules.  And we'll call you when

9  the witnesses arrive, which should hopefully be

10  shortly.  Thank you.

11     (Whereupon a brief recess was taken.)

12      THE COURT:  The jury has joined us.

13      Who would you like to call next?

14      MR. CENTRA:  The next witness is John

15  Witzigman.

16      THE COURT:  Okay.

17     (Whereupon the witness entered the courtroom.)

18      THE COURT:  Okay.  Spell your -- state your

19  name.

20      THE WITNESS:  It is John Witzigman.

21      THE COURT:  And how do you spell your last

22  name?

23      THE WITNESS:  It's spelled W-I-T-Z-I-G-M-A-N.

24      THE COURT:  The Z is silent?  How do you

25  pronounce it again?

Ashley M. Knights
Court Reporter
315-671-2058                    SYR002261

TRIAL - BECKWITH

1          THE WITNESS:  "WIT-ZIG-MAN."

2          THE COURT:  Oh, "WIT-ZIG-MAN."

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.

5      J O H N    W I T Z I G M A N, called as a witness

6   and being duly sworn, testifies as follows:

7          THE COURT:  Go ahead.

8      DIRECT EXAMINATION BY MR. CENTRA:

9   Q    Good afternoon.

10  A    Hello.

11  Q    Could you state where you're employed.

12  A    I work at the Onondaga County Center for Forensic

13  Sciences.

14  Q    And is this an accredited facility?

15  A    Yes, it is.

16  Q    And can you explain how a lab becomes accredited?

17  A    A lab becomes accredited based on an evaluation

18  from an accreditation body where they put together a set of

19  standards that a lab must meet.  And as long as the lab

20  meets that minimum set of standards, they then are at that

21  point deemed accredited.

22  Q    And what is your occupation at the lab?

23  A    I'm a forensic chemist.

24  Q    And how long you been employed in this capacity?

25  A    I've been a forensic chemist for a little over

268

TRIAL - BECKWITH

1    four years, and I've also been in another position at the

2    lab for a total of about six and a half years now.

3        Q    And could you just describe what your general

4    duties and responsibilities are in your position?

5        A    I analyze submitted evidence for the presence of

6    controlled substances and drugs.

7        Q    And what types of schooling and training have you

8    received for your position?

9        A    I have a bachelor's degree in biomedical sciences

10   from the Rochester Institute of Technology, and I went

11   through an extensive training program for approximately ten

12   months at the lab prior to completing any casework.

13       Q    And do you read any sort of scientific literature

14   to keep yourself up to date in your field?

15       A    Yes.  We routinely read different documents that

16   come out.  Most of them deal with new substances that are

17   coming out, things that we should be keeping an eye out for.

18       Q    And could you describe -- describe what your

19   day-to-day duties are at the lab.

20       A    My day-to-day duties can vary a little bit, but it

21   generally consists of prepping evidence for analysis with

22   instrumentation, analyzing the data that is produced by that

23   instrumentation, and reviewing other analysts' work.

24       Q    Now have you had the occasion to chemically

25   analyze substances to determine whether the substance is or

Ashley M. Knights
Court Reporter
315-671-2058

TRIAL - BECKWITH

1    contains a controlled substance?

2        A    Yes, I have.

3        Q    Approximately how many times?

4        A    At this point it'd be into the thousands.

5        Q    Have you had the occasion to chemically analyze

6    substances to determine whether the substance is or contains

7    cocaine?

8        A    Yes, I have.

9        Q    And how -- approximately how many times, if you

10   can --

11       A    Again into the thousands.  I'm not sure about an

12   exact number.

13       Q    And have you had the occasion to chemically

14   analyze substances to determine whether the substance is or

15   contains heroin?

16       A    Yes.

17       Q    And how many times, approximately?

18       A    Again into the thousands.

19       Q    And do you make analyses as part of your regular

20   duties at the lab?

21       A    Yes, I do.

22       Q    And have you had the occasion to testify in courts

23   in New York -- testify in courts of New York in this area

24   before?

25       A    Yes, I have.

TRIAL - BECKWITH

1    Q    And approximately how many times was that?

2    A    I believe that's about a half a dozen times.

3    Q    Now, did you become involved in a case involving

4    an individual named Davonne Beckwith?

5    A    Yes, I did.

6    Q    And what was your assignment in regards to that

7    case?

8    A    My assignment was to analyze two pieces of

9    evidence that were submitted as unknown substances and

10   analyze those for the presence of controlled substances.

11   Q    Now, Mr. Witzigman, I'm going to show you what's

12   been marked as People's Exhibit 1.

13   A    Okay.

14   Q    Take a look at Exhibit 1 for me and tell me, do

15   you -- do you recognize that?

16   A    Yes, I do.

17   Q    And how do you recognize that exhibit?

18   A    The exhibit has been marked with a unique

19   laboratory case number that was assigned by the lab that I

20   work for.  I also recognize where I have marked the evidence

21   with my initials and the date of when I marked that.

22   Q    And do you recall when you marked this item?

23   A    Yes.  It was marked on January 24th, 2017.

24   Q    And when did you first become -- when did you

25   first come into possession of Exhibit 1?

TRIAL - BECKWITH

1    A    I received the evidence on that same date,
2  January 24th, 2017.

3    Q    And where did you get this -- this bag from?

4    A    I received it from the evidence intake area at the
5  lab.

6    Q    Is this a secure area?

7    A    Yes, it is.

8    Q    And who has access to this area?

9    A    The individuals that work in that area.  There are
10 two evidence technicians that work in there as well as their
11 supervisors.  It's a total of maybe five to seven people.

12   Q    Now, is Exhibit 1 in substantially the same
13 condition now as when you last saw it?

14   A    It appears there has been some additional analysis
15 completed on a portion of it, but for the most part, yes.

16   Q    Now, can you explain what you did with Exhibit 1
17 after you first received the item from the evidence intake
18 area?

19   A    The first thing I did after receiving it and
20 returning to my work area in the lab was I obtained a weight
21 of the material inside of the packaging.

22   Q    And between the time that you took Exhibit 1 from
23 the secure evidence intake area to -- did you bring it back
24 to your work space?

25   A    Yes, I did.

TRIAL - BECKWITH

1    Q    Anybody else have custody of that at all?

2    A    No, they did not.

3    Q    So you initially weighed the -- the substance

4    contained in -- in that exhibit; correct?

5    A    Correct.

6    Q    So after you weighed that substance, did you do

7    further testing?

8    A    Yes, I did.

9    Q    And what did you do?

10   A    The first thing I did was I performed two

11   different color tests on the evidence.  The first color test

12   is known as a Marquis test.  That is a test that is done for

13   general unknowns.  That resulted in no color change on the

14   color test, which would be a negative result.  At which

15   point I performed a Scott test, which is a color test that

16   is specific to cocaine.  There are three steps in that color

17   test, and you must have a correct color change at each step

18   of that process in order to have a positive result.  Again,

19   that result was negative.

20   Q    So after receiving the negative results on the

21   initial testing, did you do any further testing of the

22   substance?

23   A    Yes, I did.

24   Q    And could you describe the further testing that

25   you performed.

TRIAL - BECKWITH

1      A    The final test that I did was using a gas

2    chromatograph mass spectrometer.  That is two sets of -- two

3    pieces of instrumentation.  The gas chromatograph

4    essentially separates out the components that are within a

5    substance, and the mass spectrometer produces a set of data

6    that allows me to analyze that data and compare it to known

7    libraries and standards to make an identification of what

8    may be in that sample.  I did that by taking a small amount

9    of the material that was inside of this packaging, placing

10   it into a vial, and then injecting it on that

11   instrumentation.

12      Q    And was that the end of your testing of this

13   substance?

14      A    Yes, it was.

15      Q    And were you able to determine what the substance

16   actually was?

17      A    I did not have a confirmation on what this

18   substance was.  There was an indication that it did contain

19   quinine.

20      Q    And if you could -- I don't know if you can, but

21   could you describe what quinine is?

22      A    From my professional viewpoint, quinine is a

23   substance that I typically see as a cutting agent mixed with

24   drugs, mixed with controlled substances.  A "cutting agent"

25   refers to something that would be used to dilute a

TRIAL - BECKWITH

1    controlled substance.

2        Q    Mr. Witzigman, I'm going to show you what's been

3    marked as Exhibit 2.  Have you take a look at Exhibit 2 and

4    ask you, do you recognize that exhibit?

5        A    Yes, I do.

6        Q    And how do you recognize that exhibit?

7        A    This item, again, has a unique laboratory case

8    number and item number as the first exhibit did.  And again,

9    my initials and the date that I marked it are on the back.

10       Q    And when did you mark this item?

11       A    On January 24th, 2017.

12       Q    And when did you first come in possession of this

13   item?

14       A    On the same day, January 24th, 2017.

15       Q    And did you get that from the same secure area

16   that you previously testified to?

17       A    Yes, I did.

18       Q    And after you received it from that area, what did

19   you do next with Exhibit 2?

20       A    The first thing I did is I returned to my work

21   area in the lab and I obtained a weight of the material that

22   was inside of the packaging.

23       Q    And after you did the weight, what did you do next

24   in regards to the testing of this item?

25       A    The next thing I did was I performed the same two

TRIAL - BECKWITH

1    color tests on the material as I did with the first exhibit.

2    So again, I did a Marquis test.  In this case, the Marquis

3    test produced a deep red color for a result.  That is

4    consistent with aspirin.  I also did a Scott test on this,

5    which, again, is specific to cocaine.  In that instance it

6    was a negative result.

7         Q    Did you do any further testing of the substance?

8         A    I did do further testing.  I did a confirmation

9    test in the same fashion as the first exhibit.  The analysis

10   that was performed from that indicated a presence of aspirin

11   and caffeine, at which point I then did an extraction to

12   remove the aspirin from the sample.  Aspirin is an acidic

13   compound.  The acidic compound can have some interfering

14   portions with our instrumentation, so I removed that to

15   ensure that there were no substances that were hidden by the

16   aspirin.

17        Q    And was that the end of your testing of that

18   exhibit?

19        A    That was.

20        Q    And in your experience at the lab have you seen

21   aspirin and caffeine during the course of your testing

22   before?

23        A    Yes, I have.

24        Q    And if you can, describe when you normally see

25   these substances during your testing.

TRIAL - BECKWITH

1    A    I usually see them as cutting agents within a

2  sample.

3    Q    Now, the substances that you found -- that you

4  tested in Exhibits 1 and 2, are they in the same condition

5  now as they were when you first pulled them from the secured

6  area?

7    A    They are in a different condition from when I

8  pulled them from the secure area.

9    Q    Did you place them in -- in different bags?

10    A    I did.  When I repackaged this evidence, I

11  packaged the material that was inside of the packaging.  And

12  in this case when I'm using the term "packaging," I'm

13  referring to what was inside of the evidence bag that was

14  holding the material.  So I separated the packaging from

15  what was inside of it and repackaged those two things

16  separately from each other.

17    Q    And you previously stated that it looks like more

18  further testing was done on those substances after you?

19    A    It appears that further testing was done to the

20  packaging material.

21          MR. CENTRA:  I have no further questions.

22    Thank you.

23          THE WITNESS:  Okay.

24          THE COURT:  Okay.  Ms. Flores?

25

Ashley M. Knights
Court Reporter
315-671-2058                SYR002271

TRIAL - BECKWITH

1          CROSS-EXAMINATION BY MS. FLORES:

2     Q    Good afternoon.

3     A    Good afternoon.

4     Q    Do you still have the two exhibits up there?

5     A    I do, yes.

6          MS. FLORES:  Okay.  May I approach, Judge?

7          THE COURT:  Yeah.

8          MS. FLORES:  I might need to use my -- see if

9     I need -- I don't think I need to use my stool.

10         THE COURT:  You can go on the side if you

11    want.

12         MS. FLORES:  Okay.

13    Q    I'm showing you what has been marked as Exhibit 1.

14    A    Okay.

15    Q    Now, is it your testimony that you weighed -- did

16    you weigh what appears to be rice?

17    A    I did not.

18    Q    Okay.

19    A    The weight would have been just of the powder

20    material that was removed from the packaging.

21    Q    Okay.  Would that be this material (indicating)?

22    A    Yes.  That is the powder material that I've

23    repackaged.  It's inside of a piece of weighing paper that's

24    been folded and taped shut.

25    Q    Piece of what paper?

Ashley M. Knights
Court Reporter
315-671-2058                                    <span style="color:red">SYR002272</span>

TRIAL - BECKWITH

1    A    Weighing paper.

2    Q    Okay.  So you -- you placed the material inside

3  the weighing paper.  Was this what you did?

4    A    Yes, I did.

5    Q    And then you taped it shut?

6    A    Yes, I did.

7    Q    And then you placed it in one of these bags?

8    A    Yes.

9    Q    And this is the bag that you placed it in; is that

10  correct?

11    A    Correct, yep.

12    Q    Did you place this item, this charcoal plastic

13  piece of -- well, this item in this -- this evidence -- this

14  bag, this clear baggie?

15    A    I did place that in there.  When I placed it in

16  there, it was in a different condition than it is now

17  because, as I previously said, it appears to have further

18  testing done to it.

19    Q    So do you recall what condition it was in when you

20  placed this piece of plastic in this clear baggie?

21    A    It was a clear piece of plastic at that point in

22  time.

23    Q    So it did not have this charcoal color to it; is

24  that correct?

25    A    That's correct.

TRIAL - BECKWITH

1    Q    Okay.  So what about this?  Again, it's another
2    piece of charcoal plastic, colored plastic?
3    A    At the time that also was a clear plastic bag or
4    clear piece of plastic, and it appears to have further
5    evidence -- further analysis done to it.
6    Q    Okay.  So you -- you -- did you put the piece
7    of -- this piece of plastic in this bag when it was clear?
8    A    Yes, I did.
9    Q    Okay.  So you -- do you know who put this piece of
10   plastic in this bag after further testing was done?
11   A    Yes.  That would be the individual that performed
12   the latent print analysis.
13   Q    Okay.  Let's go back to the other clear bag with
14   the charcoal plastic piece.
15   A    Okay.
16   Q    Is that the same -- the -- is your testimony the
17   same as far as you placing this plastic -- piece of plastic
18   in the small evidence bag when it was clear?
19   A    That's correct.
20   Q    Okay.  And but you were not the one who placed
21   this baggie or this charcoal piece -- this baggie after it
22   was tested, you were not the one who placed it back in this
23   bag; correct?
24   A    Correct.
25   Q    Okay.  Do you recall how much -- I'll take this

Ashley M. Knights
Court Reporter
315-671-2058                    SYR002274

TRIAL - BECKWITH

1    back out.  Do you recall how much this weighed?

2                THE COURT:  Now, this you're taking from

3        which exhibit?

4                MS. FLORES:  I'm still on Exhibit 1.

5    Q    And I'm showing you --

6                THE COURT:  That's the folded powder?

7                MS. FLORES:  The folded, yes.

8    Q    The weigh -- the substance in this weighing paper

9    that's inside a smaller baggie with a red line across --

10   A    Yep.

11   Q    -- did you weigh this?

12   A    I weighed the powder material that's inside of

13   that paper, yes.

14   Q    Do you call -- recall what the weight was?

15   A    There was 4.761 grams.

16   Q    4.761 grams?

17   A    Correct.

18   Q    Okay.  Do you know whether or not all 4.761 grams

19   are in here?

20   A    All 4.761 minus the small portion that was used in

21   analysis.

22   Q    In your analysis?

23   A    Correct.

24   Q    Okay.  Okay.  I'm showing you now what has been

25   marked as Exhibit 2.

TRIAL - BECKWITH

1    A    Okay.

2    Q    And from Exhibit 2 I'm showing you a very small

3    baggie, Ziploc baggie with a red line on top.

4    A    Yep.

5    Q    Okay.  Is -- did -- did you place this charcoal --

6    this piece of charcoal plastic in this little baggie?

7    A    I did not place it into the baggie in the

8    condition it's in now.  It was a piece of clear plastic when

9    I placed it in there.

10    Q    Okay.  And so like the other -- your testimony

11    with regard to the other char -- pieces of charcoal plastic,

12    it wasn't -- it wasn't you who placed -- subsequently placed

13    this baggie -- this piece of plastic after it was -- it

14    turned a charcoal color in this bag; is that correct?

15    A    That's correct.

16    Q    Okay.  And again, on -- with regard to Exhibit 2,

17    I'm showing you the clear baggie with the line on top?

18    A    Yep.

19    Q    Okay.  And is that weighing paper in there?

20    A    That is a piece of folded weighing paper, and that

21    contains the material that was removed from the piece of

22    plastic.

23    Q    Do you recall the -- the weight of this material?

24    A    Yes.  That was 1.046 grams.

25    Q    And again, is the entire 1.4 -- 1.046 grams in --

TRIAL - BECKWITH

1   in this weighing paper?

2       A    Yes.  Minus the small amount that was used in

3   analysis.

4       Q    And finally, the final item inside Exhibit 2, do

5   you recognize this clear bag?

6       A    I do, yes.

7       Q    And it -- the -- does it appear to have anything

8   inside there?

9       A    No, it does not.

10      Q    Okay.  I'm showing you what has been marked as

11  Exhibit A.

12              MS. FLORES:  Is it, Judge, Exhibit A or 5?

13              THE COURT:  Five.

14              MS. FLORES:  Oh, Exhibit 5.

15          (Whereupon Defendant's Exhibit No. 5 was marked

16          for identification.)

17      A    Okay.

18      Q    Do you recognize what has been marked as

19  Exhibit 5?

20      A    Yes, I do.

21      Q    What -- what is that?

22      A    That is a report that I generated based on the

23  results of the analysis of this evidence.

24      Q    That's your signature at the bottom?

25      A    Yes.  That's an electronic signature of mine.

TRIAL - BECKWITH

1    Q    Okay.  And you reported the results of the two

2    tests on the -- the substances?

3    A    That's correct.

4    Q    And -- and what was the -- what was the re -- what

5    did you note on this report, which is Exhibit 5, with regard

6    to Exhibit 1?  What was the result of that test?  Did you

7    need to refresh your recollection?

8    A    Nope.  I just wanted to confirm the item is all.

9    Q    Okay.

10   A    The results of Exhibit 1 were that no

11   controlled -- excuse me, no controlled substances were

12   identified.

13   Q    What about in Exhibit 2?

14   A    The same result, no controlled substances were

15   identified in Exhibit 2.

16                MS. FLORES:  No further questions.

17                THE COURT:  Okay.  Anything further,

18        Mr. Centra?

19                MR. CENTRA:  No, your Honor.

20                THE COURT:  All right.  Thank you.  You may

21        depart.

22            (Whereupon the witness was excused.)

23                THE COURT:  Who would you like to call next?

24                MR. CENTRA:  The People call David Tate.

25                THE COURT:  David Tate.

TRIAL - BECKWITH

1          (Whereupon the witness entered the courtroom.)

2                    THE COURT:  You are David Tate?

3                    THE WITNESS:  Yes.

4                    THE COURT:  T-A-T-E?

5                    THE WITNESS:  Correct.

6          D A V I D  T A T E, called as a witness and being

7     duly sworn, testifies as follows:

8                    THE COURT:  Go ahead, please.

9                    <u>DIRECT EXAMINATION BY MR. CENTRA</u>:

10     Q     Good afternoon.

11     A     Good afternoon.

12     Q     Could you state where you're employed.

13     A     I'm employed at the Onondaga County Center for

14     Forensic Sciences here in Syracuse.

15     Q     And what is your position there?

16     A     My title is latent print examiner.

17     Q     And how long have you worked at the lab?

18     A     Ten years.

19     Q     And could you describe what your general duties

20     and responsibilities are in your position right now?

21     A     Yes.  As a latent print examiner my duties include

22     examining physical evidence to try to develop friction ridge

23     detail.  So that's fingerprints, palm prints that you can

24     leave behind when you touch an item.  We call it "latent"

25     because it's not always visible with the naked eye.  So

Ashley M. Knights
Court Reporter
315-671-2058                          <span style="color:red">SYR002279</span>

TRIAL - BECKWITH

1    primarily, my job is to try to recover latent print from an

2    item, perform analysis and comparison when necessary,

3    testify, prepare laboratory reagents, do technical review of

4    my peers' casework, and so on.

5        Q    And how long you been employed in latent print

6    work?

7        A    Ten years.

8        Q    And could you describe what your educational

9    background is?

10       A    I have a bachelor of science in biology from the

11   university at Albany.  I also have a master of science in

12   forensic science from the University of New Haven.

13       Q    And can you describe the specialized education

14   that you received or the training you received to become a

15   fingerprint examiner?

16       A    Prior to being a latent print examiner here in

17   Syracuse, I completed an internship with the Hartford,

18   Connecticut Police Department's Identification Unit.  I also

19   completed an internship at the center prior to being hired.

20   Since being hired, I underwent approximately 18 months of

21   formal training in the development analysis comparison of

22   latent prints, and I have since attended and completed

23   numerous workshops including, but not limited to, distortion

24   of latent print palm fingerprint techniques, ethics, and

25   forensic science.  I've also attended conferences and

TRIAL - BECKWITH

1  presented.

2      Q    Now, have you had the occasion to identify persons

3  by comparing latent prints with their own prints?

4      A    Yes.

5      Q    Approximately how many times?

6      A    Hundreds.

7      Q    And have you had the occasion to testify in court

8  regarding identification of persons based on their prints?

9      A    Yes, I have.

10     Q    Approximately how many times?

11     A    I've testified over 40 times.

12     Q    And could you describe to us what a latent print

13  is?

14     A    On the palm side of your hand as well as the soles

15  of your feet is corrugated skin that's called

16  "prediction-rich skin."  If you think about it like

17  mountains and valleys, in a way, this corrugated skin

18  contains thousands of sweat pores that secrete water, salts,

19  waste products, and other components, amino acids.

20  Additionally, throughout the day if you touch part of your

21  body that has oils on it such as your forehead or your hair

22  or if you touch anything that might transfer to your skin

23  such as cosmetics or oils from food or motor oil or paint or

24  just about anything, it could be transferred to your skin.

25  And a lot like a rubber stamp will pick up ink and transfer

TRIAL - BECKWITH

1   an image to a piece of paper when pressed down, so too do

2   the rings of your fingers and hands have the ability to

3   transfer a reproduction of its image to an object when it's

4   touched.  But like I said before, it's called "latent"

5   because it's not always able to be seen with the naked eye

6   and may require some processing or enhancement in order to

7   be seen.

8        Q    Now, are you able to say what kind of surfaces a

9   person can leave fingerprints on?

10       A    I could give you an idea of which surfaces might

11  be better or worse than others.

12       Q    Could you do that, please.

13       A    Sure.  Some surfaces that would be considered more

14  likely to retain a fingerprint or a latent print if you

15  touch it would be a smooth, nonporus or a smooth, hard

16  surface such as glass, if you think about it that way.

17  Additionally, paper can be an excellent surface for

18  receiving latent prints.  Surfaces that would not be good

19  would be rougher surfaces or surfaces that have a lot of

20  dirt or grit or powder on them.  So imagine a stone or a

21  brick, something like that.  That would be not ideal.  And

22  then there's a lot of objects that are somewhere in between

23  those two extremes.

24       Q    And are you able to describe some of the objects

25  that are kind of in between?

TRIAL - BECKWITH

1    A    Certainly.  So for instance, a gun would be a

2  great example.  Many times a gun contains both smooth,

3  polished surfaces as well as textured or grit surfaces.  And

4  those textured surfaces would be a lot less likely to retain

5  an impression if you touch it, whereas the polished, smooth

6  surface would be more likely to retain something.

7    Q    Mr. Tate, I'm going to show you what's been marked

8  as People's Exhibit 1.  I'm going to ask you to take a look

9  at that exhibit and ask you, do you recognize Exhibit 1?

10    A    Yes, I do.

11    Q    And how do you recognize that exhibit?

12    A    This exhibit has our unique laboratory

13  identification case number on it as well as my own initials

14  and markings on it.

15    Q    And do you know when you marked that exhibit?

16    A    I received and opened the item on March 2nd of

17  this year and sealed it up on March 3rd.

18    Q    And where did you initially get that item from?

19    A    This item was obtained from our evidence intake

20  section of the laboratory, which is a controlled, limited

21  access section of the laboratory that houses all the

22  evidence that outside agencies bring in for analysis.

23    Q    To your knowledge, was there previous testing done

24  on this exhibit before you had received it?

25    A    It is my understanding that the drug evidence

TRIAL - BECKWITH

1    section of our laboratory performed analysis on the contents

2    prior to my receiving it.

3         Q    And is that exhibit in substantially the same

4    condition now as is the last time you saw it?

5         A    Yes.  With the exception of it is open.

6         Q    Now, after you received Exhibit 1 from the

7    evidence intake area, what did you first do with it?

8         A    An item such as this which is a plastic bag corner

9    and a plastic bag would first undergo a visual examination

10   with the lighting that you might have, fluorescent lighting

11   or intense light source such as a high power LED light, in

12   order to potentially see ridge detail that might be able to

13   be seen with just that light.  The next would be the use of

14   a high powered light source where we can control variable

15   wavelengths.  Some products of someone's sweat residue or

16   contaminants may fluoresce or luminesce under a different

17   wavelength.  Next would be the fuming of liquid superglue

18   heating up.  Liquid superglue gives off vapors, and those

19   vapors have the ability to deposit on latent print residue.

20   If it's on an item, following that would be the application

21   of two different dye stains, liquid dye stains that can

22   adhere to the fumed superglued print and under a certain

23   wavelength will fluoresce.  Lastly would be the application

24   of a fine black powder, in this case black magnetic powder

25   similar to what you might see on a TV crime show where

TRIAL - BECKWITH

1    they're applying powder with a brush.

2        Q    Now I'm going to have to have you take a look at

3    the contents of Exhibit 1.  This is a bag labeled "inner

4    bag," and there is a charcoal looking piece of plastic in

5    that bag.  Is that the same condition that piece of plastic

6    was in when you first got that from the evidence intake

7    area?

8        A    No.  The item in question has residual black

9    powder from my processing method left on it.

10        Q    Was it a different color before you had put the

11    powder on it?

12        A    Yes, it was.

13        Q    I'm now going to show you another bag that was

14    contained within Exhibit 1 labeled "outer bag."  Can you

15    take a look at that.  And is that in the same condition as

16    when you first initially received Exhibit 1 from the

17    evidence intake area?

18        A    No.  This item too also contains residual black

19    powder on it.

20        Q    Were these clear bags before you had put the

21    powder on them?

22        A    Yes.

23        Q    Now, after your analysis of the -- the bags in

24    Exhibit 1, were you able to locate any prints on those

25    items?

TRIAL - BECKWITH

1      A     No.  No latent prints were recovered from that

2   item.

3      Q     Now, you stated there are some surfaces that

4   are -- some surfaces that are more, I guess, receptive to

5   prints and some that are not.  How would you describe the

6   plastic bags on Exhibit 1?

7      A     Plastic bags in general can be good or they can be

8   bad depending on the condition of the bag.  If it's been

9   handled and creased or wrinkled, it's going to be a little

10  bit less likely to retain ridge detail on it versus if it

11  was brand-new out of a box.  If it has any residual

12  contents -- whether it's liquid or powder or anything of

13  that nature -- on the surface of it, that too would be

14  something that would hinder the development of someone's

15  latent prints.

16              MR. CENTRA:  I would move to enter Exhibit 1

17      into evidence.

18              THE COURT:  Okay.  Any further objections?

19              MS. FLORES:  May I voir dire?

20              THE COURT:  Him?

21              MS. FLORES:  Yes.

22              THE COURT:  Sure.

23      VOIR DIRE EXAMINATION BY MS. FLORES:

24      Q     After you did your analysis of the substance in --

25   in Exhibit 1, did you put those items that are now in

Ashley M. Knights
Court Reporter
315-671-2058                        SYR002286

TRIAL - BECKWITH

1    Exhibit 1 -- were you the one who put them in the bag that's

2    all of Exhibit 1?

3                    MS. FLORES:  Okay.  May I approach?

4                    THE COURT:  Yep.

5                    MS. FLORES:  Be easier to do this.

6        Q     After you performed your analysis, did you put all

7    of these items in Exhibit 1 back in this larger bag?

8        A     To be clear, the only thing I analyzed were the

9    plastic bags, themselves, but there's additional -- a powder

10   substance within this overall packaging that I did not

11   perform any analysis on.  That would have been something

12   that a different section would have done.  But yes, I

13   repackaged it into the outside bag that has a laboratory

14   label on it.

15       Q     So you took this entire bag from your secure area;

16   correct?

17       A     Correct.

18       Q     And out -- and you -- out of this outer bag you

19   took only the bag that contained the char -- the what is now

20   a charcoal-colored plastic?

21       A     That's correct.

22       Q     And then after your analysis, you put it back in

23   this bag?

24       A     Yes.

25       Q     Like I'm trying to do.  Oops.

TRIAL - BECKWITH

1          MS. FLORES:  I have no objections to

2     Exhibit 1 being entered into evidence.

3          THE COURT:  Exhibit 1 is received.

4          (Whereupon People's Exhibit No. 1 was received

5          into evidence.)

6          MS. FLORES:  That's just Exhibit 1; right?

7          MR. CENTRA:  Yes.

8          MS. FLORES:  Okay.

9          CONTINUED DIRECT EXAMINATION BY MR. CENTRA:

10     Q    I'm now going to show you what's been marked as

11     People's Exhibit 2.  I'm going to ask you if you recognize

12     this exhibit.

13     A    Yes, I do.

14     Q    And how do you recognize Exhibit 2?

15     A    This exhibit has the same laboratory case number

16     as well as my own initials and markings on the packaging.

17     Q    And when did you first come into possession of

18     Exhibit 2?

19     A    I received and opened this item on March 2nd of

20     this year.

21     Q    And did you analyze this exhibit just as you had

22     Exhibit Number 1?

23     A    Yes, that's correct.

24     Q    And is this exhibit in substantially the same

25     condition now as the last time you saw it?

TRIAL - BECKWITH

1    A    Yes, it is.

2    Q    Now, did you receive this exhibit from the secure

3    area as you previously testified about Exhibit 1?

4    A    Yes, I did.

5    Q    And what did you first do with Exhibit 2 when you

6    received it from that secure area?

7    A    With this item which is a plastic bag corner I

8    performed the same examinations that I did with the previous

9    exhibit we discussed.  That would be the visual examination,

10   the use of different light sources, the application of

11   superglue fuming, the dye stains, and the black magnetic

12   powder.

13   Q    And based on your analysis of the item in

14   Exhibit 2, were you able to locate any latent prints?

15   A    No latent prints were recovered from that item.

16   Q    Now I'm going to show you what's contained in

17   Exhibit 2, a bag containing a charcoal-looking piece of

18   plastic.

19            THE COURT:  Mr. Centra, you're blocking the

20       jury.

21            MR. CENTRA:  Oh, I'm sorry.  I'll come over

22       this way.

23   Q    A charcoal piece of plastic.  Is that the piece of

24   plastic that you analyzed out of Exhibit 2?

25   A    Yes, it is.

TRIAL - BECKWITH

1    Q    And is that in -- does that look substantially the
2   same as when you first got it out of the evidence intake
3   area?
4    A    No.  This too has residual black powder from the
5   final application of my examination.
6    Q    Was this initially a clear piece of plastic just
7   as the others were in Exhibit 1?
8    A    Yes, it was.
9    Q    And is that piece of plastic, based on your
10  observation right now, in a similar material as the plastic
11  in Exhibit 1?
12   A    Yes.
13   Q    And so would your description of, I guess, the --
14       THE COURT:  Suitability.
15   Q    -- to leave the prints same as Exhibit 1?
16   A    Yes.
17       MR. CENTRA:  I now move to enter Exhibit 2
18   into evidence.
19       THE COURT:  Ms. Flores?
20       MS. FLORES:  May I voir dire similarly?
21       THE COURT:  Yes.
22   VOIR DIRE EXAMINATION BY MS. FLORES:
23   Q    Okay.  I'm showing you Exhibit 2.  Now, did you
24  receive this entire clear bag from the secure area of the
25  lab?

TRIAL - BECKWITH

1    A    Yes, I did.

2    Q    And after -- and in the course of -- before you

3    analyzed it, did you take this item out of there?

4    A    Yes, I did.

5    Q    And then you placed it back in when you were done?

6    A    That's correct.

7    Q    And then you returned this back to the -- to the

8    secure area?

9    A    That's also correct.

10            MS. FLORES:  I have no objections.

11            THE COURT:  Exhibit 2 is received.

12        (Whereupon People's Exhibit No. 2 was received

13            into evidence.)

14            MR. CENTRA:  I have no further questions for

15        this witness.  Thank you, Mr. Tate.

16            THE COURT:  Thank you.

17            Questions, Ms. Flores?

18            MS. FLORES:  Yes, just a couple.  May I

19        approach the witness, Judge?

20            THE COURT:  Sure.

21        (Whereupon Defendant's Exhibit No. 6 was marked

22            for identification.)

23        CROSS-EXAMINATION BY MS. FLORES:

24    Q    I'm showing you what has been marked as Exhibit 6.

25    Do you recognize that?

TRIAL - BECKWITH

1    A    Yes, I do.  That is the report that I issued based

2    upon my examination of the two exhibits we've been

3    discussing.

4    Q    Is that your signature at the bottom?

5    A    Yes, it is.

6    Q    What was the conclusion that you recorded in this

7    report?

8    A    My conclusion was that no latent prints were

9    observed or developed on the plastic bag corner or plastic

10   sandwich bags contained in these two exhibits.

11            MS. FLORES:  I have no further questions.

12            THE COURT:  Thank you.  If nothing further,

13       you may depart.

14            THE WITNESS:  Thank you.

15        (Whereupon the witness was excused.)

16            THE COURT:  Anything further, Mr. Centra?

17            MR. CENTRA:  No, your Honor.

18            THE COURT:  Do the People rest?

19            MR. CENTRA:  Yes, your Honor.

20            THE COURT:  Members of the jury, the People

21       have rested.  I must take up a legal matter with the

22       lawyers.  I'm going to give you a 15-minute recess.

23       Don't discuss the case.  Don't form any opinions.  You

24       may leave the floor.  Follow all the written rules.  Be

25       ready to go in 15 minutes.  Thank you.

TRIAL - BECKWITH

1          (Whereupon the jury was excused.)

2          THE COURT:  All right.  Ms. Flores, make

3    whatever motion you'd like to make.

4          MS. FLORES:  Your Honor, at this time I would

5    like to reserve my request for a motion -- motion for

6    trial order of dismissal to after my client and I

7    discuss whether or not he will testify.

8          THE COURT:  All right.  Then we'll see you in

9    about 14 minutes.  And if you call him as a witness,

10   we'll take it up at that time.  Thank you.  I want to

11   revisit -- give me a minute -- my Sandoval ruling;

12   okay?

13         MS. FLORES:  Yeah, that's what I was going to

14   ask you, Judge.

15         THE COURT:  Because I have two Sandoval

16   notes.  All right.  Now, I have Sandoval notes from

17   March 7th, Debbie Dlugolecki, court reporter.  I have

18   Sandoval notes from 5/16, Debbie McCarthy, court

19   reporter.  And my -- that would be my more recent

20   ruling was that he could be asked were you convicted of

21   a felony in 2003.  And if you said yes, that would be

22   the end of it, and he equivocated, then he would be --

23   we would have a bench conference.  So that was my

24   ruling after balancing probated weight and prejudicial

25   effect.  Thank you.

                    Ashley M. Knights
                    Court Reporter
                    315-671-2058                    SYR002293

TRIAL - BECKWITH

1       MS. FLORES:  Your Honor, if I -- if I --

2       THE COURT:  Yeah.

3       MS. FLORES:  If it comes up that he's on

4  federal probation -- that he's on probation, is that

5  going to open the door?

6       THE COURT:  Well, why -- why would you bring

7  that up?  And then I'll tell you whether it opens the

8  door.

9       MS. FLORES:  Because we heard testimony that

10  from one -- one -- either Officer Breen or Officer

11  Irvine, I have to look up my notes, that there was

12  smell of alcohol on his breath.

13       THE COURT:  Yeah.  And?

14       MS. FLORES:  And if you're on probation,

15  you're tested several times as to whether or not you

16  have alcohol in your system.  Same thing for marijuana.

17       THE COURT:  Yeah, but not -- not -- not if

18  it -- if you pee it away the next day.  I mean, the

19  answer to the question is you're -- if you're going to

20  raise that he was on federal probation.

21       MS. FLORES:  Well, I'd just like probation --

22  just probation because if he's going to testify,

23  Mr. Centra's going to ask him if he's been convicted of

24  a felony in 2003.

25       THE COURT:  Yes.

Ashley M. Knights
Court Reporter
315-671-2058

SYR002294

TRIAL - BECKWITH

1        MS. FLORES:  So that's going to come out.

2        THE COURT:  Yeah, but that has to do with the

3   law of impeachment and Sandoval.  You -- so you're

4   going to bring out that he was on probation?

5        MS. FLORES:  Just -- just for -- I -- I

6   haven't totally decided that yet.  I have to talk to

7   him.

8        THE COURT:  And then he's going to be able to

9   cross-examine him about -- about "What are you doing

10  out at 3:00 in the morning?  What are you doing --" I

11  mean, I don't know.

12       MS. FLORES:  I mean, we're prepared for that

13  possibility.

14       THE COURT:  Okay.  I'm saying might you open

15  the door to something?  Yes.

16       MS. FLORES:  Well, as far as the details of

17  the conviction is what I'm asking.

18       THE COURT:  Well, here's my question.  At the

19  Sandoval proffer there was nothing about a federal

20  matter.  All I have is possession of a controlled

21  substance fifth degree and burglary third degree.

22       MS. FLORES:  2003 was state; right?

23       THE COURT:  Yes.

24       MS. FLORES:  Okay.  Never mind, Judge.  The

25  probation referred to something else that was not -- it

TRIAL - BECKWITH

1    was not the 2003 conviction.  So I'm -- I'm going to

2    withdraw.

3             THE COURT:  Yeah, but here's what I'm trying

4    to tell you is -- is no -- no mention was made at a

5    Sandoval conference about a federal conviction.  And

6    I'm -- and I'm -- and I'm not going to -- I'm not going

7    to allow it to be reargued.  So --

8             MS. FLORES:  I'm not going to argue that,

9    Judge.

10            THE COURT:  Okay.  Right.  So he's not

11   allowed to bring up any federal conviction.

12            MS. FLORES:  Okay.

13            THE COURT:  Because it wasn't a proffer at

14   the Sandoval.

15            MS. FLORES:  Okay.

16            THE COURT:  If you don't open the door, then

17   he can't ask him about it.

18            MS. FLORES:  Okay, Judge.

19            THE COURT:  Thank you.

20            MS. FLORES:  Can I ask about the certified

21   medical records?

22            THE COURT:  What about them?

23            MS. FLORES:  I would like to admit them into

24   evidence because they are certified.

25            THE COURT:  All right.  And, Mr. Centra, what

TRIAL - BECKWITH

1    do you say about that?

2         MR. CENTRA:  Judge, I'd just ask that they --

3    a proper foundation be laid.  Just because they're

4    certified doesn't mean they should be let into

5    evidence.  There were witnesses that could be called to

6    testify to the contents of that, and I believe that

7    would be the best evidence in this case.

8         MS. FLORES:  Well, that's the purpose of

9    certified medical records is that they -- that is --

10   that is the foundation.  They're business records that

11   don't require someone from Upstate to come here and

12   testify that this is a certified medical record and

13   this was made in response to the -- the Court's

14   subpoena.

15        THE COURT:  Well, see, the rule is that

16   whatever is a business record would come in as a

17   business record.  I'm -- there's a -- there's an

18   authentication certificate, so I'm not going to drag

19   anybody down from the hospital; however, every single

20   item in the -- the medical record is not admissible

21   either because it could be double hearsay or because it

22   would need medical interpretation; okay?

23        MS. FLORES:  Okay.

24        THE COURT:  And so I'm going to have to look

25   at that at the break and --

Ashley M. Knights
Court Reporter
315-671-2058                    SYR002297

TRIAL - BECKWITH

1        MS. FLORES:  Would the Court -- would it be
2    helpful if I -- I stated what I wanted to admit?
3            THE COURT:  I know what you want to admit.
4            MS. FLORES:  Pardon?
5            THE COURT:  See -- okay.  See, now, hold on
6    now.  See, do you want to admit his -- his statements
7    to the -- to the north -- to the medical people?
8    Because that's one issue.
9            MS. FLORES:  No.
10            THE COURT:  Okay.  You want to admit that
11    they found some kind of a perineal abrasion but no --
12    no rectal injury of any kind?
13            MS. FLORES:  Well, yes.  I would like to
14    admit the drawing that shows that the abrasions were
15    very close to the anus.
16            THE COURT:  Okay.  And then so I don't think
17    that that needs medical interpretation.  So let me work
18    on this over the break.  And if there's something
19    Mr. Centra wants to argue about or that either of you
20    think should be included, then we'll talk about it
21    further after the jury leaves today.
22            MS. FLORES:  Okay.
23            THE COURT:  Okay.  Thank you.
24            MS. FLORES:  So I would have to go in the
25    booth with him to talk about all this.

Ashley M. Knights
Court Reporter
315-671-2058                    SYR002298

TRIAL - BECKWITH

1          THE COURT:  Go ahead.

2          MR. CENTRA:  What time are we due back,

3   Judge?

4          THE COURT:  Take -- take at least ten

5   minutes.

6          (Whereupon a brief recess was taken.)

7          THE COURT:  My report on my review of the

8   Upstate medical record chart resulted in my concluding

9   that pages 5, 6, 7, 8, and 9 of the chart that consists

10  of 32 pages is predominantly lay information.  Now,

11  what I mean by that is this.  Sometimes you get these

12  charts and they have all sorts of technical stuff on

13  them and they're predominantly technical and without a

14  medical professional, their relevance cannot be

15  ascertained; however, these pages are almost

16  exclusively nonmedical except for, perhaps, page 6.

17  But page 6 has to do with the -- the physical exam and

18  then continues on page 7 where the sketch is.  And then

19  pages 8 and 9 have to do with further discussions.

20  Now, I say that so statements made by the patient for

21  medical diagnosis, even if they're self-serving, are

22  theoretically the -- an exception to the hearsay rule.

23  And so my -- my preliminary conclusion was this, that

24  Ms. Flores offered the entire record, I rejected that.

25  I reflected upon these pages, which I would be inclined

TRIAL - BECKWITH

1    to permit subject to further arguments of counsel.  So

2    does either side wish to object to the excerpt of

3    pages 5, 6, 7, 8, and 9?  These, of course, if

4    received, will be available in the jury room.

5          MR. CENTRA:  And, Judge, I would just note my

6    previous objection.  Further, some of the notes,

7    especially page 7, I believe that a doctor's testimony

8    would be required here to -- to describe the -- the

9    nature of the injury that he examined on that day.

10          MS. FLORES:  Your Honor, I think the --

11    the -- the -- the drawing or the diagram speaks for

12    itself.  I don't think the jury needs any expert help

13    to understand what a superficial abrasion just left of

14    the anus is.

15          THE COURT:  Well, I guess it's this; okay?

16    Could that -- that is exactly what it says.  Now, could

17    that have been caused by a rash by some -- by a piece

18    of plastic bag being stored there?  Could that have

19    been caused by a variety of other things?  The answer

20    for that is -- is yes.  But the question is not what

21    causation is.  The question is do you need a medical

22    expert to tell you what that is.  Now -- okay.  All

23    right.

24          So, Mr. Centra, I am overruling your

25    objection unless there's something that is critical.

TRIAL - BECKWITH

1          Now, what do you say about pages 5, 6, 7, 8,

2     9, Ms. Flores?

3          MS. FLORES:  Again, your Honor, don't need a

4     medical expert --

5          THE COURT:  No, no.

6          MS. FLORES:  Oh.

7          THE COURT:  I'm asking you if you would

8     like -- he's objecting to five, six, seven, eight, and

9     nine in concept.

10         MS. FLORES:  Your Honor, I would like these

11    pages to be admitted.

12         THE COURT:  All right.  So I'm going to admit

13    pages 5, 6, 7, 8, and 9 as Exhibit Number --

14         MS. FLORES:  Seven.

15         THE COURT:  -- 7.  And I'll put the exhibit

16    label up here.

17        (Whereupon Defendant's Exhibit No. 7 was marked

18         for identification and received into evidence.)

19         MR. CENTRA:  And -- and, Judge, based on the

20    Court's ruling in this, we would have a rebuttal

21    witness.

22         THE COURT:  Understood.  You had a doctor.

23    You had him on your witness list.

24         MR. CENTRA:  Yes.

25         THE COURT:  That's fine.

```
                        TRIAL - BECKWITH

 1            All right.  Now what are your plans, then,

 2     for Mr. Beckwith?

 3            MS. FLORES:  Your Honor, Mr. Beckwith would

 4     like to testify in his defense.

 5            THE COURT:  All right.  Very good.  So let's

 6     call down for the jury.  I'll tell them what occurred

 7     with the exhibit.

 8            And, Mr. Beckwith, would you come up now so

 9     that the deputies can get you situated.

10            MR. CENTRA:  Judge, can I just bring up

11     something briefly before the jury is here?

12            THE COURT:  Yes.

13            MR. CENTRA:  There is testimony that was

14     brought up during the hearing that Mr. Beckwith

15     stated -- well, it came out that he tested positive for

16     marijuana while on -- while on parole.

17            THE COURT:  Yeah.

18            MR. CENTRA:  Would I be able to inquire into

19     that without actually getting into the fact that he's

20     on parole?  I just wanted to -- because if he's going

21     to state that there was no marijuana --

22            THE COURT:  We'll do that at the sidebar --

23            MR. CENTRA:  Okay.

24            THE COURT:  -- depending what he says on

25     direct as far as opening the door.  Do you want to get
```

TRIAL - BECKWITH

1    word to your witness or your staff to alert this person

2    to be here at 9:15 tomorrow?

3              MR. CENTRA:  The doctor?

4              THE COURT:  The rebuttal witness.

5              MR. CENTRA:  I have texted him and said if we

6    need him tomorrow, it's going to be at 9:15.

7              THE COURT:  Beautiful.

8              MR. CENTRA:  So I've given him the heads-up.

9              THE COURT:  Okay.

10         (Whereupon the jury entered the courtroom.)

11              THE COURT:  All right.  Members of the jury,

12    in your absence Exhibit 7, which is an excerpt of

13    records from the Upstate Medical University Hospital ER

14    room have been received.  They will be available to you

15    in your deliberations and may be commented upon by

16    counsel in closings arguments.

17              The defense has called Mr. Davonne Beckwith.

18         D A V O N N E  B E C K W I T H, called as a

19    witness and being duly sworn, testifies as follows:

20              THE COURT:  Go ahead, please.

21         DIRECT EXAMINATION BY MS. FLORES:

22    Q    Good afternoon, Mr. Beckwith.

23    A    Good afternoon.

24    Q    Be sure that you speak so that these jurors back

25    here can hear you; okay?  I can barely hear you.

Ashley M. Knights
Court Reporter
315-671-2058                    SYR002303

309

TRIAL - BECKWITH

1    A    Yes, ma'am.

2    Q    Okay.  All right.  Mr. Beckwith, how -- are you a

3  resident of Syracuse?

4    A    Yes, I am.

5    Q    How long have you been a resident of Syracuse?

6    A    Thirty-six years.

7    Q    Is that how old you are now?

8    A    Yes.

9    Q    You have any children?

10    A    Yes.

11    Q    How many?

12    A    Four.

13    Q    How old are they?

14    A    Sixteen, seven, six, and five.

15    Q    Do you have any sort of medical training?

16    A    No.

17    Q    Okay.  Now, you heard testimony from the court

18  reporter about certain statements that you made; correct?

19  At the grand jury?

20    A    Yes.

21    Q    Okay.  So do you recall telling the grand jury

22  that "The officer slid his hand in my pants and rectum"?

23    A    Yes.  Yes.

24    Q    Could you tell the jury what you meant when you --

25  you stated that to the jury?

Ashley M. Knights
Court Reporter
315-671-2058

SYR002304

TRIAL - BECKWITH

1    A    What I meant was he slid his -- he slid his hands

2   inside my front of my boxers, grabbed my balls, spread them

3   apart, then he slid his hand in the back of my ass in my

4   buttocks area and, like, sort of swiped me with his finger.

5   He felt like he was digging to feel my -- my asshole, my

6   anus.

7    Q    Okay.  So what did you --

8    A    I didn't mean --

9    Q    -- is your understanding of what the rectum is?

10    A    The bottom of my asshole.

11    Q    Okay.  Do you recall which officer did that?

12    A    Officer Breen.

13    Q    Okay.  It was not Officer Irvine?

14    A    Officer Irvine, no.  He only searched me once.

15    Q    Okay.  Now, do you recall making a statement to

16   the grand jury that the officer did a cavity search and he

17   didn't find nothing?

18    A    Yes, ma'am.

19    Q    Now, do you know what a cavity search is?

20    A    Yes.

21    Q    What is a cavity search?

22    A    When you check somebody when they're naked, their

23   inside clothing area.  Like, a visual cavity search.  Like,

24   they make you squat, see if you had anything, you know,

25   things like that.  But he didn't do that.  He did a physical

TRIAL - BECKWITH

1    cavity search.

2        Q    And what is your understanding of what a physical

3    cavity search is?

4        A    He -- he intruded.  He went in my pants.

5        Q    He went inside your pants?

6        A    He went inside my pants.

7        Q    Were you wearing underwear?

8        A    Yes.  Oh, yes, he went inside my underwear, I'm

9    sorry.

10       Q    Okay.  And -- and you told the grand jury "He

11   didn't find nothing."  What did you mean by that?

12       A    What I mean by that was he did the -- he did these

13   searches, he invaded my privacy, like, he -- he violated me.

14       Q    Did he find anything?

15       A    No, he didn't.

16       Q    Okay.  Do you recall telling the grand jury that

17   you never possessed these drugs?

18       A    Yes.

19       Q    Could you tell this jury what you meant when you

20   told the grand jury you never possessed these drugs?

21       A    The DA asked me -- the DA asked me -- sorry, DA

22   asked me, "Did you possess these drugs?"  I said no.

23       Q    Okay.  Do you recall being asked the question "So

24   this is drugs that you never possessed before in your life?"

25       A    Yes.

Ashley M. Knights
Court Reporter
315-671-2058                        SYR002306

TRIAL - BECKWITH

1      Q    And do you recall your answer being "I never

2  possessed these drugs, sir"?

3      A    Yes.

4      Q    Okay.  And finally, do you recall telling the

5  grand jury that you didn't know the reason for the officer

6  planting drugs on you?

7      A    Yes, I do.  Actually --

8      Q    Do you recall being asked the question at -- asked

9  the question at the grand jury proceedings, "Well, in your

10  opinion, do you think they planted drugs on you that a user

11  would possess or they planted drugs on you to show you were

12  a drug dealer and that someone who possessed those drugs

13  would possess something?"  Do you recall being asked that

14  question?

15      A    Yeah, I was asked that questioning before my

16  answer.

17      Q    Okay.  And what -- and --

18      A    I said, "I don't know what's the -- I don't know

19  what the reason for him planting drugs on me."  Because he

20  asked me --

21      Q    Okay.  So you didn't know -- so was that your --

22  your response to a question?

23      A    That was my response to him, his question, the

24  DA's question asking me the reason for him planting drugs on

25  me.  So I said, "I don't know what's the reason for him

TRIAL - BECKWITH

1    planting drugs on me."  I was answering a question.

2        Q    Okay.

3        A    That wasn't my statement, like, as far as, like,

4    me telling -- you know, just answering his question.

5        Q    Okay.  Let's back up.  Do you report -- do you

6    recall where you were on September 6th, 2016 that -- let's

7    say that evening?

8        A    Yes.

9        Q    Where were you?

10        A    State Fair.

11        Q    Who -- who were with you at the State Fair?

12        A    My stepdaughter, my niece, my nephew.

13        Q    And anyone else?

14        A    And my girlfriend, Rayshell, and I.

15        Q    Okay.  And so where -- where did you go after the

16    State Fair?

17        A    Took the kids home to the babysitter.

18        Q    And then what happened next?

19        A    We went home.  It was my girlfriend, Rayshell's,

20    day off from work.  She works.  She don't work Monday,

21    Tuesday, and Wednesdays.  So she wanted to go out.  So we

22    went and shot pool.

23        Q    Do you know what -- what Rayshell does for a

24    living?

25        A    Yeah.  She do nursing.  She work with people with

Ashley M. Knights
Court Reporter
315-671-2058                                SYR002308

TRIAL - BECKWITH

1    mental disabilities, physical disabilities.

2        Q    Okay.

3        A    Seniors.

4        Q    Pardon?

5        A    And seniors.

6        Q    And seniors?

7        A    Yeah, senior living.  She helps seniors.

8        Q    Okay.  So do you recall where you went to shoot

9    pool?

10        A    The north side of Butternut.

11        Q    Okay.

12        A    Somewhere in that area.

13        Q    So where did you go after you were -- you shot

14    pool?

15        A    After we shot pool, we was going heading home.  It

16    was getting late.

17        Q    Okay.  Did you -- let's back up.  At that bar,

18    did -- do you know -- do you remember if you had anything to

19    drink?

20        A    I didn't have anything to drink.

21        Q    Okay.  How about --

22        A    Rayshell had something to drink.

23        Q    Okay.  And so who drove from the bar?

24        A    I did because she asked me to because she was

25    highly intoxicated.

TRIAL - BECKWITH

| | | |
|---|---|---|
| 1 | Q | Okay.  Where did you drive to? |
| 2 | A | I drove home. |
| 3 | Q | And where is home? |
| 4 | A | Home is on the South Side. |
| 5 | Q | Okay.  And this -- |
| 6 | A | On Coolidge.  ███████████ |
| 7 | Q | That's where you reside? |
| 8 | A | Yes.  ████████████ with Rayshell. |
| 9 | Q | Who do you live there with? |
| 10 | A | Rayshell Johnson. |

11    Q    Okay.  So you were driving home.  Do you recall
12 the route that you took?

13    A    We took the back way.  Like, the university --
14 university way.  On Butter -- 81.  Came out by State Street,
15 Salina Street.  South Salina Street came out by.

16    Q    Okay.  So -- so you came up by South Salina and
17 State Street?

18    A    Like, South Salina.  I came out on South Salina
19 and Borden, actually.

20    Q    Where did you go from there?

21    A    Going down South -- North -- down South Salina
22 headed north.  I turned on -- I turned left on Kirk Ave.

23    Q    Okay.  So at any time on the ride home did you
24 come in contact with police officers?

25    A    Yes.  As I was -- as I was getting ready to turn

TRIAL - BECKWITH

1    left, it was -- the officer's vehicle was sitting to the --

2    on the opposite side of the street just sitting there.

3        Q    Okay.

4        A    He wasn't moving or nothing.  He was just sitting

5    there.

6        Q    All right.  So you made a left onto Kirk?

7        A    Yes.  A turn signal.  Made a left onto Kirk Ave.

8        Q    Do you remember turning -- turning your turn

9    signal on?

10       A    Yes.  You have to.  That's part of your procedure

11   of travel.

12       Q    Okay.  But you noticed the -- was it a black and

13   white --

14       A    Yes, a black --

15       Q    -- vehicle?

16       A    It was a black and white SUV, ma'am.

17       Q    So you knew that to be police -- a police car;

18   correct?

19       A    Yes, ma'am.

20       Q    Okay.  So after you made a left onto Kirk, what

21   happened?

22       A    Made a left.  Left on Kirk.  Kirk kind of a long

23   block.  Traveling down Kirk Ave.  Before, like, I signaled

24   for the -- to turn right, pulled in to the stop sign.

25       Q    Right onto where?

TRIAL - BECKWITH

1    A    Right onto Landon.

2    Q    Okay.

3    A    Kirk is the long -- the long block, side block.  A

4    signal for Landon, pulled to the stop sign, stopped, I made

5    a right.  Now I'm traveling down Landon, going to Kennedy

6    Street.

7    Q    Okay.  Did you make it to Kennedy Street?

8    A    Kennedy's a short block.  I made it to Kennedy

9    Street.  But there's a stop sign, you know, in the process.

10   Same thing, stop sign.

11   Q    Stop sign at Kennedy and Landon?

12   A    Kennedy and Landon, yes, ma'am.

13   Q    Okay.  So which way were you going to go onto

14   Kennedy?

15   A    I signaled to the left as I'm cruising to the stop

16   sign because it's a short block.  A very short block.

17   Q    Okay.

18   A    I hear a engine roaring.  The windows was down

19   already.  So I hear the engine roaring.  I look up, I don't

20   see nothing.  As I'm turning -- as I stopped, then I get

21   ready to turn left onto Kennedy by the school is when I seen

22   the red and blue lights.

23   Q    Okay.  So which school was it that --

24   A    William Beard.  William Beard on Kennedy Street.

25   Q    Okay.  So were you driving past that school?

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR002312

TRIAL - BECKWITH

1    A    No.  I wasn't -- yeah, I was sort of driving -- I
2    was just turning on to the school.  The school was, like, in
3    the middle of the block.

4    Q    Okay.  So after you were about to turn to go past
5    the school, what happened next?

6    A    I seen the lights, and I looked down the street
7    behind me.  I, like, looked.  I looked to the left and I
8    seen -- I seen an officer.  They was, like, going past
9    Landon.

10   Q    Yes?

11   A    And he made a wide turn to go back towards me like
12   he was looking for me.

13   Q    Okay.  And then -- go ahead.

14   A    Like he was looking for me.  So I just pulled
15   right over in front of the school.

16   Q    So you were on the same side of Kennedy as the
17   school?

18   A    Yes.

19   Q    That curve?

20   A    Same side of the school, yes, ma'am.

21   Q    Okay.  So did -- did the police vehicle stop?

22   A    It stopped, yes.  It stopped behind me.

23   Q    Okay.  What happened after it stopped?

24   A    When it stopped, Officer -- I see Officer Irvine
25   approaching my side of the car.  I looked in the mirror.  I

TRIAL - BECKWITH

1    seen another officer going to the other side of the car.

2        Q    Okay.  Do you recall which officer was on your

3    side?

4        A    Officer -- the black officer, Officer Irvine.

5        Q    Officer Irvine was on your side?

6        A    Yeah, Officer Irvine was on my side.

7        Q    Did you know that his name was Officer Irvine at

8    the time?

9        A    No.

10       Q    Okay.  So you later learned --

11            THE WITNESS:  Judge.

12            THE COURT:  What's the matter?  The thing

13       went?

14            (Whereupon a discussion was held off the record.)

15       Q    Okay.  Okay.  So you later learned that the

16   officer on your side was Officer Irvine?

17       A    Yes.  Yes, ma'am.

18       Q    Okay.  And the other -- now -- now, which officer

19   was on the passenger's side?

20       A    Officer Breen.  Officer Breen.

21       Q    Did you know his name was Officer Breen at the

22   time?

23       A    No.  The names wasn't showing.

24       Q    They were not showing?  Okay.

25       A    I didn't know until I got the report.

                    Ashley M. Knights
                    Court Reporter
                    315-671-2058                    SYR002314

TRIAL - BECKWITH

1    Q    Okay.  So after Officer Irvine got to your window,

2   what, if anything, did he say?

3    A    He came to the window, he looked in the car, and

4   he said, "Any guns or drugs in the car?"

5    Q    Okay.  And what was your response, if you recall?

6    A    I was sort of pissed.  I said, "No, ain't no guns

7   in the car."

8    Q    Okay.

9    A    Again, I was kind of, like ...

10   Q    You were angry?

11   A    Yeah, because it's, like, sort of insulting a

12   little bit.

13   Q    Okay.  So he asked, you said no.  And then what,

14   if anything, did he say next?

15   A    I said no.  He said, "Sure aren't any guns or

16   drugs in the car?"  I said no.

17   Q    Was this Officer Irvine?

18   A    This is Officer Irvine.

19   Q    Okay.  So after you said no again, what happened?

20   A    He said, "Are you --" he said, "You out late?  You

21   out past curfew, anything like that?  Do you have a curfew?"

22        I said, "No, I don't have a curfew."

23   Q    Okay.  Now, do you have -- you -- you have a

24   criminal conviction, a felony conviction in -- for 2003; is

25   that correct?

321

TRIAL - BECKWITH

1      A    Yes.

2      Q    Okay.  Now, so after you told him that you didn't

3   have a curfew, what happened next?

4      A    He said, "Step out the car."

5      Q    Okay.  So did you step out of the car?

6      A    Oh, rewind.

7      Q    Okay.

8      A    I'm speeding.  He said, "You sure you don't have a

9   gun?"  I said no.  Then he said, "Step out the car."  I said

10  no.

11     Q    Why did you say no?

12     A    Because I understood that this wasn't a traffic

13  stop.

14     Q    What do you mean that you "understood this wasn't

15  a traffic stop"?

16     A    He was onto something else because a traffic stop

17  is license and registration or, you know, you just ran that

18  red light or ran a stop sign, do you have a license and

19  registration, I think, and insurance.

20     Q    So did he ask -- did he tell you why he stopped

21  you?

22     A    No.  He just asked me -- he looked in the car,

23  looked at my girlfriend, looked at me, and he said, "Any

24  guns or drugs in the car?"

25     Q    Okay.

Ashley M. Knights
Court Reporter
315-671-2058                        SYR002316

TRIAL - BECKWITH

1      A     That was it.

2      Q     So you said no.  So what happened next?

3      A     Then I said no.  And he reached in to unlock the

4  door, and I locked the door back.  And I told my girlfriend

5  to get her phone together.

6      Q     Okay.

7      A     She said, "What's wrong?  What's going on?"

8            I said, "Just get your phone together.  Get it on

9  record."

10     Q     Oh, get it on record?

11     A     Get it on record.

12     Q     Okay.  Do you recall why you told her to do that?

13     A     I -- yes, I -- I understand why I told her to do

14  that.

15     Q     Why did you tell her to get it on record?

16     A     Because the officers was being rude and was being

17  violent and he was on some bullshit.  He was on a traffic

18  stop.

19     Q     So okay.  So after you told your girlfriend to get

20  it on record, what happened next?

21     A     After I told her to get the phone ready, like, he

22  kept reaching in the door.  He told me step out the car, he

23  was going to beat my ass, he going to beat the fuck out me.

24  That's what he said.

25     Q     Okay.

TRIAL - BECKWITH

1      A    I said no.  He hit the lock again.  I told her,

2  "Hurry up.  Get the phone ready."  She dropped it.  She was

3  fumbling.  She was fumbling with the phone.  I picked it up,

4  gave it to her.  I'm trying to swipe.  She has a lock on her

5  phone.  She has the screen locked.

6      Q    Okay.

7      A    So I rolled the window up a little bit.  He banged

8  on the window.  And she's like, "He's going to break my

9  window."  She start crying, so I just unlocked the door to

10 get out.

11     Q    Okay.

12     A    When I unlocked the door to get out and plant my

13 feet, that's when Officer Breen just shocked me with the

14 Taser.

15     Q    Okay.  So you're sure it was Officer Breen?

16     A    Yes, it was Officer Breen.  Officer Irvine was

17 standing right behind him.

18     Q    Was standing where?

19     A    Right behind him.  I was facing him.

20     Q    Okay.  So did you feel anything when Officer Breen

21 deployed Tasers?

22     A    No, I didn't even know I was hit with the Taser.

23     Q    So how can you know you were Tased?

24     A    Because I seen the string and I said, "Come on,

25 man, you're on some bullshit."

Ashley M. Knights
Court Reporter
315-671-2058                            SYR002318

TRIAL - BECKWITH

1    Q    Okay.  So after you -- after -- after you were

2  Tased, what happened next?

3    A    Officer Breen grabbed my arm right here

4  (indicating).  He pulled me out the car.  I went to the

5  ground, and I -- I didn't leave -- my whole body didn't

6  touch the ground, just my hands touched the ground.  And

7  Irvine grabbed me and he walked me to the car.

8    Q    Both of them did?

9    A    Nah, just Irvine with Breen, like, right behind

10 me.  He on -- Breen on this side, Irvine was on this side

11 (indicating).

12   Q    Okay.  So Officer -- okay.  Who was -- did any of

13 them have contact with your body while you were being

14 walked?

15   A    Yes.  While I was being walked to the car, Irvine

16 escorted me to the front of his vehicle on the driver's

17 side, and that's where I put my hands on the car.

18   Q    Okay.  And where was Officer Breen?

19   A    Officer Breen was right behind me.

20   Q    Okay.  So what happened after you put your hands

21 on -- on Officer Irvine's scar -- car?

22   A    Breen walked away towards Rayshell.

23   Q    Okay.

24   A    Because I seen him walk around to the car to get

25 her out, made her sit on the curb.

TRIAL - BECKWITH

1     Q    Okay.

2     A    Irvine started checking me.

3     Q    What do you mean by "checking" you?

4     A    He pat frisked me.  Officer Irvine, black guy, pat

5 frisked me.

6     Q    Okay.  And where did he touch you?  Did he touch

7 you outside your clothing?

8     A    Outside my clothing.  Officer Irvine never --

9     Q    Okay.  Well, so he touched -- he pat searched you

10 outside your clothing?

11    A    Yeah.

12    Q    Did he find anything?

13    A    No.  He -- he pat frisked me pretty good.  I'm

14 talking about real good.  And he told Breen that "He's

15 good."

16    Q    Okay.

17    A    Breen pushed Irvine out the way.

18    Q    Okay.

19    A    And that's when Officer Breen started checking me

20 himself.

21    Q    So what do you mean by "checking" you?

22    A    He pat frisked me.  Went in between.  He yanked my

23 pants up a little bit.

24    Q    Went between where?

25    A    Went between my legs, my balls area and my crotch

TRIAL - BECKWITH

1    area.

2        Q    Was this outside your clothing?

3        A    Outside my clothing the first frisk.  Excuse me,

4    the first frisk was outside my clothing.

5        Q    So did he find anything?

6        A    No, he didn't find nothing.

7        Q    Okay.

8        A    Then the second time he searched me is when it got

9    a little more -- he violated me.

10       Q    Okay.  What do you mean -- okay.  So the second

11   time -- you said he searched you a second time?

12       A    The second time he pat frisk -- he pat frisked me

13   again.  He was in between and he squatted down, reached

14   the front of my pants, went in --

15       Q    What do you mean he reached in the front of your

16   pants?

17       A    He reached in the front of my pants, went inside

18   my boxers.  That's when he lift my penis up and grabbed my

19   balls and squeezed, like, and spread them apart.  Then he --

20   the spot behind my balls is where he felt.  He -- he reached

21   back there, felt right there, and when he went to the back

22   of my ass behind my pant -- behind my -- it's my ass -- I

23   don't know how -- how -- I'm not a doctor.  I don't want to

24   define it wrong again.

25       Q    Okay.  So he -- he -- he put -- he put his hand

TRIAL - BECKWITH

1  behind -- was he --

2       A    He went in my ass again.

3       Q    He went inside?  Was it inside your boxers?

4       A    Yeah, he went in -- he still was inside of my

5  boxers.  He slid his right hand around because he squatted

6  down and he slid his hand -- his arm -- his hand in the back

7  of my ass when he, like -- like, the slit of my butt -- my

8  buttocks, he went in there and he --

9       Q    So he went inside your buttocks between your

10  buttocks cheeks?

11       A    Well, between my buttock and the bottom of my

12  asshole, and he slid -- his fingers slid across it.

13       Q    Okay.

14       A    And that's when I was tussling with him.  I

15  scissored his arm.  I was trying to get him out.  And Irvine

16  was sitting behind me, told me if he moved, "beat the fuck

17  out of him."  One leg was --

18       Q    Who told who?

19       A    Officer -- Officer Breen told Irvine "If he takes

20  his hands off the hood of his car, beat the fuck out of

21  him."

22       Q    Okay.

23       A    I'm on the hood of the car like this stretched out

24  (indicating).  I got one leg off the ground, and I'm

25  touching with him trying to kick him off.

                        TRIAL - BECKWITH

1      Q    Why are you trying to kick him off you?

2      A    Because he was violenting me.  Because he had his

3  hands in my ass.

4      Q    At any point did either officer ever tell you you

5  were under arrest?

6      A    No, they never said I was under arrest.

7      Q    Did they cuff you?

8      A    I never was cuffed, ma'am.  I was cuffed after he

9  violated me.

10     Q    Did you -- did you feel any pain at all?

11     A    I felt when -- when -- when he went in my ass area

12  and he went back there, when he was tussling, I did feel

13  like it was a little pinch, little scratch because I had his

14  hands scissored out, I had them clamped, you know, I had his

15  hands clamped while he had his hands in my butt.  And he had

16  one hand in front holding onto, like, around my thigh area,

17  stuff like that, to try and stop me from moving and open me

18  up.

19     Q    Okay.  So did he find anything?

20     A    No, he didn't find anything, ma'am.

21     Q    Okay.  So after -- after -- at one point after he

22  went into your buttocks area, what happened after that?

23     A    After he did that, he let me go.  Told -- he told

24  Irvine -- no, after he let me go, I said, "Call -- call your

25  boss.  Call the chief of police.  Call Frank.  Call Frank

TRIAL - BECKWITH

1    Fowler.  Call whoever you got to call, sergeant, whatever

2    you got to call.  Tell them you just violated --" I said,

3    basically, "I don't know what's going on," you know what I'm

4    saying?  "I don't have anything."

5             And he -- he told him -- him and Irvine was

6    talking.  He was, like, "Relax."  Telling Irvine to relax.

7        Q    Wait, wait.  Who was telling Irvine to relax?

8        A    Breen.  Him and Breen was talking.  I couldn't

9    really hear the whole conversation.  And Officer Breen

10   walked around his car and came back.  Then he told Breen to

11   move -- then he told Irvine -- Officer Irvine, the black

12   officer, to move, and that's when he pat frisked me again

13   and he said, "What's this?  We've got something."

14       Q    Okay.  And what did you see?

15       A    I didn't see anything at first.  I didn't see

16   nothing.  I didn't even know what he had.  But I knew it was

17   something that he was trying to, you know ...

18       Q    So your understanding was he had something in his

19   hand?

20       A    He had something.  But I didn't get to see it.

21   Told me to turn around.

22       Q    And he turned around?

23       A    He told me to turn around.

24       Q    Okay.  So Breen told you to turn around?

25       A    (Nodding head up and down.)

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR002324

TRIAL - BECKWITH

1    Q    And what happened after you turned around?

2    A    He -- to -- told Officer Irvine to cuff me.

3  Irvine cuffed me and put me in the back of the police car,

4  and Breen got in the front police car.  He didn't get in the

5  front.  He opened the front door, and he popped the glove

6  compartment.  When he popped the glove compartment, he had a

7  scale, money, drugs.

8    Q    How do you know what were -- what was in the glove

9  box?

10    A    Because I was sitting in the back of the police

11  SUV cruiser and he hit -- he hit the glove compartment and

12  he pulled a scale out.

13    Q    How did you know there were drugs in there?

14    A    Because I seen it with my own eyes.

15    Q    You know what drugs look like?

16    A    Yeah, I know what drugs look like.

17    Q    Okay.  Okay.  So -- so you said he popped open the

18  glove box.  So what happened next?

19    A    Pulled the scale out.  And he -- he popped the

20  side of it.  He put it on the seat.  And the bag was already

21  opened.  And --

22    Q    Okay.  So -- when did you see the bag?  You

23  mentioned a bag.

24    A    I seen the bag when I was in the back of the

25  police cruiser.

TRIAL - BECKWITH

1    Q    Okay.

2    A    It was a big bag.

3    Q    What do you recall the color of the bag?

4    A    It was a clear bag.

5    Q    A clear bag?

6    A    Yes.

7    Q    Okay.  Did you see what was in -- could you see

8    what was inside the clear bag?

9    A    It was a lot of rice.  Not like the rice you

10   showed me.

11   Q    Okay.  It was a lot of rice?

12   A    A lot of rice was in there.

13   Q    Okay.  So you said the bag was opened?

14   A    Yes.

15   Q    How -- and so what happened next?

16   A    I seen him -- the powder substance that he had,

17   the tan powder substance, I seen him open that.  Firstly, I

18   seen him weigh it.  He dropped it on the scale -- excuse me,

19   I'm speeding.  He weighed it.  He said about some grams, 5

20   or 6 grams.  He opened it up.  He already had it open here,

21   he just had it -- he just wedged it open a little bit.  He

22   stuck his knife in it, and he put it inside the little

23   packet that had water in it.  And he said, "Oh, yeah, look

24   what we did.  We got a sentence."  And he shook it and

25   closed it up.  And Officer Irvine was telling him to give

Ashley M. Knights
Court Reporter
315-671-2058                          SYR002326

TRIAL - BECKWITH

1    him the rest of it so he could test it.  He said, "No, I got

2    it.  I got it.  Just -- just make sure she's all right."

3    And then other cop cars started pulling up.  Then --

4         Q    Okay.  So did you see about how many other police

5    cars pulled up?

6         A    About three.  About three cars.  I'm not sure

7    about three.  A couple few.

8         Q    Okay.  So did you -- do you recall about how many

9    officers exited those three cars?

10        A    I think about four of them.  But they never

11   approached the vehicle.  They just sat in they own area.

12        Q    Okay.  So what, if anything, happened next?

13        A    Oh, yeah, after that, the sergeant came.  I asked

14   her -- I told her that her officers violated me.

15        Q    How did you know -- okay.  Was this a --

16        A    Because I seen.

17        Q    Was this a female?

18        A    A female sergeant.  She had --

19        Q    How do you know she was a female -- how do you

20   know she was a sergeant, I mean?

21        A    Because she had the color coding on the side of

22   her uniform.

23        Q    Okay.  So she arrived on the scene; correct?

24        A    Yes.

25        Q    All right.  So what happened next?

TRIAL - BECKWITH

1      A    She opened the door.  She said, "You all right?
2  What's going on?"

3           I said, "The officers violated me.  I want to
4  speak to the chief of police or whoever can help me.  You
5  know, he just went in my ass.  He violated.  I didn't have
6  anything."

7           She said, "Oh, yeah?"

8           I said, "He got drugs in the glove compartment.  I
9  don't know what the hell is going on, you know what I'm
10  saying?  You might want to check this out."  And she said
11  all right and closed the door, and that was that.  So I seen
12  where she was going, so I just sat back and be quiet.

13          Then Officer Irvine and Breen got in the car, and
14  Breen said, "Where your guns at?  You got any guns?"

15      Q    Okay.  Wait.  So do you remember who got into the
16  driver's seat?

17      A    Officer Irvine, the black officer.

18      Q    Okay.  And Officer Breen got into the front
19  passenger seat?

20      A    Yeah.  Officer Breen, yeah.  Yes.

21      Q    Okay.  So you were -- you were -- after they got
22  into the car, what were you -- what were you just testifying
23  to?

24      A    After they got in the car, we started leaving.  He
25  said -- he said, where your guns at?  Got any guns?

                            TRIAL - BECKWITH

1        Q    Okay.  And what --

2        A    And he gave me that look like got any guns, like,

3   trying to work something out.  I said, "I don't have any

4   guns.  Just take me downtown."  I didn't want to talk to

5   them, didn't want to deal with them, just wanted to get away

6   from them.

7        Q    What did you mean by "take me downtown"?

8        A    Just take me down to the Justice Center.

9        Q    To the Justice Center?

10       A    Yes, ma'am.

11       Q    That's the jail?

12       A    Yes, ma'am.

13       Q    Okay.  So after you said "take me downtown," what

14  happened next?

15       A    They took me downtown.  I went in.  We

16  processed -- when I went in, processed me, they first, you

17  know, pat frisk you, stuff like that, take your shoes off.

18  They walk -- officers came and got me.  The deputies, they

19  walked me to the back area.

20       Q    The deputies walked you to the back area?

21       A    Area to the -- the part -- the booty room.

22       Q    And what's the "booty room"?

23       A    Booty room is where they take you to check you to

24  see if you got drugs.  Officer or somebody inspect you for

25  having drugs.

TRIAL - BECKWITH

1    Q    How would they inspect you in the booty room?

2    A    No, I'm just saying the Syracuse Police Department

3    want to do a visual or a cavity search, anything like that,

4    they would take you to downtown to do a visual search.  And

5    that's where they take you, they process you.  They take you

6    in there.

7    Q    Okay.  But you said that there was a booty room;

8    correct?

9    A    Yes.

10    Q    Okay.  Can you just describe for the jury what

11    goes on in the booty room?

12    A    Oh, the booty room is where they make you squat,

13    bend, they take your clothes off, do a visual search of you,

14    make sure you don't have anything as you're being admitted

15    into the jail.  Or you know, if a officer suspects you have

16    something on the street, they would take you to the Justice

17    Center and bring you in that backroom and make you do a

18    strip search, a visual strip search.  And they would see if

19    you have anything.

20    Q    Anything where?

21    A    Like, hidden within your butt or under your nuts

22    or wherever, your toes or your socks, anything like that.

23    Q    Okay.  Did they do that to you?

24    A    Yes, they did that to me.

25    Q    Did they find anything?

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR002330

TRIAL - BECKWITH

1    A    No, they didn't find anything.  And when he was

2    searching me when I went to squat for him, as I was -- I

3    felt it tingling, like, a burning sensation within my

4    buttocks area.  My ass area with, you know, where I -- my

5    ass area.

6    Q    Okay.

7    A    Around my --

8    Q    You felt a burning sensation there?

9    A    My ass area, my rectum area.  Felt like my asshole

10    was burning a little bit.  But it was, you know ...

11    Q    Okay.  So after you felt that, what, if anything,

12    did you do?

13    A    Told the doc -- I told the first -- first told the

14    deputy, I said, "I need to see the nurse."

15        He said, "You going to see the nurse.  Just get

16    dressed first.  Get dressed again."  So I went back out --

17    back out where I came in at when you first come in to

18    Justice Center when they first bring you in.  Went back,

19    told the nurse I need to see her.  I went in -- I went in

20    a -- to the cage.  The cage, the holding cell.  The cage.

21    Took some tissue and I wiped.  Was blood all over the

22    tissue.  It was, like, streaks.  Not blood all over.

23    Streaks of blood.  Like, I don't want to say blood all over

24    it.  It was streaks of blood throughout the tissue.  So I

25    bang on there.  He grabbed me.  Said, "Tell the nurse."

TRIAL - BECKWITH

1          Said, "What's wrong?"

2          "My ass is burning.  Police went in my ass.  I

3  have an issue."

4          He said, "Did you tell them?"

5          I said, "I told them, I -- I told her -- I told

6  the police know about it."  I said, "I don't want to deal

7  with them because they're on some crooked shit."  Sorry.

8     Q    Okay.  So after you told -- okay.  Who were you

9  telling that to?

10    A    I was telling that to the nurse.

11    Q    So did the nurse examine you?

12    A    The nurse -- no.  The nurse said she didn't want

13  anything to do with me.  She kicked me out.  She sending me

14  to the hospital.  So she called officers, and they came and

15  got me.

16    Q    Which officers?

17    A    They -- the officers that were working -- see --

18    Q    The deputies?

19    A    I think it's deputies or police.  It was the

20  Syracuse Police Department.

21    Q    The --

22    A    Or the deputy.  It was one of them.  It's officer

23  that work downtown.

24    Q    The Syracuse Police?

25    A    Yeah.  He had blue on.

TRIAL - BECKWITH

1          THE COURT:  Okay.  Would it be permissible

2     for me to instruct the jury the -- about the personnel

3     and how the county jail personnel --

4          MS. FLORES:  Sure.

5          THE COURT:  Okay.  Members of the jury, the

6     Onondaga County jail is operated by the sheriff of

7     Onondaga County through an agreement that is authorized

8     by the correction law.  Persons that are arrested by

9     the Syracuse Police Department may be lodged at the

10    Onondaga County jail the evening before they go to

11    court.  And they are -- the Onondaga County jail

12    charges the City of Syracuse a fee that is authorized

13    by law to provide that service.  Unlike towns and

14    villages when they arrest someone, they go to the

15    judge's house sometimes; although, that's been -- been

16    phased out quite a bit.  And so what they do is they

17    make an arrest, they take the person in front of a

18    judge, and then they get a court commitment to the

19    Onondaga County jail.  And so the -- the booking

20    officer at the Onondaga County jail is a Sheriff's

21    Department employee as a deputy sheriff usually.  The

22    nurse is an employee of the sheriff or the County

23    Department of Health.  And the strip search procedure

24    that was described by the witness -- and you can

25    correct me if I'm wrong -- but that was done by deputy

TRIAL - BECKWITH

1    sheriffs.  Is that your testimony?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.  And however, the -- this

4    case, I believe, the -- the -- according to the

5    witness, the nurse indicated that because of

6    Mr. Beckwith's statements to her, that he should be

7    seen at a hospital and not received at the county jail.

8    So far am I right?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Okay.  And you believe that he --

11   she called members of the Syracuse Police Department to

12   arrange that, not deputy sheriffs?

13             THE WITNESS:  I went in a police car.

14   Syracuse Police car.

15             THE COURT:  Okay.  Thank you.  Go ahead.

16   Q    Okay.  So do you recall which hospital they took

17   you to?

18   A    Upstate.  Adams.

19   Q    Upstate Hospital?

20   A    Yes.  Emergency room.

21   Q    Okay.  So after you got to the emergency room,

22   what, if anything, happened?

23   A    Yes, Vera House was there.

24   Q    Who's Vera -- what's Vera House?

25   A    Vera House is people that support people that have

TRIAL - BECKWITH

1    been raped or abused or any -- sexually assaulted in any

2    way.  They sat through the whole thing with me.

3        Q    Sat through -- Vera -- okay.  So was there one

4    person from Vera House?

5        A    One person from Vera House.  The Syracuse Police

6    Department was there.  The forensic drug -- the forensic guy

7    was there to take pictures, and a sergeant.

8        Q    Okay.  So you test -- just testified that Vera

9    House sat through the whole thing.  What do you mean by "the

10   whole thing"?

11       A    She sat waiting in the room with me through the

12   process to make sure everything was done.

13       Q    What do you mean?  What?

14       A    Like, she just was there for support and make sure

15   that -- you know, she asked me questions about what

16   happened, she took reports, and she gave me some information

17   to contact with them, contact them from having any problems,

18   like, as far as sleeping, you know, someone to talk to,

19   anything like that.

20       Q    Okay.  So after she talked to you, what -- what

21   happened next?

22       A    The doctor came in.

23       Q    Okay.  And what did he do?

24       A    The nurse came in, said the doctor will be right

25   with me, then the doctor finally came.  He spoke with me.  I

TRIAL - BECKWITH

1   asked him what's going on.  I told him I was assaulted by

2   the police.  So such -- he asked me how do I know this.  And

3   I explained what I just explained to you guys, the court.

4   And he said to take pictures, and the forensic people and

5   doctor took pictures.

6          Q    Who took pictures?

7          A    The -- the Syracuse Police Department Forensic for

8   internal affairs purposes.

9          Q    Okay.  So they took pictures of what?

10         A    My rectum -- I mean my anus and my ass, my

11  buttocks area.  They made me bend over and spread them on

12  the table, on the bed, and he took a couple photos.  And the

13  doctor asked me to bend over as well, and he looked at it.

14  He said, "You have a couple abrasions close to the -- the

15  anus area."  And I -- he asked me how -- how do you feel as

16  far as the pain and stuff like that from a seven to ten -- I

17  mean one to ten.  I said it was a seven.  A little bit of

18  stinging.

19         Q    Okay.  So he said one to ten.  So what was your

20  understanding that -- that a score of one would mean?

21         A    One?

22         Q    As far as pain.  You said seven?

23         A    It was -- he said, "Between one and ten, what was

24  your pain?"

25         Q    So do you know --

Ashley M. Knights
Court Reporter
315-671-2058                                   SYR002336

TRIAL - BECKWITH

1    A    "On a scale one to ten, what was your pain?"

2    Q    Which is the worst -- which number corresponded

3 with the worst pain, ten or one?

4    A    Ten is the worst pain.

5    Q    Okay.  And you said seven?

6    A    Says about a seven.

7    Q    Okay.  So what happened next?

8    A    He left out -- he went -- he left out for a while.

9 The officers was asking me questions, trying to get a quick

10 report.  He wrote down, like, four words and --

11    Q    Four what?

12    A    Four words on a piece of paper, and he gave me --

13 he -- he was being rude.  Like, he -- you know what I'm

14 saying?  So I -- I was making an accusation about one of his

15 fellows.  So he didn't really -- he just took his pictures

16 and he left.

17    Q    So this was the same person who took the pictures

18 wrote down a few words, four words?

19    A    The sergeant.

20    Q    The sergeant wrote this down?

21    A    Yeah.

22    Q    Was it the same sergeant that was -- that

23 responded to --

24    A    No.  It was a male.  It was a male.

25    Q    Okay.  So what happened after that?

TRIAL - BECKWITH

1      A    Again, the Vera House lady came back in the room.

2  She talked to me for a while.  The doctor came in.  He said

3  did you -- basically, you know, the Vera House lady was

4  saying "We could do a touch kit to see, you know, if there's

5  any DNA as far as sperm or something like that."

6            I said, "I wasn't assaulted in that way."  And I

7  told him, "I did wipe.  I wiped to see if I have blood."

8            And he said all right.  He said, "Do you want to

9  take more pictures for the hospital purposes?"

10           I said no.  I said, "As long as you document

11 what's going on and the officers already took pictures, you

12 know ..."

13     Q    Okay.

14     A    And that was that.

15     Q    Okay.  So that ended the exam?

16     A    That ended the exam.  They gave me discharge

17 papers.

18     Q    Did they give you any medication?

19     A    Yeah, they gave me cream to apply to my rectum --

20 to my anus area.  Rectal cream.  And they gave me some pain

21 pills.

22     Q    Do you recall what pain pills?

23     A    Just, like, I think it was ibuprofen.  Just basic

24 ibuprofen.

25     Q    Okay.  So where did you go from there?

TRIAL - BECKWITH

1      A    From there I went back to the Justice Center.

2      Q    At any time that night did you have any heroin on

3  you?

4      A    No, ma'am.

5      Q    Or cocaine?

6      A    No, ma'am.

7      Q    Was there any -- okay.  Whose car were you driving

8  at the time?

9      A    I was driving Rayshell Johnson's car.

10     Q    Okay.  Was there any cocaine in that car?

11     A    No, ma'am.

12     Q    Or heroin?

13     A    No, ma'am.

14     Q    Okay.  Do you -- do you know whether or not there

15  was marijuana in that car?

16     A    No, no marijuana was in that car.

17     Q    Okay.  But that was her car; correct?

18     A    Yes.

19     Q    All right.  Do you know whether or not she had any

20  marijuana on -- in her -- on her -- her person?

21     A    She had a state job, ma'am.  She's not allowed to

22  smoke.

23     Q    Okay.

24     A    Bad enough she didn't even want to drive.  She

25  can't afford it.  She was on probation, period.

Ashley M. Knights
Court Reporter
315-671-2058                    SYR002339

TRIAL - BECKWITH

1    Q    Okay.  Was -- do you -- do you know what it means
2    to take an oath?
3    A    Yes.
4    Q    What does it mean -- okay.  Do you recall being
5    given an oath before you testified before the grand jury?
6    A    Yes.
7    Q    Okay.  And do you know what that oath required you
8    to do?
9    A    Yes.
10   Q    What did it require you to do?
11   A    Tell the truth.
12   Q    Okay.  Did you tell the truth when you gave those
13   statements to the grand jury that I went over with you
14   earlier?
15   A    Yes.  I -- that's why I wanted to go to the grand
16   jury.
17   Q    Was -- is everything that you told this jury today
18   the truth?
19   A    Yes.
20           MS. FLORES:  Okay.  I have no further
21       questions.
22           THE COURT:  Okay.  Mr. Centra?
23       CROSS-EXAMINATION BY MR. CENTRA:
24   Q    Good afternoon, Mr. Beckwith.
25   A    How you doing, sir?

TRIAL - BECKWITH

1      Q    Good.  All right.  Just going to briefly go

2  through the facts here.  So on September 9th, 2016 you were

3  driving, was it your girl --

4            THE COURT:  6th.

5      Q    Oh, September, I'm sorry, September 6th, 2016 you

6  were pulled over in your girlfriend, Rayshell's, vehicle?

7      A    Yes, sir.

8      Q    And you were driving that vehicle; correct?

9      A    Yes, sir.

10      Q    And you were actually with Mrs. Johnson all day;

11  correct?

12      A    Yes, sir.

13      Q    You went to the fair?  You guys had -- she had

14  been drinking?

15      A    Yes, sir.

16      Q    And that drinking went straight throughout the

17  night?

18      A    She had a few drinks throughout the night.

19      Q    Approximately what time did you get to the fair?

20  Was it morning?  Afternoon?

21      A    It was, like, evening.  It was, like, evening,

22  probably.

23      Q    And so that's kind of --

24      A    Three or four.  Three or four p.m.

25      Q    And that's where your day began and you guys were

TRIAL - BECKWITH

1   hanging out up until you were pulled over on that day?

2       A    We was at the fair, and the day really ended at

3   the bar.

4       Q    And she was drinking that whole time?  You said

5   she was pretty intoxicated?

6       A    Yes, sir.

7       Q    And you're saying that you -- you didn't have one

8   drink throughout that whole -- that whole time you were at

9   the fair, the bar, or anything?

10      A    No, sir.

11      Q    And when you were pulled over, there was actually

12  open alcohol -- alcoholic beverages found in the vehicle;

13  correct?

14      A    Yes.

15      Q    And so, when they pulled you over, you heard them

16  testify it smelled like marijuana in the vehicle?

17      A    Yes, sir.

18      Q    And you're claiming that there was no marijuana in

19  the vehicle; correct?

20      A    There was no marijuana in the vehicle, sir.

21      Q    And you said that Rayshell can't smoke marijuana?

22      A    She can't smoke.  She doesn't smoke.

23      Q    Were you smoking marijuana that night?

24      A    No, sir.

25      Q    Do you smoke marijuana?

TRIAL - BECKWITH

1    A    No, sir.

2    Q    Isn't it true that you actually tested positive

3  for marijuana a few months prior in April of 2016?

4    A    Yes, sir.  Actually, I tested positive for

5  cocaine.

6    Q    All right.  And isn't it also true, as you've

7  already touched on, that you've been convicted of a felony

8  and that was in 2003; correct?

9    A    Yes, sir.

10    Q    And so on that day, you didn't have a valid

11  license; correct?

12    A    No, sir.

13    Q    So you shouldn't have been driving that vehicle?

14         THE COURT:  You mean yes, he's correct?  You

15    did or did not have a license?

16    A    No, I did not have a license.

17    Q    So you shouldn't have been driving that vehicle?

18    A    Yes, sir.

19    Q    And it was after you had stated that you didn't

20  have a license and Officer Irvine said that he smelled the

21  marijuana when you were asked to leave the vehicle; correct?

22    A    Can you repeat that, sir?

23    Q    It was after you had told Officer Irvine that you

24  didn't have a license and after he had smelled the marijuana

25  that he asked you to step out of the vehicle; correct?

TRIAL - BECKWITH

1    A    No, sir.  Wrong.

2    Q    I'm wrong?  But he did ask you to step out of the

3    vehicle; correct?

4    A    Yes, he asked me to step out the vehicle.  I

5    locked the door, and I told him I didn't have no guns or

6    drugs in the car.

7    Q    And he never -- I mean he -- he repeatedly asked

8    you to step out of the vehicle, and you -- you just

9    testified that you weren't having any of it; correct?

10    A    I testified that he didn't have anything?

11    Q    No.  That you weren't having any of it.  You

12    weren't going to listen to him.  You weren't going to get

13    out of the vehicle.

14    A    I testified -- I testified that I locked the door

15    and I didn't get out.

16    Q    But he was asking you to get out; correct?

17    A    He told me to "Get the fuck out the car.  I'm

18    going to beat your ass."  Would you get out the car too?

19    Q    But he was asking --

20         MR. CENTRA:  I'm going to ask the judge to

21         instruct --

22         THE COURT:  No, see, you answered the

23         question.  Don't ask questions of the lawyer.

24         What's the next question?

25    Q    So after he repeatedly asked you to step out of

TRIAL - BECKWITH

1    the vehicle, he opened your car door; correct?

2        A    I gave up and opened the car door, yeah.

3        Q    So the car door was opened, and you still decided

4    to struggle with them; is that correct?

5        A    No, sir.

6        Q    You just --

7        A    The car door was opened.  Told her to get the

8    phone ready.  I put -- I turned around to get out the car.

9    I got -- my feet hit the ground.  That's when he Tased me

10   and I didn't know he even Tased me.

11       Q    So it's your testimony that you were initially not

12   complying with Officer Irvine, and then all of a sudden you

13   decided that you're going to get out even though you just

14   asked me would I get out of the vehicle if they told me?

15       A    Because I --

16            MS. FLORES:  Objection, Judge.

17       Argumentative.

18            THE COURT:  The objection is sustained.

19       Q    So you were eventually taken out of the vehicle

20   and you were searched; correct?

21       A    Yes, sir.

22       Q    And you heard that they had recovered the -- the

23   bags on you, the -- the clear plastic bag; correct?

24       A    No, sir.  Repeat your question.  You said --

25       Q    They stated that they found a clear plastic bag on

TRIAL - BECKWITH

1    you?

2        A    He -- he didn't state nothing to me.

3            THE COURT:  No, no, no.  Okay.

4        A    His question is --

5            THE COURT:  Hold on.  You may ask him what

6        occurred.  You may ask him what testimony he heard

7        during the trial.  But be specific.

8            MR. CENTRA:  All right.

9        Q    All right.  So it was you and Ms. Johnson in the

10   vehicle; correct?

11       A    Yes, sir.

12       Q    And at this point were both of you out of the

13   vehicle when you had stepped out of the vehicle, or was

14   Ms. Johnson still in the vehicle?

15       A    I was just out of the vehicle.

16       Q    All right.  And you were eventually taken to the

17   front of the police vehicle; correct?

18       A    Yes, sir.

19       Q    It's your testimony you were not handcuffed?

20       A    I was not handcuffed, sir.

21       Q    So you're saying that these officers just picked

22   you up and walked you over there?

23       A    They pulled me out of the car by one arm, pulled

24   me to the ground.  I was going to get on the ground.  They

25   pulled me back up.  Irvine walked me to the car by my right

                         TRIAL - BECKWITH

1   arm, and Breen was standing behind me.  And I put my hands

2   on the vehicle.  That's when Irvine started checking me.

3        Q    All right.

4        A    I was never handcuffed.

5        Q    So during this arrest, at some point you, in fact,

6   started shouting something about Derek Wilson?

7        A    During this arrest?

8        Q    Yes.

9        A    No.

10       Q    No.

11       A    When I was in the vehicle, I stated something.  I

12  said, "I'm sue your ass for violating me."  And I said

13  something about Derek Wilson --

14       Q    And you know Derek Wilson?

15       A    -- suing them.  No.  I remember that he sued the

16  Syracuse Police Department for being violated.  And I said

17  I'm going to sue his ass too.

18       Q    And you're aware that Derek Wilson sued the police

19  a while back for a similar type circumstances; correct?

20       A    Whole Onondaga County's aware of that, sir.

21       Q    And you were -- and you were bringing up his name

22  at this point, so you were aware of it?

23       A    Yes.  Because I remember he had a civil for that,

24  sir.

25       Q    And didn't you previously state that it was your

                         Ashley M. Knights
                          Court Reporter
                           315-671-2058                    SYR002347

TRIAL - BECKWITH

1    intention to sue?

2        A    Yes.

3        Q    Sue for $30 million?

4        A    Yes, I'm suing.  I filed a claim.  Yes, sir.

5        Q    And while you -- they -- they took you to booking,

6    correct, and you testified to that?

7        A    Yes, sir.

8        Q    And while you were -- you were brought to booking

9    and you were charged with possession of the bags that the

10   officers stated they found on you; correct?

11               THE COURT:  Well, hold on now.

12       A    I don't know what my charges was.

13               THE COURT:  No, no, no.  Please.  People

14       don't get charged at booking.  People might get booked

15       at booking, they might get charged in court the next

16       day.

17               THE WITNESS:  Yeah.

18               THE COURT:  So you may ask him which of those

19       two circumstances or both of them, but specify.  Go

20       ahead.

21       Q    So were you officially booked on the circumstances

22   from that night?

23       A    I was booked on whatever circumstances they had.

24   I don't know what my charges was that night.

25       Q    The previous day were you arraigned on charges?

Ashley M. Knights
Court Reporter
315-671-2058                           SYR002348

TRIAL - BECKWITH

1    A    Yeah.

2         THE COURT:  The following day, you mean?

3    Q    The following day, I mean.

4    A    Yes, that's the process that everybody goes
5    through when they booked.

6    Q    At that point did you find out that you were
7    charged with drug possession?

8    A    Yes, sir.

9    Q    Now let's go back to when you were at booking.
10   You stated they actually searched your person again;
11   correct?

12   A    Yes, sir.

13   Q    And you were placed in a holding cell; is that
14   correct?

15   A    Yes, sir.

16   Q    And at one point you were placed in a holding cell
17   for a little while by yourself?

18   A    Yes, sir.

19   Q    And -- and then at some point after that you
20   complained about the pain and you were eventually
21   transported to the hospital; correct?

22   A    No.  I complained about the pain when I was in
23   being searched.  I told them I needed to see the nurse.

24   Q    But you were eventually taken to the hospital;
25   correct?

TRIAL - BECKWITH

1    A    Yes, sir.

2    Q    And at the hospital you received a exam by -- by a

3  doctor; right?

4    A    Yes, sir.

5    Q    And you, in fact, told the doctor that the injury

6  to your anus took place during a search in booking?

7    A    No. you're wrong.

8              MR. CENTRA:  Judge?

9              THE COURT:  Yes?

10              MR. CENTRA:  Can I take a look at the exhibit

11    that was entered in?

12              THE COURT:  Exhibit 7?

13              MR. CENTRA:  Exhibit 7.

14              THE COURT:  Yep.

15    A    It's wrong.

16    Q    In fact, it states in Exhibit 7, Mr. Beckwith,

17  statement that you made to the -- appears to be Dr. Jacob

18  Frier.  "Patient stated that he was being -- states that

19  last night he was being booked by an arresting officer.  And

20  per that patient, he was searched for drugs around his

21  genitals in the process."

22    A    Did I say I was being booked by the arresting

23  officer?  The arresting officer is not the deputy at

24  Onondaga County Justice Center.

25    Q    And you, in fact, told --

TRIAL - BECKWITH

1      A    Right.

2      Q    -- that same doctor that you had a stinging pain

3   that was around two out of ten on the pain scale; correct?

4      A    Two out of ten?

5      Q    Yes.

6      A    Seven.

7      Q    Well, you previously stated that it was seven;

8   correct?  But --

9      A    Seven.

10      Q    But here in this exhibit that's been entered into

11   evidence it says that you're -- you told the doctor that it

12   was two out of ten; correct?

13      A    No.  My discharge papers say 7/10.

14      Q    Well, if you look -- I'm going to have you take a

15   look at --

16           THE COURT:  You can show him.

17           MR. CENTRA:  Yes.

18      Q    I'm going to have you take a look at seven and

19   read right here where it says "Patient states he currently

20   has a two out of ten stinging pain."

21      A    That's wrong.  That's wrong.

22           THE COURT:  The next question, please.

23      A    Because my discharge papers say seven out of ten.

24      Q    Yes, and I'm going to get to that.  Later on you

25   actually met with an RN named Maureen Garvey, who was what

TRIAL - BECKWITH

1  they call a SANE nurse, a sexual assault nurse examiner.

2  And you told her that your pain was seven out of ten;

3  correct?

4      A    I don't know.  I can't remember -- I remember the

5  doctor was in there, and the nurse came in there.  The

6  doctor asked, "What's your pain?"  I said seven.  It was

7  seven out of ten.

8      Q    So at some point it was seven out of ten and some

9  points it was two out of ten?

10     A    No.  You said -- I said it was a seven out of ten.

11 And you're stating that -- I did tell the doctor seven out

12 of ten, but you're telling me I said two.  I'm telling you

13 it was seven.

14              THE COURT:  Okay.  This is --

15              MR. CENTRA:  I understand.

16              THE COURT:  The document is in evidence.  You

17      may sum up upon it.  Please don't argue.  Please

18      continue.

19     Q    And you, in fact, refused an examination from the

20 sexual assault -- the nurse examiner even though you had an

21 alleged sexual assault?

22     A    He asked me have I had -- was it being -- was it

23 intercourse?  I said no.  He said, "You want to do a touch

24 kit?"  I said no.  He said, "Sperm?  Anything like that?"  I

25 said no.  I wiped.  He said, "You sure?"  I said I didn't

TRIAL - BECKWITH

1    want to do a touch because I wiped already.  I wiped the

2    blood.  I was leaking, so I wiped the blood up.  I cleaned

3    myself up.

4         Q    And you stated you were bleeding from the anus;

5    correct?

6         A    No.  I was bleeding from around the anus.

7         Q    Around the anus?

8         A    I didn't say from the anus.

9         Q    Well, around the anus?

10        A    Yeah.  My asshole area.  Around my asshole area.

11        Q    In the medical report it actually states it was a

12   nonbleeding injury; isn't that correct?  I'm going to have

13   you take a look at page 7 of Exhibit 7.  There (indicating).

14        A    It was abrasion.  It was scratches.  Must have

15   stopped bleeding.  I was no longer bleeding when I got to

16   the hospital.  Told you I just had scratches around my

17   buttocks area.  When I wiped, it was blood on the tissue.

18   It was stinging.

19        Q    And --

20        A    Maybe the blood -- it stopped bleeding.  After a

21   while, you know, you do stop bleeding.  It wasn't gashes.

22   Gashes is going to continue to bleed; a scratch is not going

23   to continue to bleed for a hour.  That's common sense, like.

24   I was scratched.

25        Q    And --

TRIAL - BECKWITH

1    A    Not cut.

2    Q    -- you had previously stated here when you first

3    testified today that Officer Breen had put his finger -- I'm

4    just quoting you -- in your asshole?

5    A    I didn't say he put his finger in my asshole.

6    Q    Isn't that what you testified here?  That's

7    exactly what you testified here today.

8    A    Well, I didn't say that.

9        MS. FLORES:  Objection.

10        THE COURT:  Excuse me.  Don't make him be a

11        court reporter.  The jury will ask for a read-back if

12        necessary.  Please continue with your next question.

13    Q    And then on page 5 of the medical reports you, in

14    fact, stated that the police did not enter your rectum; is

15    that correct?

16    A    No, he did not go inside my asshole.  I never

17    testified that he went inside my asshole.  I said he went in

18    my ass area, my rectum area.

19    Q    So --

20    A    He swiped me.

21    Q    So -- so after you were booked and charged after

22    that night, you found out that you were charged with

23    criminal possession of a controlled substance in the third

24    degree, criminal possession of a controlled substance in the

25    fourth degree, as well as other charges; correct?

TRIAL - BECKWITH

1     A     Yes.

2     Q     And those charges were, in fact, presented to the

3  grand jury; correct?

4     A     Yes, sir.

5     Q     And that was on September 9th of 2016?

6     A     Yes, sir.

7     Q     And you took the oath swearing to tell the truth?

8     A     Yes, sir.

9     Q     And in grand jury, you testified to the stop that

10 you testified to here today; correct?

11    A     I didn't hear your last part.

12    Q     You testified to the stop that you testified to

13 here in court today?

14          THE COURT:  The encounter with the police,

15    you described it in grand jury?

16    A     Yes, yes, yes.

17    Q     And you, in fact, testified there that the officer

18 went into your rectum; correct?

19    A     Yes, he went in my ass area.

20    Q     And you there testified that he did a cavity

21 search; correct?

22    A     Yes.

23    Q     And you claim that you, in fact, never possessed

24 the drugs that they had found?

25    A     Yes, sir.

TRIAL - BECKWITH

1     Q    And you stated that they planted the drugs on you;

2  correct?

3                 MS. FLORES:  Objection.

4     A    I answered your question.

5                 THE COURT:  No.  What's the objection?

6                 MS. FLORES:  Well, again --

7                 THE COURT:  No, again what?

8                 MS. FLORES:  As far as what he's asking him

9        what he testified to --

10                THE COURT:  No, he's asking him now about --

11                MS. FLORES:  Oh, okay.

12                THE COURT:  -- what he testified to in front

13       of the grand jury.

14                MS. FLORES:  Oh, okay.  Okay.

15    Q    And like you said, the charges that were presented

16  before the grand jury were for the drug possession?

17                MS. FLORES:  Objection, Judge.  He would not

18       know initially what charges were presented to the grand

19       jury.

20                THE COURT:  Well --

21                MS. FLORES:  He only learned that after he

22       was arraigned.

23                THE COURT:  Excuse me, now.  How do you know

24       that?  Couldn't he have gotten grand jury notice?  All

25       right.  So --

TRIAL - BECKWITH

1          MS. FLORES:  He didn't --

2          THE COURT:  So hold on.  Your objection is

3     overruled.  But, Mr. -- excuse me.  I should say this.

4     The reason for your objection is rejected; however,

5     Mr. Centra can draw out from him whether or not he knew

6     before going into the grand jury room that one of the

7     charges or one or more charges were drug-related that

8     the grand jury would consider.  Go ahead.

9     Q     Mr. Beckwith, is it true that you were served with

10    a grand jury notice about the presentment to the grand jury?

11    A     Yes.

12    Q     And on that notice it's stated that you were being

13    charged with criminal possession of a controlled substance

14    in the third degree as well as other charges?

15    A     I -- I just know it was a drug charge.  My lawyer

16    told me that drug charges was being presented to the grand

17    jury, yes.

18    Q     So you were aware it is a drug charge being

19    presented to the grand jury?

20    A     That's it.

21    Q     And the -- is it fair to say that the statements

22    that you had made to the grand jury would dissuade them from

23    charging you with a drug possession?

24    A     Huh?  You said it would --

25          MS. FLORES:  Objection, Judge.

TRIAL - BECKWITH

1          THE COURT:  Hold on.  That's sustained as to

2      the form of the question.

3      Q    Is it your belief that if the grand jury believed

4  what you had said in the grand jury that day, that it would

5  prevent -- that they would not charge you with those --

6  those drug charges?

7      A    I believe my story just needed to be heard.  What

8  happened, what really happened, I needed to be heard.  I

9  just wanted to tell my side of the story.

10         MR. CENTRA:  All right.  I have no further

11     questions.  Thank you.

12         THE COURT:  Okay.  Ms. Flores?

13         MS. FLORES:  I have no questions, Judge.

14         THE COURT:  All right.  Members of the jury,

15     we're going to break for today.  On your way out I'm

16     going to have you order sandwiches for -- for tomorrow

17     for lunch because I think I can get you the case by

18     lunch.  So don't discuss the case.  Don't form any

19     opinions.  Follow all of the written rules.  But stay

20     in your jury room, order your lunch, order a sandwich

21     for tomorrow before you go.  Thank you.  And have a

22     good evening.  9:15 tomorrow just like today.

23         (Whereupon the jury was excused.)

24         THE COURT:  All right.  Mr. Beckwith, you can

25     return to your table.

TRIAL - BECKWITH

1           (Complying.)

2               THE COURT:  All right.  I want to do just a

3       little bit of a charge conference keeping in mind that

4       you may call more witnesses.  Both sides can still call

5       more witnesses.

6               MS. FLORES:  Okay.

7               THE COURT:  But just to make things easy, I'm

8       going to use Section 140.10, Subdivision, I'm going to

9       say, 1(a).  See, whatever occurred occurred in the

10      officer's presence; all right?  And therefore, for

11      example, the defendant -- the officer, at least as a

12      matter of law -- that's up to the jury to decide, but

13      as far as a matter of law, the officer had probable --

14      he had reasonable cause to arrest the defendant for

15      aggravated unlicensed operation of a motor vehicle in

16      the third degree because he confessed that he was

17      driving with a suspended license.  So that is a crime

18      under the Vehicle and Traffic Law.  Possession of

19      marijuana is UPM, is -- is not a crime.  It's a -- it's

20      a violation.  And so what I decided to do is to, when I

21      reauthorize the rest, to just use the one.  An offense

22      in the person's presence.  The jury's not going to know

23      the difference between a misdemeanor, a felony, a

24      violation, or an offense.  And so that's what I'm going

25      to be -- be using.  It's just easier.  It's more

TRIAL - BECKWITH

1    protective of the defendant.  But it's easier because

2    it's obvious that it was in his presence; all right?

3            MS. FLORES:  So this would be the definition

4    of an authorized arrest?

5            THE COURT:  For the resisting arrest, yes.

6            MS. FLORES:  Okay.

7            THE COURT:  Now, as far as the OGA, I am

8    thinking of submitting it because depending upon one's

9    view of the evidence in the light most favorable to the

10   People, his -- his conduct in the -- in the indictment

11   it says to perform a -- prevented them performing an

12   official function.  He failed to comply with orders

13   when they were attempting to place him under arrest.

14   Now, that -- that's really duplicitous -- or excuse me,

15   multiplicitous resisting arrest.  But then it says

16   further the defendant was attempting to prevent the

17   officers from locating a bag of narcotics which the

18   defendant was trying to conceal in his person.  But of

19   course, we know that we don't have that.  So I'm going

20   to mull this over overnight.  But I don't think he

21   could get any extra time for -- because I think it's

22   the same physical activity.  And I'm thinking of -- of

23   not submitting it because it is multiplicitous of

24   resisting arrest.  That's just my thought on that.  As

25   you know, I gave you the record on appeal from Ribowski

Ashley M. Knights
Court Reporter
315-671-2058                           SYR002360

TRIAL - BECKWITH

1   on special issue submissions in a perjury case, and I

2   will be putting together a verdict sheet to show you

3   that will have each of the sections of testimony that

4   were read by the court reporter.  Let me just see what

5   else.  I'm going to put the -- the limiting instruction

6   on the defendant's prior conviction that it only goes

7   to credibility, not propensity.  And let's see, all

8   right.  So does anybody have anything fact-specific or

9   case-specific as far as an instruction as of this

10  moment?  If not, it's okay.

11            MS. FLORES:  Judge?

12            THE COURT:  Yes.

13            MS. FLORES:  What was the cite to Ribowski

14  again?

15            THE COURT:  It's on a thing I gave you.

16            MS. FLORES:  Oh, it's on the packet?

17            THE COURT:  It's on the order where I

18  attached the record on appeal; okay?

19            MS. FLORES:  Okay.

20            THE COURT:  But it's 77 New York 2d, 2AD 4.

21  Before I forget, I got a -- all right.  So you can call

22  more witnesses tomorrow if you want.

23            MS. FLORES:  Okay.

24            THE COURT:  People may call a rebuttal

25  witness tomorrow who's a doctor.  And hopefully, we'll

TRIAL - BECKWITH

1    get them deliberating in time for their sandwiches to

2    come.  Anything else for today?

3            MR. CENTRA:  Judge, I just had a couple

4    things on the --

5            THE COURT:  Yes.

6            MR. CENTRA:  -- instruction.

7            THE COURT:  Yes.

8            MR. CENTRA:  I was just going to ask, it

9    looked like there was some questions and information

10   that alluded to the legality of the stop by Ms. Flores,

11   so I would ask for an instruction from the Court

12   instructing the jury to the --

13           THE COURT:  Okay.

14           MR. CENTRA:  -- the legality of that, the --

15   the hearings had already been held, and that the search

16   was upheld.

17           THE COURT:  Well, I could -- I could include

18   that in the -- if an officer sees a vehicle and

19   traffic -- a -- a -- even a single Vehicle and Traffic

20   Law violation committed in his presence, he may

21   lawfully pull over the car.  That's what you mean;

22   right?

23           MR. CENTRA:  Yes.

24           THE COURT:  Okay.  Then I'll do that.  All

25   right.  What else?  Anything else for today?  If not,

TRIAL - BECKWITH

1    thank you very much.  We'll see you at 9:15 tomorrow.

2    I've got approval for overtime if we needed it.

3         (Whereupon the proceeding was adjourned.)

4

5

6

7         C E R T I F I C A T E

8

9    I, Ashley M. Knights, Registered Professional Reporter,

10   Certified Realtime Reporter, and New York Realtime Court

11   Reporter, of the Fifth Judicial District, State of New York,

12   DO HEREBY CERTIFY that the foregoing is a true and accurate

13   transcript from my stenographic notes taken in the

14   above-entitled matter and the whole thereof.

15

16

17

18                    February 28, 2018

19

20

21

22

23   _____

24                    Ashley M. Knights, RPR, CRR, NYRCR

25

Ashley M. Knights
Court Reporter
315-671-2058

SYR002363

VOLUME III

S T A T E   O F   N E W   Y O R K
COUNTY COURT    COUNTY OF ONONDAGA
------------------------------------------x Indictment No.:
THE PEOPLE OF THE STATE OF NEW YORK,     : 2016-0920-1

                            Plaintiff,  : Index No.:
                                          16-1102
vs.                                     :
                                          DR No.:
DAVONNE BECKWITH,                       : 16-444978

                            Defendant.  : NYSID No.:
                                          8317941J
------------------------------------------x
                                          Proceeding:
                                          Trial

PRESIDING:          THE HONORABLE JOHN J. BRUNETTI
                    Supreme Court Justice in and for the
                    Fifth Judicial District
                    State of New York


HELD AT:            Onondaga County Criminal Court
                    505 South State Street
                    Syracuse, New York  13202


DATE:               June 1, 2017


APPEARANCES:        ADA JOSEPH J. CENTRA, ESQ.
                    Attorney for the People

                    IRENE AURORA FLORES, ESQ.
                    Attorney for the Defendant


REPORTED BY:        Ashley M. Knights, RPR, CRR, NYRCR


                    Ashley M. Knights
                     Court Reporter
                     315-671-2058

SYR001899

1                           INDEX OF WITNESSES

2       FOR THE PEOPLE:

                                                                    Page
3       THOMAS WEIDMAN, MD
                Direct Examination by Mr. Centra                    374
4               Cross-Examination by Ms. Flores                     379
                Redirect Examination by Mr. Centra                  381
5               Recross-Examination by Ms. Flores                   382

6

        FOR THE DEFENDANT:
7

        RAYSHELL JOHNSON
8               Direct Examination by Ms. Flores                    385
                Cross-Examination by Mr. Centra                     390
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Ashley M. Knights
                        Court Reporter
                        315-671-2058                    SYR001900

TRIAL - BECKWITH

1      THE COURT:  People versus Beckwith.  The

2  jury's not here.  I'm going to have to interrupt you

3  before -- well, we're going to have to delay calling

4  the next witness because of a gentleman who has to be

5  brought up for a remand order.  So, Ms. Flores, what

6  are your plans as far as calling any more witnesses?

7      (Whereupon a discussion was held off the record.)

8      MS. FLORES:  She's not out there, Judge.

9  Judge, my next witness isn't here, so I was just going

10  to call one more.  And if --

11      THE COURT:  Were you going to call the woman

12  who was in the car?

13      MS. FLORES:  Yes.

14      THE COURT:  Well, by the time -- if she gets

15  here by the time this fellow comes up, you'll call her.

16      MS. FLORES:  Okay.

17      THE COURT:  If not, the law permits me to

18  allow a witness to be called out of order.  Mr. Centra

19  is going to call a rebuttal witness.  This is what, the

20  doctor who was actually referenced in the medical

21  report?

22      MR. CENTRA:  Yes, your Honor.

23      THE COURT:  And you're calling him to rebut

24  the testimony of the defendant?

25      MR. CENTRA:  Yes.

TRIAL - BECKWITH

1        THE COURT:  Okay.  So we'll just see who gets
2    here first, the -- the detainee person or your witness
3    and take it from there.
4        MS. FLORES:  Okay.
5        THE COURT:  Let's do a little more here.  I
6    want to preview a couple of things.  First, I'm
7    sticking with my inclination about the OGA because I
8    think it's just going to prolong and complicate
9    matters.  And I'll -- I'll explain for the jury that
10   has nothing to do with the merits of the case and not
11   to draw any inference.  But I'm doing it strictly to
12   facilitate their deliberations.  So that's my plan.
13   With regard to Mr. Centra's request, I'm going -- I
14   roughed this out.  Before I begin the resisting arrest
15   instruction, I'm hereby advising you that the legality
16   of the actions of the police in pulling the car over is
17   not an issue for the jury; however, I instruct you that
18   if a police officer observes a violation of the Vehicle
19   and Traffic Law, then that is a legal basis to pull the
20   car over.  What is an issue for the resisting arrest
21   count is that the jury will be asked to determine
22   whether the People have proven beyond a reasonable
23   doubt that the arrest for which the defendant is
24   accused of resisting was, quote, authorized, end quote,
25   under a definition I will give you.  That's my plan.

TRIAL - BECKWITH

1     Now, remember, I might say it slightly differently

2     because I roughed it out with notes, so you're welcome

3     to object, but I call it the end of the instruction

4     exceptions or requests.

5             MR. CENTRA:  Judge, was Julio Hernandez

6     the --

7             THE COURT:  Mr. Hernandez, yes.

8             MR. CENTRA:  Is that what it was?  Okay.

9        (Whereupon a discussion was held off the record.)

10            THE COURT:  We're going to take the witness

11    the People have out of order.  Call him in.  That's

12    Dr. ...

13            MR. CENTRA:  Thomas Weidman.

14            THE COURT:  Dr. Weidman.  Bring in the jury,

15    please.

16       (Whereupon the witness entered the courtroom.)

17            THE COURT:  Sir, give your spelling to the

18    court reporter.

19            THE WITNESS:  First name Thomas, T-H-O-M-A-S,

20    middle initial K, W-E-I-D-M-A-N.

21       (Whereupon the jury entered the courtroom.)

22            THE COURT:  All right.  Members of the jury,

23    good morning.  I'm sorry for the delay.  We were all

24    here ready to go, the witness, the lawyers, and then

25    there was something that delayed me.  So the -- the

TRIAL - BECKWITH

1          defense has not necessarily rested yet, but I'm

2          allowing the People to call a what's called "a rebuttal

3          witness" out of turn since that witness is here and the

4          other witness may be on the way.  This way, the

5          proceedings are not delayed.

6                    Please state your name.

7                    THE WITNESS:  My name is Thomas Weidman.

8                    T H O M A S   W E I D M A N,  M D, called as a

9      witness and being duly sworn, testifies as follows:

10                   THE COURT:  Go ahead, please.

11                   DIRECT EXAMINATION BY MR. CENTRA:

12         Q    Good morning, Doctor.

13         A    Good morning.

14         Q    Could you state where you're employed?

15         A    I'm employed at Upstate Emergency Medicine,

16     Incorporated.  We are an independent contracting group

17     contracted to work in the emergency department at University

18     Hospital in Syracuse, New York.

19         Q    And how long have you been there?

20         A    I have been there for a total of ten years; three

21     years as a resident, seven years as an attending.

22         Q    And could you briefly go through your schooling

23     and training that you received to become a doctor?

24         A    Four years of undergrad at Sienna College outside

25     of Albany, New York, five years at Albany Medical College to

TRIAL - BECKWITH

1    receive my MD, and then three years of residency training in

2    emergency medicine at SUNY Upstate, and then I've been an

3    attending since July 1st of 2010 at University Hospital.

4        Q    And specifically, what type of medicine do you

5    practice right now?

6        A    I practice emergency medicine.

7        Q    Can you describe what your duties and

8    responsibilities are in your position?

9        A    Strictly in the emergency department.  Only deal

10   with trauma, stroke, virtually -- not virtually, but anyone

11   coming in looking for emergency care is seen by an emergency

12   medicine physician.

13       Q    Doctor, I'm going to draw your attention to

14   September 6th of 2016.  Do you remember this date?

15       A    Not specifically, no.

16       Q    Do you recall if you were working on that date?

17       A    I did not until I received the subpoena and went

18   back, checked my schedule.  And I was working on that date.

19       Q    Did you review any sort of medical reports to --

20   to refresh your recollection?

21       A    Yes.  I reviewed the medical record of the case at

22   hand after I received the subpoena, which is standard for

23   me.  We get a lot of criminal cases at University Hospital.

24   I'm here in this -- not necessarily this room, but here at

25   court a number of times a year typically for criminal cases.

TRIAL - BECKWITH

1        MR. CENTRA:  Where is Exhibit 7?

2        (Whereupon a discussion was held off the record.)

3    Q    Doctor, I'm going to show you what's been entered

4    into evidence as Exhibit 7.  Is this the report you reviewed

5    to refresh your recollection from that date?

6    A    Yes, this would be the chart from that date.

7    Q    On that date, it's September 6th of 2016, did you

8    see a patient by the name of Davonne Beckwith?

9    A    Yes.

10   Q    And what was the reason for him coming into the

11   emergency room that day?

12   A    Complaint was sexual assault and potential anal

13   trauma.

14   Q    And was he, in fact, examined?

15   A    Yes.  By both myself and the resident physician.

16   Q    And do you recall if he had been asked to state

17   what his pain on a scale of one to ten would be?

18   A    Not specifically by me.  I don't typically ask

19   that question.  That's something that's usually asked by

20   either the triage nurse, which is when you come into the ER

21   you're assessed almost immediately by a registered nurse,

22   and they would put that in the note.  So I probably didn't

23   ask him his pain; although, I don't recall specifically, but

24   it -- in the medical record it stated he had a two out of

25   ten stinging pain without radiation.

TRIAL - BECKWITH

1    Q    And did you, in fact, examine Mr. Beckwith?

2    A    Yes.

3    Q    And did you examine the pain that he had stated to

4    his anus?

5    A    Yes.

6    Q    And what were the results of your examination that

7    day?

8    A    I have -- I have to review the chart because I

9    don't remember specifically this case, but the -- we found a

10   less than 1 centimeter -- which would be about the tip of

11   your pinky -- superficial abrasion just to the left of the

12   anus.  Nothing bleeding, nothing draining, mildly tender,

13   and not swollen.

14   Q    So there was no blood during your examination?

15   A    No.

16   Q    Would you describe this as a -- as a big abrasion?

17   A    No.  Less than 1 centimeter would be less than --

18   approximately half an inch.

19   Q    And can you describe what a superficial abrasion

20   is?

21   A    So abrasions are basically graded out on how much

22   of the layers -- how many layers of skin they take off.

23   Your skin is layered at the top by just the superficial

24   layer of the skin, which is just the top which is epidermis.

25   And then the dermis is the next layer.  And then we start

TRIAL - BECKWITH

1   getting into blood vessels, et cetera.  A superficial

2   abrasion, by definition, is just the top layer, the

3   epidermis.

4       Q    So it did not get into the blood vessels?

5       A    Correct.

6       Q    Now, in your experience as a doctor, would you

7   consider this a common injury that you see?

8       A    Yes.

9       Q    And based on your experience, what are some things

10  that you've seen that could cause an injury of this nature?

11      A    So an injury in this particular area for this can,

12  A, be trauma, which could certainly be sexual assault.  It

13  can be insertion of any foreign object, which we do see

14  occasionally.  Can be from constipation.  So if the patient

15  has particularly hard stool and is straining to have a bowel

16  movement, you can have this.  Or if you were to have

17  multiple loose bowel moments and you're wiping or even

18  wiping aggressively after having a stool, you can have an

19  abrasion of this nature.

20      Q    Would you consider this a serious injury?

21      A    No.

22      Q    Is there -- is this an injury that's normally very

23  painful?

24      A    No.

25               MR. CENTRA:  I have no further questions.

```
                        TRIAL - BECKWITH
```

1        Thank you, Doctor.

2                THE COURT:  Okay.  Ms. Flores?

3            CROSS-EXAMINATION BY MS. FLORES:

4        Q    Hi.  Good morning, Doctor.

5        A    Morning.

6        Q    Did -- was that the entire medical record on this

7    patient that you examined, which was on Exhibit 7 --

8                THE COURT:  Okay.  But hold on.  Hold on.

9            Just for clarification of you, Doctor, also.  All of

10           the paperwork that was dismissed as part of the, quote,

11           "medical record," end quote, would include a lot of

12           nonmedical forms.  You know what I'm talking about?

13               THE WITNESS:  Mm-hmm.

14               THE COURT:  That is not in evidence.  What I

15           ruled to be in evidence was the five or six pages that

16           were mostly in English that a -- a -- a layperson such

17           as the jurors could -- could understand.  But so that's

18           not the entire chart.  That's an excerpt from the

19           chart.  So now that we have that, we have Exhibit 7,

20           that's the excerpt.  And then we'll call something the

21           entire chart, which is not in evidence.  With those --

22           with that lexicon, go right ahead.

23       Q    Doctor, did you review the entire chart for this

24   patient before -- in preparation for your testimony today?

25       A    I reviewed the visit from that date only.  I don't

TRIAL - BECKWITH

1   go through and review any other medical records that aren't

2   pertinent to that.  So if he had been at University Hospital

3   prior to that, I don't go to that portion of his chart

4   because I'm not allowed to look at that portion of his

5   medical record.

6        Q    Well, as far as the visit on that particular date,

7   which would have been September -- I believe September 6th,

8   2016, did you review the entire record for that visit?

9        A    Yes, ma'am.

10       Q    Do you recall reviewing -- oh, first -- first of

11  all, do you -- do you recall reviewing Maureen Garvey's

12  notes?

13       A    I don't know who that is in particular.

14       Q    She would be the SANE nurse.

15       A    I actually have that in front of me.

16       Q    You have that in front of you?

17       A    I have the SANE note in front of me.

18       Q    You have the SANE note?

19       A    Yes, ma'am.

20       Q    Okay.  Do you recall what her note was with regard

21  to the assessment -- the pain -- the pain assessment on my

22  client's part?

23       A    Not off the top of my head, no, ma'am.  But it

24  does say seven out of ten here.

25       Q    Okay.

TRIAL - BECKWITH

1           THE COURT:  Is that in the Exhibit 7?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Thank you.

4      Q    On page 9; that's correct?

5      A    Yes, ma'am.

6           MS. FLORES:  I have no further questions.

7           THE COURT:  Anything else?

8           MR. CENTRA:  Yes, just for clarification.

9      REDIRECT EXAMINATION BY MR. CENTRA:

10     Q    You just referenced a SANE nurse.  Can you

11  describe what a SANE nurse is?

12     A    SANE stands for a sexual assault nurse.  They are

13  something that they -- specialty nurse that is activated

14  typically by our triage nurse, the same person that would do

15  the initial assessment of a patient if there is an alleged

16  sexual assault involved.  They would be activated by the

17  triage nurse.  It's someone that is not -- they're

18  affiliated with the hospital but not employed by the

19  hospital, who would come to typically do the evidence

20  collection, sexual assault exam.  Something that we would do

21  as doctors, we do with them so the exam is only done once

22  and it's done correctly.

23     Q    So you -- you previously stated that Mr. Beckwith

24  came in with an allegation of sexual assault; correct?

25     A    Correct.

Ashley M. Knights
Court Reporter
315-671-2058                    SYR001911

382

TRIAL - BECKWITH

1    Q    And based on your reading of the records, did

2    he -- did he agree to have a sexual assault examination?

3    A    Can I just take a minute?

4         THE COURT:  You take your time.

5    A    According to the SANE nurse, evidence collection

6    was offered and declined, and the patient stated he just

7    wanted to make sure that his injuries were documented.

8    Q    And he had stated that at that point, that his

9    pain was seven out of ten?

10   A    In her note, correct.

11   Q    And the previous note you read it was two out of

12   ten?

13   A    And the resident's note was two out of ten,

14   correct.

15        MR. CENTRA:  I have nothing further.  Thank

16   you, Doctor.

17        RECROSS-EXAMINATION BY MS. FLORES:

18   Q    Doctor, would you agree with me that only the

19   patient, himself or herself, can accurately describe the

20   pain that he or she feels?

21   A    Yes, ma'am.  Pain is subjective.

22        MS. FLORES:  Okay.  No further questions.

23        THE COURT:  All right, Doctor.  Thank you

24   very much.  You may depart.  You can just leave that on

25   the -- give it to Mr. Centra on the way out.

TRIAL - BECKWITH

1     (Whereupon the witness was excused.)

2          THE COURT:  And, Court Officer, do you see

3     anybody in the hallway who might be the potential

4     witness who's due to arrive?  I shouldn't say

5     "potential witness."  He can just ask anybody to come

6     in.  I didn't mean it that way.  If she's not, we'll

7     take a break and I'll take care of the case that has

8     nothing to do with this case that delayed us to begin

9     with.

10          COURT OFFICER:  No, your Honor, I do not.

11          THE COURT:  Thank you.

12          Members of the jury, I'm going to ask

13    Ms. Flores to use her cell phone to get ahold of her.

14    I'm going to take a brief arraignment, about three

15    minutes.  Please go to your jury room, follow all the

16    written rules, don't discuss the case, don't form any

17    opinions.

18          (Whereupon the jury was excused.)

19          THE COURT:  Now, Ms. Flores, I got a couple

20    scheduling issues that have nothing to do with this

21    case, so we'll do that when the jury files out.

22          All right.  With regard to your case with

23    Judge Hafner, we will definitely be at lunch today at

24    1:00 when you're due with him on Mr. Hassan's case.

25          MS. FLORES:  Okay.

Ashley M. Knights
Court Reporter
315-671-2058

SYR001913

TRIAL - BECKWITH

1        THE COURT:  Now, I got something from your

2    office.  It leaves out the fact that you're in --

3    you're actually in a trial in front of me saying --

4    we'll go off the record.

5        (Whereupon a discussion was held of the record,

6        and a brief recess was taken.)

7        THE COURT:  The person you're going to call

8    is?

9        MS. FLORES:  She's present, Judge.

10       THE COURT:  And what is her name?

11       MS. FLORES:  Rayshell Johnson.

12       THE COURT:  All right.  I'm handing out the

13   verdict sheet.  And this is the special verdict form

14   that I mentioned on the Ribowski.  And if you have any

15   objections, you'll let me know.

16       So let's call down for the jury, please, or

17   bring the jury down.

18       Now, this is of little significance, but did

19   this particular witness testify in the grand jury?

20       MR. CENTRA:  Yes, Judge.

21       THE COURT:  Okay.  Thank you.  All right.

22   Ma'am, would you come up so we could get you settled.

23       Give your first and last name spelling to the

24   court reporter.  But I'm going to give you your oath

25   and have you state your name when the jury comes in

TRIAL - BECKWITH

1    here.  So give your first and last name to the court

2    reporter, spell it.

3                    THE WITNESS:  Rayshell, R-A-Y-S-H-E-L-L,

4    Johnson.

5                    THE COURT:  Do you wish to consent to smoking

6    breaks, Ms. Flores, during deliberations?

7                    MS. FLORES:  Yes, Judge.

8                    THE COURT:  Okay.

9            (Whereupon the jury entered the courtroom.)

10                   THE COURT:  All right.  The jury has rejoined

11   us.  The defense has called their next witness.  She's

12   spelled her name.

13                   But state your name, please.

14                   THE WITNESS:  Rayshell.

15                   THE COURT:  Last name?

16                   THE WITNESS:  Johnson.

17           R A Y S H E L L   J O H N S O N, called as a

18   witness and being duly sworn, testifies as follows:

19                   THE COURT:  Go ahead, Ms. Flores.

20           DIRECT EXAMINATION BY MS. FLORES:

21   Q    Good morning, Ms. Johnson.

22   A    Good morning.

23   Q    How old are you?

24   A    Thirty-eight.

25   Q    Are you a resident of Syracuse?

```
                            TRIAL - BECKWITH

 1        A     Yes.

 2        Q     Can you speak loudly enough so that the jurors

 3   back here can hear you.

 4        A     Yes.

 5        Q     Okay.  How long have you lived in Syracuse?

 6        A     All my life.

 7        Q     Okay.  So do you know Mr. Davonne Beckwith?

 8        A     Yes.

 9        Q     How do you know Mr. Beckwith?

10        A     We were in relations for a long time.

11        Q     Okay.  Do you recall -- I'm going to take you back

12   to last year on the date of September 6th, 2016.  Around

13   that afternoon or evening hours, do you remember where you

14   were?

15        A     Yes.

16        Q     Where were you?

17        A     Starting beginning of the day?

18        Q     No.  I mean just let's start at the -- you know,

19   the evening.

20        A     When the incident occurred?

21        Q     Yes.  Well, a little bit before the incident --

22   the incident.  Where were you a little bit before the

23   incident?

24        A     I was at the fair.

25        Q     Who were you at the fair with?
```

TRIAL - BECKWITH

1      A      My children and Mr. Beckwith.

2      Q      Okay.  So how long did you stay at the fair?

3      A      Until about 10, 11.  Until about 11 when it

4  closed.

5      Q      When it closed?

6      A      I'm not sure exactly what time that was.

7      Q      So what, if anything, did you do after it closed,

8  the fair closed?

9      A      Dropped off children.

10     Q      Where did you drop them off?

11     A      At home with my 18-year-old.

12     Q      Okay.  Your 18-year-old child?

13     A      Mm-hmm.

14     Q      Okay.  And from what -- what, if anything, did you

15  do after that?

16     A      Went out, played pool.

17     Q      Where -- who'd -- okay.  Let's back up.  So you

18  dropped the children off at your house --

19     A      Mm-hmm.

20     Q      -- with your 18-year-old?  Okay.  So you -- you

21  said that you later -- later from that point on went to play

22  pool?

23     A      Mm-hmm.

24     Q      Okay.  So did -- did you drive from the -- your

25  home?

388

TRIAL - BECKWITH

1    A    Yes.

2    Q    Was anyone with you when you drove from your home?

3    A    Yes.  Me and Mr. Beckwith.

4    Q    Okay.  So where did -- to where did you drive?

5    A    To a bar.

6    Q    Where was the bar?

7    A    On Bond and Butternut.

8    Q    Okay.  And is that where you played pool?

9    A    Yes.

10    Q    Were -- did you drink there?

11    A    Yes.

12    Q    Did you -- did you know if Mr. Beckwith drank

13    there?

14    A    No, he didn't.

15    Q    Okay.  So about how long did you stay there?

16    A    Maybe about a hour or two at the most, maybe.

17    Q    Okay.

18    A    A couple hours.  Not sure.

19    Q    All right.  So what did you do after that, after

20    the hour or two you were at the bar?

21    A    Headed home.

22    Q    Okay.  Let -- let me back up.  Do you remember who

23    drove to the fair?

24    A    I did.

25    Q    Okay.  Okay.  So after the bar, who drove home?

TRIAL - BECKWITH

1      A    Mr. Beckwith.

2      Q    Pardon?

3      A    Mr. Beckwith.

4      Q    Okay.  Why didn't -- why did Mr. -- was that your

5  car?

6      A    Yes.

7      Q    Okay.  So why was -- why did Mr. Beckwith drive?

8      A    Because I was intoxicated.

9      Q    Okay.  Did you smoke marijuana that night?

10     A    No.

11     Q    Do you smoke marijuana?

12     A    At that point, no.

13     Q    Okay.  Were you employed?

14     A    Yes.

15     Q    Where were you employed?

16     A    I was working for the State.

17     Q    The State doing -- as -- as what?

18     A    Working doing -- working with people who has

19  disabilities.

20     Q    Okay.

21     A    It was like being an aide.

22     Q    Okay.  Do you know if -- do you remember if

23  Mr. Beckwith was smoking marijuana that night?

24     A    No.

25     Q    Was there any blunts in your car?

TRIAL - BECKWITH

1    A    No.

2            MS. FLORES:  Okay.  I have no further

3    questions.

4            THE COURT:  Mr. Centra?

5            MS. FLORES:  Oh, wait.  I have one more

6    question.  I'm sorry.

7            THE COURT:  Go ahead.

8    Q    I'm sorry.  I forgot to ask you, Ms. Johnson, do

9    you -- do you have any criminal convictions?

10   A    Yes, I do.

11   Q    And when were -- how many?

12   A    I wasn't always a good girl, so but my last one

13   was in 2005.

14   Q    2005?

15   A    Yes.

16           MS. FLORES:  Okay.  Thank you.  No further

17   questions.

18           CROSS-EXAMINATION BY MR. CENTRA:

19   Q    Morning, Ms. Johnson.

20   A    Good morning.

21   Q    So you said that you've had relations with -- with

22   Mr. Beckwith?

23   A    Yes.

24   Q    In fact, you've known him for over, like, 15

25   years?

TRIAL - BECKWITH

1    A    Yes.

2    Q    And you were dating at some points?

3    A    Yes.

4    Q    Other points not dating?

5    A    Yes.

6    Q    At this point on September 6th, 2017, you two

7    were, in fact, in a relationship; correct?

8    A    Yes.

9    Q    You still in a relationship?

10   A    It's not relevant right now.

11            THE COURT:  In other words, he wants to know

12       do you have positive feelings toward Mr. Beckwith,

13       whether that's a sexual relationship or a marital thing

14       or --

15   A    Well, of course, he's in jail, so there's no

16   sexual relationship.  So like, I'm going to always love him

17   whether we're together or not.  I can only say that.  I

18   don't know.

19   Q    And so he -- after this incident on September 6th,

20   he was actually taken into custody?  He's been at the

21   Justice Center; correct?

22   A    Jamesville, yes.

23   Q    Jamesville, I'm sorry.  And have you -- have you

24   spoken with him?

25   A    Yes.

                              TRIAL - BECKWITH

1        Q     On the phone?

2        A     Yes.

3        Q     You visit him?

4        A     Yes.

5        Q     Any point did you guys talk about this case at

6    all?

7        A     I mean, yes and no.

8        Q     All right.  Sometimes?

9        A     Just asking me was I okay because that was a very

10   traumatic situation for me.  So ...

11       Q     I understand.  And as you just briefly touched on,

12   you actually have a criminal history of your own; correct?

13       A     Yes.

14       Q     Actually have a couple larceny charges?

15       A     You're right.

16       Q     You, in fact, were convicted of possessing

17   controlled substance in 2006, it was; correct?

18       A     2006.

19       Q     January 30th, 2006?

20       A     Was it for what?  Drug possession?  You saying

21   marijuana charge?

22       Q     No.  A controlled substance in the seventh degree.

23       A     In 2006?

24       Q     Yes.

25       A     Can you tell me the location?  Sorry.

                           Ashley M. Knights
                           Court Reporter
                           315-671-2058                    SYR001922

TRIAL - BECKWITH

1            THE COURT:  Well, putting aside the year,
2      okay, he's asking you were you at one point or another
3      convicted of a criminal possession of a controlled
4      substance in the seventh degree.
5      A     At one point I was, yes.
6            THE COURT:  Okay.
7      Q     And isn't it true that you were also convicted of
8   a felony of introducing a dangerous contraband into a
9   prison?
10     A     Yes.
11     Q     So on this night, September 6th, you had been --
12  you stated you had been drinking at the fair; correct?
13     A     Yes, I was.
14     Q     And you were drinking afterwards at the bar after
15  you dropped the kids off; correct?
16     A     Right.
17     Q     Would it --
18     A     Well -- yes.
19     Q     So you stated you were -- you were fairly
20  intoxicated; correct?
21     A     Yes, I was.
22     Q     And in grand jury you in fact say that you vaguely
23  remember the night; correct?
24     A     I --
25            THE COURT:  Well, hold on.  You can ask her

TRIAL - BECKWITH

1      whether she vaguely remembers the night here or you can

2      ask -- you've combined two things here.

3      Q    Isn't it true that you stated you vaguely remember

4  the night?

5      A    I did state that.

6      Q    And so on the night that the incident took place

7  where the police pulled over the vehicle, is it safe to say

8  that you really didn't have a very good view of everything

9  that went on that day or that night?

10     A    Of everything specifically?  Yes, that's safe to

11  say.

12     Q    And that you don't really have a very good memory

13  of what happened that night?

14     A    No.  It's safe to say that I can remember what I

15  seen.

16     Q    And is it true that you stated that Davonne

17  Beckwith, in fact, usually never wears a belt, and on that

18  night you saw his pants falling down?

19     A    I seen --

20             MS. FLORES:  Your Honor, I'm going to object.

21     This exceeds the scope of my direct.

22             THE COURT:  Excuse me.  Excuse me.  Pardon

23     me.  First of all, forgive me.  You're objecting.  What

24     is your objection?

25             MS. FLORES:  This cross exceeds the scope of

TRIAL - BECKWITH

1     my direct.  I didn't go into the -- the -- the details
2     of the arrest.
3                THE COURT:  Okay.  So the -- the objection is
4     sustained.  When you go beyond the topics covered on
5     direct, you make the witness your own; and therefore,
6     you may not ask leading questions unless the witness is
7     declared hostile.  And beside -- aside from her
8     relationship with the accused, she has seemed
9     responsive to your questions, so for now I'm not going
10    to permit leading questions on a new topic.  But if
11    there comes a time when you want her -- me to consider
12    her to be a hostile witness, you may make that request.
13    Go ahead.
14    Q    And did you, in fact, that night see the officers
15    search Davonne?
16    A    Yes.
17    Q    Did you see the -- the full search?
18    A    The full search, no.
19    Q    Did you at any point see any of the officers go
20    into -- physically go into his underwear?
21    A    I didn't physically see that, no.
22               MR. CENTRA:  Okay.  I have no -- nothing
23    further.
24               THE COURT:  All right.  Anything further?  If
25    not, thank you.  You may depart.

TRIAL - BECKWITH

1        MS. FLORES:  No, Judge.

2        THE COURT:  You're -- you're welcome to stay

3    as well.

4        (Whereupon the witness was excused.)

5        THE COURT:  Any further witnesses from the

6    defense?

7        MS. FLORES:  No, Judge.  At this time defense

8    rests.

9        THE COURT:  Any further witnesses from the

10    People?

11        MR. CENTRA:  No, your Honor.

12        THE COURT:  Members of the jury, the proof is

13    now closed.  That will signal to you that the next step

14    in this trial is the closing argument of the defense

15    followed by the closing argument of the People followed

16    by my final instructions.  Then and only then will you

17    have all of the tools that are necessary for you to --

18    to discharge your oath, which promised to deliver a

19    verdict in accordance with the evidence as you evaluate

20    it to be and the legal principles that I give you.  I

21    understand we have some smokers, so I'm going to give

22    you a 15-minute recess before closing arguments.  And

23    also, the lawyers have consented to smoke breaks at an

24    opportune time, which I'll discuss in my final

25    instructions, to be allowed during your deliberation

TRIAL - BECKWITH

1    process.  So don't discuss the case.  Don't form any

2    opinions.  Follow all the written rules.  You may leave

3    the floor.  Be ready to go in your jury room in 15

4    minutes.  Thank you.

5         (Whereupon the jury was excused.)

6         THE COURT:  Thank you.

7         MS. FLORES:  Judge, with regard to the motion

8    for a trial order of dismissal that I had reserved on,

9    I -- I -- I can't ethically make that motion at this

10   time because there has been a prima facie -- a prima

11   facie case at least to -- for on each charge of perjury

12   and resisting arrest to at least take -- have the grand

13   jury decide the issues of credibility.  So ...

14        THE COURT:  I agree.  Thank you.

15        (Whereupon a brief recess was taken.)

16        THE COURT:  The jury has joined us.  Members

17   of the jury, I'm alerting you that the law requires me

18   to discuss with the lawyers certain aspects of the law

19   that I'm going to be instructing you about once they

20   are done.  This makes sense because since your verdict

21   is to be in accordance with the evidence that you

22   evaluate and the law that I give you, that the closing

23   arguments should also touch upon both of those

24   components; however, I caution you that you have to

25   wait while the lawyers may make reference to some legal

TRIAL - BECKWITH

1    principles, you have to wait to get the official

2    explanation from me.

3            With that, I will call upon Ms. Flores for

4    the closing argument of the defense.

5            MS. FLORES:  Thank you, Judge.

6            Good morning, Everyone.

7            JUROR(S):  Good morning.

8            MS. FLORES:  On behalf of Mr. Beckwith, I

9    thank you for your attention to the testimony in this

10   case.  I could see each and every one of you paying

11   attention and listening to each testimony as they --

12   each person as they testified.  At the beginning of

13   this trial, and as I stated in my opening statement,

14   that the People of the State of New York are served by

15   a verdict justified by a fair and open-minded jury.

16   You will have to decide whether or not Mr. Beckwith

17   intentionally made false statements to the grand jury,

18   and you will have to decide whether or not he believed

19   those statements were false.  You would have to

20   determine his intent.  Please have his testimony read

21   back if you need to.

22           Ask yourself these three things as you're

23   deliberating together.  Did any of the testimonies that

24   you heard in the course of this trial, were they

25   relevant to any element of the charge of -- of perjury

TRIAL - BECKWITH

1    in the first degree?  Were they relevant to any of the

2    elements of resisting arrest?  Even if they were

3    relevant to any of the elements of the crimes charged,

4    then you have to decide whether or not any of that

5    evidence proves that element beyond a reasonable doubt.

6    If you have reasonable doubt on any one of those

7    elements, you must -- of the charge, you must acquit

8    Mr. Beckwith of that charge.  But the judge will

9    instruct you in detail after Mr. Centra gives his

10   closing statement.  The judge will instruct you on the

11   elements of perjury in the first degree.

12           The first statement that the prosecution

13   alleged is false is "The officer slid his hand in my

14   pants and rectum."  That is what they're -- the People

15   say my client told the grand jury.  You heard from

16   Mr. Beckwith yesterday.  You heard that he does not

17   have any medical training, and so you have -- with that

18   understanding and in light of how he -- what he

19   testified to yesterday, you have to assess whether or

20   not he knew what the rectum was.  If you will recall,

21   his understanding was anything that is within the --

22   the cheeks of his buttocks.  So with that said, you

23   have to determine whether or not he knew that statement

24   was false.  You have to determine whether or not he

25   intended to give a false statement.  That's the first

TRIAL - BECKWITH

1    statement.

2          The second statement that the prosecution

3    alleged is false is "The officer did a cavity search

4    and he didn't find nothing."  If you will recall,

5    Mr. Beckwith told you what his understanding of what a

6    cavity search is.  He didn't know that involves law

7    enforcement officers actually going inside the anus and

8    rectum.  Decide whether or not he even knew the

9    difference between those terms.  Try to picture what it

10    would feel like if someone actually went into that area

11    of your body.  Remember an expert from the crime lab

12    testified and told you that the substances that were --

13    that the police stated they recovered both tested

14    negative for the presence of heroin and cocaine.

15    Another expert told you that there were no fingerprints

16    developed on the bag -- the bags that were recovered

17    that the police say they recovered from my client.  And

18    you did not hear from a DNA expert.  Therefore, the

19    only proof that Mr. Beckwith had a plastic bag in his

20    pants and that he had any contact with that bag was the

21    testimonies of the two officers.  And also remember

22    they -- they told you that they had other -- they had

23    made other arrests and they had other evidence in the

24    glove compartment.  So with that said, in evaluating

25    whether or -- it's possible.  You don't have to believe

TRIAL - BECKWITH

1    or have to determine that the officers were lying.

2    They may have been mistaken.

3         The third statement that is allegedly false

4    is that Mr. Beckwith never possessed -- stated that he

5    never possessed these drugs.  Well, that's the truth.

6    Whatever they found, they said they found tested

7    negative for drugs.  I read a portion of his grand jury

8    testimony.  He was actually responding to the questions

9    asked.  And have that part of the -- the -- the

10   testimony read back to you as well.  He was asked "So

11   this is the drugs you never possessed before in your

12   life?"  So he was repeating that part of the question

13   in his answer.

14        The last statement offered by the prosecution

15   that was allegedly false is that Mr. Beckwith, quote

16   unquote, "didn't know the reason for the officer

17   planting drugs" on him.  Again, I had read a portion of

18   his grand jury testimony.  He was responding to a

19   question that was asked of him during the grand jury

20   proceedings.  "Well, in your opinion, do you think they

21   planted those drugs on you that a user would possess or

22   they planted drugs on you to show you were a drug

23   dealer and that someone who possessed those drugs would

24   possess something?"  So he was responding to a

25   question, and he was, again, quoting part of the

TRIAL - BECKWITH

1    question in his answer.  He was not the one to bring up

2    the topic of someone planting drugs on him.  Anyway,

3    how would he know a person's reason for planting drugs

4    on him?

5              So in your evaluation of whether or not

6    Mr. Beckwith believed these statements were false and

7    whether or not those statements were, in fact, false,

8    remember how he testified yesterday.  He was able to

9    look you in the eye and face you and tell you his

10   story.  He said he wanted to tell his side of the

11   story, and it was the same story that he told the grand

12   jury.  Recall your own way of determining whether or

13   not someone is lying to you.  Just because he had a

14   criminal conviction back in 2003, it is now 2017, that

15   alone should not cause you to disbelieve everything

16   he's telling you.  Remember, he even admitted to police

17   that his license was suspended.  It is not enough to

18   believe that his statements might be false or possibly

19   be false or probably were false.  You have to believe

20   that each one when you're evaluating each one, each

21   statement you would have to believe whether or not a

22   statement that he made was false beyond a reasonable

23   doubt.

24             And the judge will instruct you in more

25   detail what that burden of proof is.  It is also not

TRIAL - BECKWITH

1    enough to believe that Mr. Beckwith might have intended

2    to lie to the grand jury or possibly intended to lie to

3    the grand jury or probably intended to lie to the grand

4    jury.  Again, you must believe that he intended to lie

5    to the grand jury beyond a reasonable doubt.  And from

6    what -- everything that you've heard from him

7    yesterday, he was not lying to the grand jury.  He did

8    not intend to lie to the grand jury.  And he did not

9    believe he was lying to the grand jury.

10          Mr. Beckwith is also charged with resisting

11   arrest.  You have to determine -- and the judge will

12   instruct you on this -- whether or not he prevented or

13   attempted to prevent Officers Breen and Irvine from

14   effecting an authorized arrest.  And the judge will

15   instruct you on what an authorized arrest is.  And not

16   only that, you would also have to determine whether or

17   not he prevented or attempted to prevent this

18   intentionally.  In considering whether or not this was

19   an authorized arrest, you might want to have Officers

20   Breen and Irvine's testimony read back to you.  They

21   testified that when they came upon the car, they

22   smelled burnt marijuana and they saw alcohol in the

23   car; okay?

24          Now, you heard from Ms. Rayshell Johnson who

25   just testified for you.  She testified that what -- she

TRIAL - BECKWITH

1    admitted that she was, quote unquote, "no angel," but
2    since that time she became qualified to work with
3    people with disabilities.  So with regard to whether or
4    not there was burnt marijuana in the car or the
5    existence of blunt -- a blunt, which she denied, you
6    would have to consider whether or not it makes common
7    sense for someone with that credential to want to risk
8    it by having burnt marijuana -- by smoking marijuana or
9    having marijuana in the car.  And you didn't hear from
10   any -- anybody from the crime lab testify on whether or
11   not whatever was found in that car, whatever the police
12   said was found in that car contained marijuana.

13        So -- so as far as the author -- the
14   authorized arrest issue, again, listen to the judge's
15   instructions.  And if necessary, determine whether or
16   not what Officers Breen and Irvine testified about
17   was -- supports your determination of whether or not
18   the -- the arrest was authorized beyond a reasonable
19   doubt.  Not -- the arrest -- it's not enough to say the
20   arrest was probably authorized, it might have been
21   authorized, possibly was authorized.  You have to be
22   convinced that it was authorized beyond a reasonable
23   doubt.

24        You also have to determine what my client's
25   intent was.  You heard him testify again.  You heard

TRIAL - BECKWITH

1     him testify that he felt that this was not a routine
2     traffic stop and that he felt -- felt that he was not
3     violating any laws, and therefore, he refused to step
4     out of the car.  And he felt concerned enough to where
5     he was asking Ms. Johnson to record -- to videotape the
6     event on a cell phone.
7               You heard from -- you heard from the doctor
8     that testified also that the abrasions could have been
9     caused by a number of things; okay?  But again, if you
10    recall my client's testimony, that was never an issue.
11    The pain and the abrasions he had to an area that was
12    very close to his anus was not an issue until after
13    that arrest.  And whether or not this pain was on a
14    scale of two to ten or seven out of ten, he told you it
15    was seven out of ten.  Only the person, himself or
16    herself, can say whether or not something really hurt
17    or didn't hurt that much; okay?  And remember how
18    tender that -- sensitive that area back there is.  So
19    an abrasion that may or may have not been bleeding --
20    although, he said his was bleeding initially and that's
21    why he wanted to be brought to the hospital, but even
22    if it wasn't bleeding, you know, again, recall how my
23    client testified.  It was not easy for him to tell you
24    what happened to him that day -- that evening.
25              So with that said, what you need to do after

Ashley M. Knights
Court Reporter
315-671-2058                                    SYR001935

TRIAL - BECKWITH

1    Mr. Centra gives his closing statement is listen for

2    the judge's instructions.  You will have, as the judge

3    says, all the tools necessary to give a fair and

4    informed opinion, each and every one of you.  And then

5    you would have to deliberate together and decide

6    whether or not the DA's Office has proven beyond a

7    reasonable doubt each and every element of those two

8    charges.  And when you do that and do that with an open

9    mind, open and fair mind, I'm confident that you're

10   going to find Mr. Beckwith not guilty of both charges.

11   Thank you.

12          THE COURT:  Okay.  Thank you.  Call upon

13   Mr. Centra for the closing argument of the People.

14          MR. CENTRA:  Thank you, Judge.

15          Morning, everyone.

16          JUROR(S):  Morning.

17          MR. CENTRA:  This case that you heard these

18   past few days is a case about taking responsibility.

19   It's about Davonne Beckwith, who was found with

20   something that at the time he thought was illegal and

21   he tried to pass the blame onto the two officers, Breen

22   and Irvine, in an attempt to dissuade the Onondaga

23   County Grand Jury from charging him with possessing

24   those suspected drugs.

25          Now, you've heard from a number of witnesses

TRIAL - BECKWITH

1    during the course of this trial, and -- and once again,

2    I'm going to thank you for your -- your time and

3    patience here.  And the judge has instructed you and

4    will instruct you again, as Ms. Flores did, that it's

5    my duty to prove each element beyond a reasonable doubt

6    for perjury in the first degree and for resisting

7    arrest.  And I submit to you that I've done just that.

8          Now let's go through what you heard during

9    this trial.  You heard from Officer Breen and Officer

10    Irvine, and they told us how they pulled over Davonne

11    Beckwith on September 6th, 2016 for traffic

12    infractions.  And when speaking with Mr. Beckwith at

13    the vehicle, they find out that he was driving without

14    a license.  They also smelled marijuana and they

15    observed this burnt marijuana, what they described as a

16    "blunt cigar" in that vehicle, and they also saw

17    alcoholic beverages strewn throughout the vehicle and

18    Ms. Johnson also had one in her hand.  It was at this

19    point when they asked Mr. Beckwith to -- Irvine asked

20    Mr. Beckwith to step from the vehicle to effect an

21    arrest based on him driving without a license.

22          And there were other infractions as well.

23    And you heard that Davonne Beckwith was having none of

24    this.  He told you too he was refusing to get out of

25    the vehicle.  They asked, they asked, they asked, and

TRIAL - BECKWITH

1    he continued to refuse to step from the vehicle.  This
2    is when Officer Irvine had to physically unlock the
3    door and open the door in an attempt to physically
4    remove Mr. Beckwith from the vehicle and Officer Breen
5    came around to assist him at that point.

6         Now, as they were attempting to remove
7    Mr. Beckwith, as you heard, he was grabbing on to the
8    steering wheel with his left hand, and they saw that
9    his hand was balled up in a fist and that they saw
10   the -- what they believed to be narcotics in his right
11   hand.  And we've got that in evidence right here, and
12   you can take a look at that.  We've got the bags.  The
13   charcoal bags were clear at the time.  The print
14   examiner stated that the charcoal coloring is from
15   print dust, but this was all together in his hand.  And
16   that's what they stated they saw.  And they saw him
17   continue to struggle with that and try and place it
18   back down in the waistband of his pants.

19        So they continue to struggle, and Officer
20   Breen eventually deploys his Taser, which doesn't work,
21   but it distracts Mr. Beckwith and they're able to
22   remove him from the vehicle onto the ground.  But he
23   still continued to struggle.  So they struggle with him
24   about a minute and a half, two minutes, and then
25   they're finally able to handcuff him and -- and stand

TRIAL - BECKWITH

1   him up and bring him to the front of the patrol

2   vehicle.  And you heard them say that due to the

3   struggle, him sticking his hand down his pants -- he

4   was wearing baggy pants -- that his pants and underwear

5   were sagged down a little bit.  I think they said just

6   below his waist, below his buttocks, and that they saw

7   the plastic sticking out of the -- the waistband.  And

8   this is where Officer Irvine recovers the drugs from,

9   just from the waistband right here.  Plucked it out.

10  They each told you neither of them went into his

11  underwear.  The differentiation between rectum, anus,

12  whatever, it doesn't matter.  They stated that they did

13  not go into his pants at all.

14          And then they told you that the -- the one

15  bag contained a bag of rice and two separate bags and

16  one tested positive for cocaine, the other tested

17  positive for heroin.  And we later learned that, in

18  fact, further testing showed that they were just drug

19  cutting agents, not actual narcotics.  And -- and then

20  he was subsequently charged with possessing those

21  suspected substances.

22          Now, we actually heard from Davonne Beckwith.

23  And what I want you to listen to and what I've kind of

24  been harping on here, the judge is going to instruct

25  you on -- on credibility.  And as I've said from the

TRIAL - BECKWITH

1    get-go, this is a case about credibility.  And I want

2    you to listen to the judge's instructions carefully.

3    There are lots of different things you can look at

4    to -- to determine credibility.  Did the witness give

5    inconsistent statements?  Does the witness have a bias?

6    Does the witness have a motive to lie?  And does a

7    witness have interest in the outcome of the case?  We

8    heard from Mr. Beckwith, and I think that we can all

9    agree that his recollection of the stop is very

10   different from Officer Breen's and Officer Irvine's.

11   The officers say that Davonne Beckwith was forcibly

12   removed from the vehicle.  Davonne Beckwith says that

13   he voluntarily got out after initially refusing the

14   officers' requests.  The officers said they found the

15   marijuana.  The defendant says there was no marijuana,

16   in fact, that he doesn't smoke marijuana.  Yet on

17   cross-exam -- cross-examination he admitted that he had

18   previously tested positive for marijuana.  The officers

19   testified that Officer Irvine searched the defendant

20   and that neither officers went into his pants, let

21   alone his anus or rectum.  The defendant claims that it

22   was Officer Breen was the one that searched him and

23   that it was Officer Breen who went into his rectum.

24   What it boils down to is do you believe Officer Breen

25   and Irvine, or do you believe Davonne Beckwith.

TRIAL - BECKWITH

1          Now, we did hear from the doctor, and there

2     was an injury that was sustained, but you heard and he

3     was able to explain to you all that this is a common

4     injury.  This is something you see.  It's probably

5     something that we've all had.  It's -- I'm not trying

6     to get too graphic, but it can be caused by a bowel

7     movement, hard bowel movement, loose bowel movement.

8     It can be caused by wiping with toilet paper.  I guess

9     we could all assume that it could be caused by possibly

10    him sticking his hand into his pants with that bag.  We

11    don't know, but there's a lot of different causes for

12    this.  It's -- it's common.  And you heard the doctor

13    tell you that the injury didn't breach any blood

14    vessels and that, in fact, was not bleeding and that

15    this is -- isn't a what's considered a painful injury.

16         Then we further heard after the fact that a

17    few days later Davonne Beckwith's charges were

18    presented to the Onondaga County Grand Jury on

19    September 9th of 2016.  And these charges were for the

20    possession of the suspected drugs, and those charges

21    were criminal possession of a controlled substance in

22    the third degree and criminal possession of a

23    controlled substance in the fourth degree.

24         And we heard from the grand jury

25    stenographer, Patricia Dineen, and she told you that

TRIAL - BECKWITH

1  Davonne Beckwith came in, he swore an oath, he swore to

2  tell the truth, and we heard the statements that he

3  made that Ms. Flores touched on in -- and those

4  statements aren't in dispute.  The statements that he

5  made while referring to the police were "He went into

6  my rectum, slid his hands into my pants and rectum to

7  see if I have anything."  He said he went into his

8  pants.  He said they went into his rectum.  It's not a

9  difference between terminology or whether he knows the

10 medical term for this.  The officers never said they

11 went into his pants.  They said they didn't.  They told

12 you the consequences if they were to do something like

13 that.  It's not protocol.  They could lose their jobs.

14 They could get arrested.  He then stated that they did

15 three searches on him and that they did a cavity search

16 and that they didn't find anything.

17     And once again, we heard from the officers

18 that they did not go into his pants.  The extent of

19 their search was the pat search over the clothing and

20 then pulling the bag out of the waistband.  He said, "I

21 never possessed these drugs."  And yes, it was in

22 response to a question, but he stated he did not

23 possess these drugs, and that's what the whole grand

24 jury testimony was.  That they went into his rectum,

25 that he didn't possess the drugs.  And the final one is

TRIAL - BECKWITH

1    that he didn't know the reason for the cops planting

2    the drugs on him.  And once again, alleging that this

3    evidence was planted, which is false.  So these were

4    the false statements made to the grand jury on that

5    day.  And what was his reason?  What was his intent for

6    making those statements?  Because he was charged with

7    possessing those drugs.  If he makes those statements

8    to the grand jury and they believe him, that's him

9    dissuading the grand jury from charging him with those

10   drug possessions.

11          And we heard from the two lab -- the lab

12   technicians, and we heard from John Witzigman, who told

13   us that these aren't drugs at all.  We all know it was

14   aspirin, it was caffeine, it was quinine.  As he

15   stated, these are usually substances that he finds as

16   cutting agents in narcotics.

17          So Davonne Beckwith wants us -- wanted the

18   grand jury to believe that the officers planted these

19   suspected drugs on him.  And the big question I want to

20   ask -- want you to ask yourself here is why would a

21   police officer -- police officers who have access to

22   real drugs through the course of their investigations,

23   their evidence locker room, why would they plant fake

24   drugs on an individual?  Would they really place their

25   careers, their reputations on the line to plant fake

TRIAL - BECKWITH

1    drugs on an individual that they knew would be further

2    tested at the lab?  They know what the process is.

3    They told you.  It just doesn't make sense.

4         We've said the grand jury wants you to

5    believe that the officers put their hands into his

6    rectum and did a cavity search.  And if these officers

7    are the liars that the defendant says they are, why are

8    they sticking their hand into his rectum?  Why are they

9    cavity searching him?  Let me ask you this.  If you

10   were a police officer and you were going to lie about

11   finding drugs in a stranger's rectum, wouldn't you just

12   lie and say you found them there?  What would be the

13   point of sticking your hand into a stranger's rectum

14   for no reason when you can just write it down on a

15   piece of paper?  It's common sense.  It's something no

16   one would do.  The story just doesn't make sense.  If

17   you're going to plant drugs on somebody, couldn't you

18   just say that it was found in his pocket or something?

19   Why would it have to be his rectum?  And also ask

20   yourself why was he fighting so hard with the police

21   that night?  Why was he resisting arrest?  He admitted

22   that he didn't have a license.  If he knew that, he

23   admitted it, why wouldn't he just say okay, you know,

24   the reason he was resisting was because he knew what he

25   had on him.  He had that bag of evidence that he

TRIAL - BECKWITH

1    believed contained drugs.  He even told us that he had
2    tested positive for cocaine previously.  So fortunately
3    for this -- I guess fortunately this time the, I guess,
4    drugs that he had were not drugs at all.  It was just
5    the cutting agent.
6         I keep harping on it's going to come down to
7    credibility.  The last thing I'm going to ask you to
8    do, and like I've asked you to do, is just use your
9    common sense.  And let me ask what makes more sense to
10   you, that the police lied, planted fake drugs on
11   Davonne Beckwith, and then decided to put their hands
12   into his rectum for no reason, or that the defendant
13   made false statements to the grand jury in an attempt
14   to get his charges dropped?  It's simple.  Davonne
15   Beckwith was just looking for an out for himself, and
16   he tried to take Officers Breen and Irvine down
17   instead.  I submit to you that evidence, all the
18   evidence that you heard, proves beyond a reasonable
19   doubt that the defendant, Davonne Beckwith, is guilty
20   of resisting arrest and guilty of perjury in the first
21   degree.  Once again, I thank you all for your time.
22        THE COURT:  Thank you.  All right.  Members
23   of the jury, my final instructions to you are going to
24   have three core parts.  There's going to be also an
25   introduction and a conclusion.  Everything that I say

TRIAL - BECKWITH

1   is part of the final instruction.  The three core parts
2   will be the offenses that will be submitted to you for
3   deliberation, definition of terms, and a list of the
4   elements that must be proven beyond a reasonable doubt
5   for a specific offense before you may return a verdict
6   of guilty.  The second setting will be certain
7   guidelines for you and principles in assessing
8   credibility of witnesses.  The third explanation will
9   be the presumption of innocence, burden of proof, and a
10  definition of the term "beyond a reasonable doubt."  I
11  am telling you that in this introduction, and as I
12  said, there would be a conclusion that the present
13  state of the law does not permit me to send into the
14  jury room the script from which I'm about to read or a
15  transcript of what I'm about to say.

16      You may continue to take notes.  I remind you
17  that the notes are only an aid to your own
18  recollection.  A juror who chose not to take notes has
19  an equal voice in the jury room.  Any discrepancy in
20  recollection must always be resolved by a read-back of
21  testimony, and your verdict must be based on the record
22  of proceedings and not on your notes.

23      Your foreperson, who is juror Number 1, will
24  be given a verdict sheet as you depart the courtroom.
25  The verdict sheet will include on it the four

TRIAL - BECKWITH

1    allegations that the People claim were false

2    statements.  And I will get back to that when I

3    instruct you on the perjury count.  Any notation on the

4    verdict sheet, however, is solely to allow you to

5    distinguish what you are deliberating upon.  It is not

6    a substitute for instruction, and it is not evidence of

7    anything.

8         As far as the verdict procedures, I'm putting

9    the cart before the horse, but when you've completed

10   your work, you will send out a note that says "We've

11   completed our work" and you will file in and everybody

12   will stay seated, including the People, the lawyers,

13   everybody, and then I'm going to turn to the

14   foreperson, who will remain seated, and in this case

15   I'm going to ask him two questions:  How does the jury

16   find the defendant as to Count 1, guilty or not guilty?

17   As to Count 2, guilty or not guilty.  And then I will

18   go around the jury box by seat number to confirm the

19   unanimity of the verdict.

20        Also, in the past jurors have expressed some

21   concern if they see so many law enforcement officers in

22   the courtroom during the rendition of a verdict.  I am

23   telling you that that circumstance is not in any way

24   any indication whatsoever about the importance or

25   unimportance of this case or any aspect of it, and you

TRIAL - BECKWITH

1    are to ignore that circumstance if you perceive it.

2    And I want you to have no fear or anxiety concerning

3    it.

4            To conclude my introduction, I want to harken

5    back to jury selection.  When I told you what an

6    individual juror does.  An individual juror engages in

7    a two-step process:  Credibility assessment and

8    application of burden of proof.  Each of you must

9    decide whether and to what degree you find evidence

10   credible, believable, accurate, and then go on to

11   consider if what you have identified as credible

12   convinces you beyond a reasonable doubt.  And I've been

13   talking about you as an individual juror because in the

14   end, as I said in orientation, you as an individual

15   juror are going to be made to cast a vote, but the

16   jury, itself, is not going to be made to reach a

17   unanimous result.

18           Now, what deliberations are about is one

19   juror making a point to fellow jurors as to why or why

20   not some component of the evidence should or should not

21   be believed and why or why not evidence that a juror

22   has found credible does or does not convince them

23   beyond a reasonable doubt as to each element of the

24   offense that the jury is considering.  Now, this is a

25   dynamic process.  And what I mean by that is that as

TRIAL - BECKWITH

1    the deliberations unfold and jurors make points on both

2    topics to fellow jurors, you as an individual juror may

3    have a different view and change your mind on multiple

4    times.  But as the process ensues and the number of

5    points made becomes either repetitive or fewer, then

6    your position may become more fixed.  And at the end of

7    these delib -- instructions, I'm going to tell you that

8    no juror should surrender his or her honest belief as

9    to the weight or effect of the evidence simply to get

10   the process over or because they are outvoted.  On the

11   other hand and with equal importance, I will tell you

12   that no juror should hesitate to reexamine his or her

13   views and even change his or her mind if he or she

14   becomes convinced that such change of mind should be

15   considered.

16          Now, at the start of the trial you might have

17   remembered, or not, I listed three potential charges of

18   resisting arrest, obstructing governmental

19   administration, and perjury in the first degree.  I

20   have made a legal determination that the obstructing

21   governmental administration should not be submitted to

22   you because it is duplicative of the resisting arrest

23   allegation.  And in order to streamline your

24   deliberations, I will not be submitting that to you.

25   You are not to draw any inference whatsoever in favor

TRIAL - BECKWITH

1   of or against one side or the other because of my

2   action.  This is strictly a legal determination based

3   upon the law of multiple -- multiplicity that would

4   facilitate streamlining your deliberations by

5   concentrating on the two substantive charges that are

6   different that are submitted to you for your

7   deliberation.

8          Now I'm going to move on to the first count

9   listed on your verdict sheet which alleges resisting

10  arrest.  Before I get into the substance of that

11  instruction, I am hereby advising you that the legality

12  of the actions of the police in pulling over the car is

13  not an issue for the jury.  That is a question of law,

14  and I further instruct you that if a police officer

15  observes any violation of the Vehicle and Traffic Law,

16  that is a legal, valid basis to pull the car over.  An

17  issue that will be submitted to you is whether or not

18  the People have proven that the arrest of which the

19  defendant is accused of resisting was authorized.  And

20  that brings me to my specific instruction.  Under our

21  law, a person is guilty of resisting arrest when he or

22  she intentionally prevents or attempts to prevent a

23  police officer from effecting an authorized arrest of

24  himself or herself.

25          I am now going to give you some definition of

TRIAL - BECKWITH

1    terms.  "Intent" means conscious objective or purpose,

2    and thus, a person intentionally prevents or attempts

3    to prevent a police officer from effecting an

4    authorized arrest of himself or herself when his or her

5    conscious objective or purpose is to do so.

6             Now, with regard to an authorized arrest, the

7    People contend that the officers had the legal

8    authority to effect an arrest based upon either

9    possession of marijuana or driving with a suspended

10   license.  An arrest for an offense is authorized when

11   the police officer making the arrest has reasonable

12   cause to believe that the person being arrested has

13   committed such offense in his presence.  Reasonable

14   cause does not require proof that the offense was, in

15   fact, committed.  Reasonable cause exists when a police

16   officer has knowledge of facts and circumstances

17   sufficient to support a reasonable belief that an

18   offense has been or is being committed.

19            Before you may find the defendant guilty of

20   resisting arrest, the People must prove two elements to

21   your satisfaction beyond a reasonable doubt:  First,

22   that on or about September 6th, 2016 in the county of

23   Onondaga, the defendant, Davonne Beckwith, prevented or

24   attempted to prevent a police officer from effecting an

25   authorized arrest of himself, and that the defendant

TRIAL - BECKWITH

1    did so intentionally.  If the People prove both

2    elements to your satisfaction beyond a reasonable

3    doubt, you must find the defendant guilty of resisting

4    arrest.  If the People fail to prove either one or both

5    of those elements to your satisfaction beyond a

6    reasonable doubt, you must find the defendant not

7    guilty of resisting arrest.

8          The second and final offense concerning which

9    you will ask to deliberate alleges perjury in the first

10   degree.  Under our law a person is guilty of perjury in

11   the first degree when that person swears falsely and

12   when his or her false statement consists of testimony

13   and is material to the action or proceeding or matter

14   in which it was made.  A person swears falsely when

15   that person intentionally makes a false statement which

16   he or she does not believe to be true when giving

17   testimony.  A person intentionally makes a false

18   statement which he or she does not believe to be true

19   when that person's conscious objective or purpose is to

20   do so.  Testimony means an oral statement made under

21   oath in a proceeding before a court, body, agency,

22   public servant, or other person authorized by law to

23   conduct such proceeding and to administer the oath or

24   to cause it to be administered.

25          In a prosecution for perjury, falsity of a

TRIAL - BECKWITH

1    statement may not be established by the uncorroborated

2    testimony of a single witness.  What that means is that

3    the falsity of the defendant's statement may not be

4    established by the testimony of a single witness, even

5    if that testimony is found to be believable.  There

6    must be some additional evidence independent of that

7    witness tending to prove that the defendant's statement

8    was false.  A false statement is material to an action,

9    proceeding, or matter when it reflects upon the matter

10   under consideration during the action or proceeding in

11   which it is made or tends to support and give credit to

12   the witness in respect to a main fact in issue.  Also,

13   a false statement in a proceeding before a grand jury

14   is also material when that false statement has the

15   natural effect or tendency to impede or influence or

16   dissuade the grand jury from pursuing its

17   investigation.

18          Now, the People have alleged that four

19   statements were made to the grand jury that were

20   intentionally false.  Even though there is one perjury

21   count, you'll be asked to deliberate specifically on

22   four discrete specified statements that will be in

23   quotation marks in your -- on your jury sheet.  As to

24   each one of them, before you may find the defendant

25   guilty, you must conclude -- and when I say that, you

Ashley M. Knights
Court Reporter
315-671-2058

SYR001953

TRIAL - BECKWITH

1    can't find the defendant guilty unless you conclude

2    beyond a reasonable doubt that the People have

3    established the three necessary -- necessary elements

4    for perjury.  And I'm going to give you those in

5    summary.  But the People must establish each of these

6    three elements beyond a reasonable doubt before you may

7    find the defendant guilty of any one or more of the

8    four specified statements on your verdict sheet.  And

9    these are the three elements that must be established

10   beyond a reasonable doubt.  First, that on or about

11   September 9th, 2016 in the county of Onondaga, the

12   defendant, Davonne Beckwith, intentionally made a false

13   statement which he did not believe to be true; and

14   second, that the false statement consisted of

15   testimony; and third, that the false statement was

16   material to the action, proceeding, or matter in which

17   it was made.  If the People prove all three elements

18   beyond a reasonable doubt as to any one or more

19   specific statement, then you must find the defendant

20   guilty of perjury in relation to that statement or

21   statements.  If the People fail to prove all three

22   elements to your satisfaction beyond a reasonable doubt

23   as to any statement, then you must find the defendant

24   not guilty in relation to that statement.

25              This brings me to the second segment, certain

TRIAL - BECKWITH

1    guidelines for you in evaluating testimony and

2    evidence.  The evidence in the case is the testimony

3    that was received and not subject to an instruction

4    that you should disregard it -- I don't think I gave

5    one during this trial -- as well as any physical item

6    that was received in evidence.

7         A quick word about jury expertise.  I

8    mentioned in the orientation if you have some special

9    expertise that crops up in your jury deliberation above

10   and beyond that which an ordinary person would be

11   exposed to from being on this earth for the number of

12   years that they have been on this earth, then you may

13   not convey that specialized instruction to support a --

14   a -- your -- your vote to fellow jurors.  Let's say you

15   were an expert in psychology.  You could not convey

16   some aspect of psychology to fellow jurors to support

17   your vote and convince them why some aspect of the

18   testimony should or should not be believed.

19        Now, as you know, you have to assess the

20   credibility of the witnesses and the evidence.  And

21   credibility has two components.  First, is the witness

22   lying on purpose?  Second, even if the witness is not

23   lying, is their testimony accurate?  Because it is

24   possible for a person to believe they are giving

25   accurate testimony and still be inaccurate.  And

TRIAL - BECKWITH

1    there's no magic formula -- formula that you use for

2    this.  You use the same type of tests from your daily

3    lives.  And here are some examples of them.  You must

4    ask yourself did the witness really have the

5    opportunity to see, hear, know, and remember the events

6    concerning which he or she testified?  Was there any

7    obstruction to their ability to do so such as parked

8    trucks, leaves on trees, noisy mufflers going by when

9    somebody says they heard something?  Did they need eye

10    glasses or contact lenses?  Had they injected any --

11    ingested, excuse me, or injected any intoxicants?  Was

12    the testimony of the witness plausible and therefore

13    more likely to be accurate or less plausible and

14    therefore less likely to be accurate?  How did the

15    witness impress you on the witness stand?  What was

16    their body language?  What was their demeanor and

17    manner?  Did they impress you as frank and open and

18    certain or deceptive or vague or unsure?  Did the

19    witness have a bias, hostility, motive, or some other

20    attitude that in your view may have affected the

21    believability of the witness?  You may ask yourself

22    does the witness have an interest in the outcome of a

23    case or could the witness care less about the outcome

24    of the case?

25              Now, a defendant who testified -- testifies

TRIAL - BECKWITH

1    is an interested witness; however, you're not required

2    to reject the testimony of any witness who you find is

3    interested, nor are you obligated to believe the

4    testimony of a disinterested witness.  In the end, you

5    will determine the credibility of all witnesses.

6        You may also ask why the witness made

7    statements prior to the trial that were inconsistent

8    with their trial testimony, and if so, the number of

9    them and their degree of importance.  You may also ask

10   whether or not the testimony of one witness is

11   consistent with that of another witness in the trial

12   that you find credible.  I'll remind you that a police

13   officer's testimony is entitled to no greater or lesser

14   weight than that of any other witness.  Also, should

15   you find that a witness has lied on a material point on

16   purpose, then you are at liberty to disregard their

17   entire testimony.  You're not required to do so,

18   however.  You may still believe portions of it.

19       Now, you heard in this trial, first, that a

20   witness, Ms. Johnson, had previously been convicted of

21   a crime.  The law does permit a witness to testify who

22   has been convicted of a crime, but the jury may

23   consider that in assessing that person's overall

24   credibility.  Now, you also heard Mr. Beckwith testify

25   that he had been convicted of a crime.  I emphasize

TRIAL - BECKWITH

1    under no circumstances are you to consider that fact in

2    deciding whether or not the defendant committed any

3    crime charged in this case.  You may only consider the

4    testimony about a prior crime in assessing his

5    credibility of his testimony before you and for no

6    other purpose.  Such conviction is not evidence that he

7    committed any offense in this case.

8        Now, by these processes and others, you

9    should be able to determine which portions of the

10   testimony you are willing to accept as credible and

11   then go on to consider which -- whether or not the

12   People have proven the defendant's guilt as to a

13   particular crime as to each element beyond a reasonable

14   doubt.

15       This brings me to Core Segment 3, the rules

16   applicable to all criminal cases.  Let me remind you

17   that a charge, an arrest, an indictment is not evidence

18   that the defendant did anything wrong.  It has no

19   evidentiary value.  And you're to draw no inference

20   unfavorable to the accused simply because of a charge.

21   He has pleaded not guilty and Mr. Beckwith denies the

22   allegations.  Under our law, he is presumed innocent.

23   Throughout these proceedings and as a result you must

24   find him not guilty unless you conclude on the credible

25   evidence at this trial that the People have proven the

TRIAL - BECKWITH

1    defendant's guilt beyond a reasonable doubt as to each

2    element of the offense you are considering.

3            Now, in determining whether or not the People

4    have satisfied their proving the defendant's guilt, you

5    may rely upon the testimony introduced by the defense;

6    however, I caution you that the defense in calling

7    witnesses has not assumed a burden of proof.  The

8    burden of proof never shifts.  It remains with the

9    People to prove each element beyond a reasonable doubt.

10   I now move on to reasonable doubt.

11           Our law uses the term "beyond a reasonable

12   doubt" because the law understands that in dealing with

13   human affairs, there are very few things in this world

14   that we can know with absolute certainty; and

15   therefore, the law does not require the People to prove

16   a defendant guilty beyond all doubt.  On the other

17   hand, it is not sufficient to prove that the defendant

18   is probably guilty.  In a criminal case, the proof of

19   guilt must be stronger than that, that is proof beyond

20   a reasonable doubt.

21           What is a reasonable doubt?  A reasonable

22   doubt is an honest doubt of the defendant's guilt for

23   which a reason exists based upon the nature and quality

24   of the evidence or lack thereof.  It is an actual

25   doubt, not an imaginary doubt.  It is a doubt that a

TRIAL - BECKWITH

1    reasonable person acting in a matter of this importance

2    would be likely to entertain either because of the

3    evidence that was presented or because of the lack of

4    convincing evidence.  Proof of guilt beyond a

5    reasonable doubt is proof that leaves you so firmly

6    convinced of the defendant's guilt that you have no

7    reasonable doubt as to the existence of any element of

8    the offense you are considering or the defendant's

9    identity as the person who committed it.

10             In determining whether or not the People have

11   proven the defendant's guilt beyond a reasonable doubt,

12   you should be guided by a full and fair consideration

13   of all of the evidence.  And after considering all of

14   the evidence, each of you must decide whether and to

15   what degree, if any, you find evidence credible, and

16   then go on to determine whether or not that credible

17   evidence convinces you beyond a reasonable doubt as to

18   each element of the offense that the jury is

19   considering.  Whatever your verdict may be, it must not

20   rest upon baseless speculation, nor may it be

21   influenced in any way by bias, prejudice, sympathy, or

22   a desire to bring to an end your deliberations or to

23   avoid an unpleasant duty.  In your deliberations you

24   may not consider matters pertaining to possible

25   sentence.  In the event of a verdict adverse to the

TRIAL - BECKWITH

1    defense, the Court imposes punishment, and the jury

2    plays no role in that regard.

3              This brings me to the wrap-up conclusion of

4    these instructions.  As I've told you, the foreperson,

5    who's Juror Number 1, you are asked, sir, to sign any

6    note that comes out.  You may also chair the

7    discussions or appoint someone else to chair the

8    discussions who wants to volunteer to do that.

9              Speaking of notes, let me talk about the

10   kinds of notes.  The first note is an administrative

11   note.  I'm telling you now that the lawyers have

12   consented to smoking breaks.  But that's governed by a

13   few things.  First, it must be an opportune time to do

14   that.  Second, we must have enough court officers to do

15   that.  Because when the smoking break is declared, the

16   jury doors will be opened.  No deliberations may take

17   place at all until all 12 jurors are back together with

18   the door shut.  The -- the smokers alone will be taken

19   downstairs in a secure elevator.  The smokers probably

20   will not run into anybody, but if you run into body --

21   anybody, you just say, "I'm on jury duty" and you can't

22   discuss anything with them.  And the people who don't

23   smoke are not to go outside.  Now, when I do this in

24   January, I don't get any people interested in that.

25   But now it's nice out.  But you're going to be

Ashley M. Knights
Court Reporter
315-671-2058                    SYR001961

Case 5:21-cv-00809-GTS-TWD    Document 67-25    Filed 09/20/24    Page 210 of 222

TRIAL - BECKWITH

1    breathing secondhand smoke anyway, so you're not to go

2    outside. This is not a break; this is strictly a

3    smoking break.

4         What else? We need pens, we need Post-it

5    notes, that's an administrative note. I don't have to

6    get the lawyers together to respond to an

7    administrative note. I do have to get the lawyers

8    together and talk to them about any note that asks for

9    a read-back of testimony or that asks a legal question.

10   I have to seek their input before providing you with a

11   response.

12        Let's talk about read-backs of testimony.

13   You can have the entire trial read back if you want.

14   If you really want to hear where David Tate got his

15   bachelor's degree, then you're going to ask for the

16   entire testimony of David Tate. But usually the jurors

17   are not interested in the entire testimony of anybody.

18   They're usually interested in a segment. Now,

19   sometimes they think they want the entire testimony of

20   Witness X to see if Witness X said something about

21   Topic Z. Well, nowadays with all this highly

22   technological equipment, pull out the chart now, see,

23   I'm holding in my hand stenographic paper. And you'll

24   notice that Ashley's machine doesn't even have it

25   because she has electronic stenographic paper. Some of

Ashley M. Knights
Court Reporter
315-671-2058                                  SYR001962

TRIAL - BECKWITH

1     the court reporters still have this though.  My point

2     being, just like when you use on Word or WordPerfect to

3     find a word, you could ask the question did so-and-so

4     say something -- such and such about Topic B and simply

5     ask Ashley to do a word search and then she could give

6     you an answer rather than having the entire witness's

7     testimony read back.  Sometimes you'll recall it was a

8     particular witness and Mr. Centra was asking about a

9     particular topic.  Sometimes you'll recall it was

10    Ms. Flores and she was asking another witness about

11    another topic.  If you ask for a read-back about a

12    topic, then automatically, the direct and cross will be

13    read back to you.  What I'm getting at is I'm -- I'm

14    telling you you can have everything read back, but I'm

15    asking you to be surgical about the request but make

16    sure you get what you are interested in.

17              The second type of question is a legal

18    question.  I've given you a lot of information.  I

19    don't want you to worry about seeming inadequate by

20    asking a question.  If you do ask a legal question and

21    I'm permitted by -- to -- I am -- if I'm allowed to do

22    so without invading your province, then I will give you

23    the answer to the question.  Sometimes if a jury asks a

24    question in the form that is -- it's asked, I'm not

25    allowed to answer it.  So sometimes I'll rephrase it

TRIAL - BECKWITH

1    with the lawyers and give it a more generic general

2    response that would hopefully address your concerns

3    without invading the province of the jury.  Now, in

4    that regard, let me say that if you ask -- when you

5    send out a note, especially a read-back, they'll --

6    it'll take a while for Ashley to prepare because she

7    needs to proof it and prepare it.  She doesn't just

8    press a button.  With regard to sending out notes, at

9    no time do -- do not give the verdict sheet to the

10   court officer.  Simply write out a note, "We've reached

11   our -- our verdict."  Never tell me what the status of

12   your deliberations are in terms of a numerical vote.

13   And do not tell the Court what the verdict is in your

14   note.  And do not tell the court officer what the

15   verdict is in your note.

16        Now, your verdicts on either one or both

17   counts must be unanimous.  That means all 12

18   deliberating jurors must agree to any guilty verdict.

19   All 12 deliberating jurors must agree to any not guilty

20   verdict.  And now you know what "deliberate" means, to

21   exchange views with one another, to consult each other

22   on those two topics as well as other matters, listen to

23   each other, give each other's views careful

24   consideration, and reason together and deliberate.  And

25   when you do so, with a view toward reaching an

TRIAL - BECKWITH

1    agreement if that can be done without surrendering

2    individual judgment.

3                In the end, as you know from the orientation

4    last Tuesday, each of you must decide this case as an

5    individual juror, but only after a full and fair and

6    impartial consideration of all of the evidence with

7    fellow jurors and the legal instructions I have given

8    you.  You should not surrender an honest view of the

9    evidence simply because you are outvoted or to get the

10   trial over with.  By the same token, you should not

11   hesitate to reexamine your views and even change your

12   mind if you can become convinced that the position you

13   have should be reevaluated.

14               Now, let me read to you Section 310.10 of the

15   Criminal Procedure Law, which places restrictions on

16   the court officers who will be supervising you.  Quote,

17   The jury must retire to deliberate upon its verdict at

18   a place outside the courtroom.  It must be provided

19   with suitable accommodations therefore and must be

20   continuously kept together under the supervision of a

21   court officer.  Such court officer may not speak to or

22   communicate with them or permit any other person to do

23   so except when so authorized by the Court or when

24   performing administerial duties with respect to said

25   jurors.  Any exceptions or requests, Mr. Centra?

TRIAL - BECKWITH

1          MR. CENTRA:  No, your Honor.

2          THE COURT:  Ms. Flores?

3          MS. FLORES:  No, Judge.

4          THE COURT:  Let me just meet with the lawyers

5     for a minute.

6          (Whereupon a discussion was held off the record at

7          the bench.)

8          THE COURT:  All right.  Now, ma'am, you are

9     alternate Number 1.  You are going to be retained.  You

10    will be retained in a separate jury room.  I hope you

11    brought reading material in accordance with my jury

12    information sheet.  You will be brought back for any

13    read back.  And your -- you will be given your lunch.

14    Let me talk about lunch.  You may send -- you may send

15    something out before lunch, but we've ordered the

16    lunches for 12:45.  So that'll get you started in terms

17    of your deliberation.  We're going to send the exhibits

18    down in a minute.  I'm going to give Court Officer

19    Catula (phonetic) the verdict sheet, itself.  And

20    you -- you -- it's Ms. Mujak?

21          JUROR(S):  Mujak.

22          THE COURT:  I want you to walk in front of

23    Court Officer Catula because he'll get you situated

24    right in the room there, and then the jurors will

25    follow down.  Let me just make sure we've covered

TRIAL - BECKWITH

1    smoking breaks.  Okay.  The alternates are retained.

2    So I have that.  Okay.  So, members of the jury, you're

3    about to perform one of the most important duties of

4    citizenship, which is to sit as a juror in a criminal

5    case.  Let your verdicts be the result of your faithful

6    allegiance to your oath which promised to deliver a

7    verdict in accordance with the evidence as you evaluate

8    it to be and the law that I have given you.  Please

9    file out now.  Ms. Mujak, you go first, please.

10            COURT OFFICER:  You can take your notes with

11   you.

12            THE COURT:  Bring your notebooks.  That's

13   what they're for.

14            And we'll stay on the record for a minute.

15          (Whereupon the jury was excused.)

16            THE COURT:  Okay.  Now let's compile the

17   exhibits.  I do have an exhibit list here.  So the lab

18   report of Witzigman and the lab report of Tate were not

19   offered, so they're not in.  The medical record is

20   seven.  And then we have the three plastic -- well,

21   no -- we have three plastic bags, yes.

22            MR. CENTRA:  Yes.

23            THE COURT:  Yes.

24            MR. CENTRA:  And we have --

25            THE COURT:  Now, I -- go ahead, put them down

TRIAL - BECKWITH

1    there.  Now, I'm going to ask each of you the question.

2    Do you believe, Mr. Centra, that the entire grand jury

3    appearance of Mr. Beckwith transcript is fully and

4    completely in evidence?

5            MR. CENTRA:  Yes, Judge.

6            THE COURT:  And Ms. Flores, do you concur in

7    that regard?

8            MS. FLORES:  Yes.  I cross-examined her with

9    regard to that.

10            THE COURT:  All right.  So what I would like

11    to do, with somebody's permission, is to put an

12    original exhibit on that, label -- or is it on the

13    back?

14            MR. CENTRA:  I've got one on the back, Judge.

15            THE COURT:  I'm thinking it would facilitate

16    deliberations to have multiple copies of Exhibit 7 and

17    Exhibit -- what's -- what's the grand jury -- what's

18    that?

19            MR. CENTRA:  Four, Judge.

20            THE COURT:  Exhibit 4.  You know what I mean?

21            MS. FLORES:  Yes.

22            THE COURT:  In other words, make multiple

23    copies.  Maybe not 12 copies, but six or seven copies

24    and put them in.  Is that acceptable?

25            MS. FLORES:  Yes, Judge.

TRIAL - BECKWITH

1              MR. CENTRA:  Yes, I have no problem with

2     that.

3              THE COURT:  Okay.  Very good.  Thank you.  I

4     think we're going to have a recess, and I'm going to --

5     I'll bring the exhibits down in a minute.

6              MS. FLORES:  Judge?

7              THE COURT:  Yes.

8              MS. FLORES:  With regard to my appearance

9     with Judge Hafner --

10             THE COURT:  Yes.

11             MS. FLORES:  -- should I just go from --

12             THE COURT:  We're going to be at lunch from

13    quarter to one to quarter to two, so you'll be free.

14             MS. FLORES:  Okay.

15             THE COURT:  Thank you.

16        (Whereupon a luncheon recess was taken.)

17             THE COURT:  Mr. Foreperson, I received a note

18    indicating that you have reached your verdict; is that

19    accurate?

20             JURY FOREPERSON:  Yes.

21             THE COURT:  And is each verdict unanimous?

22             JURY FOREPERSON:  Yes.

23             THE COURT:  As to the first count charging

24    resisting arrest, how does the jury find the defendant,

25    guilty or not guilty?

TRIAL - BECKWITH

1          JURY FOREPERSON:  Guilty.

2          THE COURT:  As to the second count, perjury

3     in the first degree, Specification A, how does the jury

4     find the defendant, guilty or not guilty?

5          JURY FOREPERSON:  Guilty.

6          THE COURT:  As to Specification B, perjury in

7     the first degree, how does the jury find the defendant,

8     guilty or not guilty?

9          JURY FOREPERSON:  Guilty.

10          THE COURT:  As to Specification C as to

11     perjury in the first degree, how does the jury find the

12     defendant, guilty or not guilty?

13          JURY FOREPERSON:  Guilty.

14          THE COURT:  And as to Specification D,

15     perjury in the first degree, how does the jury find the

16     defendant, guilty or not guilty?

17          JURY FOREPERSON:  Guilty.

18          THE COURT:  Members of the jury, you say by

19     your foreperson that you find the defendant guilty of

20     resisting arrest and four separate specifications of

21     perjury in the first degree.  Now as to each of you

22     individually by seat.  Juror Number 1, is that your

23     verdict or verdicts?

24          JUROR(S):  Yes.

25          THE COURT:  Juror Number 2, are those your

TRIAL - BECKWITH

1          verdicts?

2                    JUROR(S):  Yes.

3                    THE COURT:  Juror Number 3, are those your

4          verdicts?

5                    JUROR(S):  Yes.

6                    THE COURT:  Juror Number 4, are those your

7          verdicts?

8                    JUROR(S):  Yes.

9                    THE COURT:  Juror Number 5, are those your

10         verdicts?

11                   JUROR(S):  Yes.

12                   THE COURT:  Juror Number 6, are those your

13         verdicts?

14                   JUROR(S):  Yes.

15                   THE COURT:  Juror Number 7, are those your

16         verdicts?

17                   JUROR(S):  Yes.

18                   THE COURT:  Juror Number 8, are those your

19         verdicts?

20                   JUROR(S):  Yes.

21                   THE COURT:  Juror Number 9, are those your

22         verdicts?

23                   JUROR(S):  Yes.

24                   THE COURT:  Juror Number 10, are those your

25         verdicts?

TRIAL - BECKWITH

1          JUROR(S):  Yes.

2          THE COURT:  Juror Number 11, are those your

3    verdicts?

4          JUROR(S):  Yes.

5          THE COURT:  And, Juror Number 12, are those

6    your verdicts?

7          JUROR(S):  Yes.

8          THE COURT:  Your verdicts having been

9    confirmed as unanimous, they will be accepted by the

10   Court.  I want to thank you for your jury service.  I

11   hope you found it informative.  And if you found it an

12   edifying experience, spread the word to fellow

13   citizens.  You do not have to wait for me, but I'm

14   going to come down to speak with anyone who would like

15   to speak to me and perhaps offer some suggestions how

16   we can better improve the things we do around here.

17   The Alternate Number 1 may now join you in the jury

18   room.  Thank you for your service, please file out.

19   I'll be right down in a minute.  And, Mr. Foreperson,

20   if you would, hand the jury form to Court Officer

21   Catula on your way out.

22          (Whereupon the jury was excused.)

23          THE COURT:  Ms. Flores, June 23rd.  Are you

24   available?  It's a Friday.

25          MS. FLORES:  Let me double check.  I think

TRIAL - BECKWITH

1    I'm in trial that week.

2              THE COURT:  Thank you.

3              MS. FLORES:  Yeah, the 23rd is fine.

4              THE COURT:  Fine.  Thank you.

5              MR. CENTRA:  Was that June 23rd, Judge?

6              THE COURT:  Yes.  And I'm going to go get the

7    exhibits.

8              MS. FLORES:  That's 9:00; right?

9              THE COURT:  Yes.  Actually, the exhibits are

10   here.  Mr. Centra, you can take them.  And I want you

11   to retain the extra copies we made because they're part

12   of the record.  Thank you.  If there are any more, I'll

13   get them from the jury room.

14             MR. CENTRA:  All right.  Thank you.

15        (Whereupon the proceeding was adjourned.)

16

17

18

19

20

21

22

23

24

25

```
 1                        C E R T I F I C A T E

 2

 3        I, Ashley M. Knights, Registered Professional Reporter,

 4   Certified Realtime Reporter, and New York Realtime Court

 5   Reporter, of the Fifth Judicial District, State of New York,

 6   DO HEREBY CERTIFY that the foregoing is a true and accurate

 7   transcript from my stenographic notes taken in the

 8   above-entitled matter and the whole thereof.

 9

10

11

12                              March 6, 2018

13

14

15

16

17        _____

18            Ashley M. Knights, RPR, CRR, NYRCR

19

20

21

22

23

24

25
```

Ashley M. Knights
Court Reporter
315-671-2058

SYR001974