# United States District Court
# For the Northern District of New York

Davonne Beckwith,

               Plaintiff,

    v.

The City of Syracuse, et al.,

               Defendants.

Case No. 5:21-cv-809 (GTS/TWD)

**Plaintiff's Response to Defendants' Statement of Undisputed Facts and Statement of Additional Facts**

## Introduction

Local Rule 56.1(a) requires that a party moving for summary judgment submit a "statement of each *material* fact about which the moving party contends there exists *no genuine issue*." (emphasis added). The Rule further provides that "[f]ailure of the moving party to submit an *accurate and complete* Statement of Material Facts shall result in a denial of the motion.") (underscore in original) (emphasis added).

Here, Defendants' purported Statement of Material Facts Not in Dispute (hereinafter "SOMF") includes numerous purported facts that are not material to any of the limited issues in this motion.[1] With respect to the recitation of facts that *are*

---

[1] The legal issues raised in Defendants' motion are limited to whether Defendants can be held liable for denying Plaintiff his right to a fair trial and/or for maliciously prosecuting Plaintiff on a charge of perjury. Resolution of those issues depends on whether Plaintiff has adduced sufficient evidence that Defendants lied to prosecutors when they claimed that, contrary to Plaintiff's sworn Grand Jury testimony, they recovered cocaine and heroin from Plaintiff after observing the drugs inside a plastic bag that was protruding in plain view from Plaintiff's waistband, and that they never conducted any type of invasive search of Plaintiff. Defendants' SOMF, however, goes well beyond those issues, and includes, among

material to the issues in this motion, Defendants' SOMF is indisputably inaccurate and incomplete in that ignores a plethora of admissible evidence in Plaintiff's favor, and in so doing asserts as undisputed "facts" numerous facts that Defendants know are in dispute. Pursuant to Rule 56.1(a), Defendants' failure to submit an accurate and complete Statement of Material Facts should, at the threshold, result in a denial of Defendants' motion.

Without waiving the aforesaid objection, Plaintiff, Davonne Beckwith (hereinafter "Plaintiff" or "Beckwith"), submits the following Response to Defendants' Statement of Material Facts Not in Dispute.

### INITIAL TRAFFIC STOP OF PLAINTIFF DAVONNE BECKWITH

1.    On September 6, 2016, at approximately 3:00 a.m. ("Date of the Incident"), Detective Irvine and Officer Breen were patrolling in a marked police vehicle ("Patrol Vehicle") when they first encountered a grey 2009 Honda Accord (the "Vehicle"), which was later determined to be owned by Rayshell Johnson ("Ms. Johnson") and driven by Plaintiff Davonne Beckwith ("Plaintiff"), between the 1400 and 1600 blocks of South Salina Street in the City of Syracuse. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. C, SYR001094, SYR001096; Exh. D, 19:1-5, 19:11-16, 27:12-23; Exh E, 14:12-19; Exh. F, [Plaintiff's Deposition Transcript] 40:11-18; GJ 5:12-15, 8:14-19, 45:19-22).

Response: Plaintiff admits.

---

other things, numerous purported statements of fact regarding traffic violations and other conduct by Plaintiff, and by a passenger in Plaintiff's vehicle, that allegedly resulted in Defendants' initial stop and arrest of Plaintiff.

2.     Defendant Officers' shift had begun at approximately 10:00 p.m. on September 5, 2016. (Exh. D, 16:15).

Response: Plaintiff admits.

3.     Defendant Officers had completed two arrests, one for criminal possession of marijuana and one for an outstanding bench warrant, prior to encountering Plaintiff. (Exh. D, 17:19-23, 18:6-18).

Response: Plaintiff admits.

4.     Ms. Johnson initially told Office Breen that she and Plaintiff were returning home from a bar-b-que on the north side of the City of Syracuse. (Exh. A, SYR003080).

Response: Plaintiff admits.

5.     Subsequently, Plaintiff would later testify that he and Ms. Johnson had been out playing pool at a bar on the north side of the City of Syracuse from approximately 10:00 or 11:00 p.m. until the bar they were at closed at 2:00 a.m. (Exh. F, 38:24-25; Exh. G, [Grand Jury Transcript] 38:1-5).

Response: Plaintiff admits.

6.     Plaintiff, however, initially testified before a grand jury that he and Ms. Johnson stopped for food after leaving the bar but later testified at his deposition that they went straight home. (Exh. F, 39:18-23; Exh. G, 38:5-9).

Response: Plaintiff admits only that he testified before a grand jury in 2016 that after leaving the bar, and before heading towards home, he and Johnson "stopped and grabbed some finger food…something to eat out, nothing with a

fork or anything, sit down like that," (Exh. G, 38:5-9), and that seven years later he testified at his deposition that he "did not stop anywhere else on [his] way home." (Exh. F., 39:21-22). Plaintiff disputes Defendants' editorializing that he testified that he and Johnson "went straight home," and disputes the suggestion that there are any material inconsistencies between his testimonies.

7.    Early on September 6, 2016, Defendant Officers were driving south along South Salina Street when they saw the Vehicle driving north on the same street. (Exh. A, SYR003080; Exh. E, 18:5-8).

Response: Plaintiff admits.

8.    One of the headlights on the Vehicle was significantly dimmer than the other, which was a New York State Vehicle and Traffic Law ("VTL") equipment infraction. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. D, 20:10-14, 21:1-2, 26:16-19; Exh. E, 14:20-25, 15:1-7; Exh. G, 5:17-22).

Response: Plaintiff denies that one of the headlights on the Vehicle was significantly dimmer than the other. Instead, "[a]ll of the lights on Johnson's car were working properly…." Beckwith Decl. ¶ 2 ("All of the lights on Johnson's car were working properly"). Moreover, the vehicle had recently been inspected, all of the traffic tickets were "thrown out," and Plaintiff was "innocent" of the charge regarding "the light." (Exh. F. 80:25-81:4) (testifying that all traffic tickets were "thrown out" and he was "innocent" of the charge regarding "the light").

9.    Defendant Officers, observing the VTL infraction, turned around and headed northbound on South Salina Street behind the Vehicle in their marked Patrol Vehicle in order to further investigate. (Exh. A, SYR003080; Exh. D, 22:5-6).

Response: Plaintiff denies that the officers "observed" any VTL infractions, since Plaintiff had not committed any of those VTL infractions. *See* Response to SOMF ¶ 8, *supra*.

10.    Subsequently, Plaintiff then made a left turn onto Kirk Avenue. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. D, 21:12-13; Exh. G, 5:22-23).

Response: Plaintiff admits.

11.    At the intersection of Kirk Avenue and Landon Avenue, Plaintiff stopped and then applied the Vehicle's turn signal as he was turning right, which was another VTL infraction by not signaling outside 100 feet of his turn. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. D, 21:17-23, 26: 20-23; Exh. G, 5:23-25, 6:1-2).

Response: Plaintiff denies that he failed to properly signal. *See* Response to SOMF ¶ 8, *supra*.

12.    Plaintiff then drove north along Landon Avenue to the intersection with West Kennedy Street where he again applied his turn signal too late at the intersection and also failed to completely stop the Vehicle at the stop sign, which were two additional VTL violations. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. D, 22:5-11, 18-23, 26:20-24; Exh. G, 6:2-7).

Response: Plaintiff denies that he committed any of the referenced VTL infractions. *See* Response to SOMF ¶ 8, *supra*.

13.    Shortly after Plaintiff made this turn onto what was the 200 block of West Kennedy Street, Defendant Officers activated the emergency lights of their Patrol Vehicle and initiated a traffic stop of the Vehicle ("Stop"). (Exh. A, SYR003080; Exh. B, SYR003073; Exh. H, SYR003134; Exh. D, 24:5-10; Exh. G, 6:7-11

Response: Plaintiff admits.

14.    Officer Breen radioed in the Stop while Detective Irvine active the lights on the Patrol Vehicle, including their Patrol Vehicle's spotlight (Exh. A, SYR003080; Exh. C, SYR001096; Exh. D, 23:24-25, 24:13-15).

Response: Plaintiff admits.

15.    After several seconds, Plaintiff pulled the vehicle over to the right side of West Kennedy Street. (Exh. D, 26:7-10).

Response: Plaintiff admits.

16.    Officer Irvine illuminated the passenger compartment of the vehicle with their Patrol Vehicle's spotlight causing the officers to be able to see the two occupants, later to be identified as Plaintiff and Ms. Johnson. (Exh. A, SYR003080; Exh. B, SYR003073).

Response: Plaintiff admits.

17.    Defendant Officers parked behind the Vehicle and then exited their police vehicle. (Exh. E, 16:19-25, 17:1).

Response: Plaintiff admits.

18.    Detective Irvine approached the driver's side of the Vehicle where Plaintiff was located, while Officer Breen approached the front passenger's side where Ms.

Johnson was located. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. E, 16:19-25, 18:19; Exh. F, 45:7-13; Exh. G, 8:10-13).

Response: Plaintiff admits.

19.    The smell of burnt marijuana emanated from the vehicle. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. D, 28:7-10, 30:11-16, 30:20-23, 31:1-1; Exh. E, 21:16-19; Exh. G, 9:2-3).

Response: Plaintiff denies that any smell of marijuana emanated from the vehicle. Beckwith Decl. ¶ 6 ("neither Johnson nor I had smoked marijuana that day or the prior evening, and there was no smell of marijuana in the car"); Exh. F at 53:23-24 (denying presence of marijuana).

20.    Defendant Officers observed an open Mike's Hard Lemonade alcoholic drink on the floor by Ms. Johnson's feet and an open beer can in the backseat of the vehicle. (Exh. B, SYR003073; Exh. D, 27:24-25, 28:1-7; Exh. E, 22:20-23; Exh. G, 9:8-14, 81:13-22).

Response: Plaintiff admits.

21.    There was also rerolled cigar filled with marijuana, commonly referred to as a "blunt," in the cup holder between Plaintiff and Ms. Johnson, which was recovered as evidence. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. I, SYR002469; Exh. J., pg. 1-2; Exh. D, 28:7-10, 30:11-16, 30:20-23, 31:1-15; Exh. E, 22:23-25, 23:1-6; Exh. G, 9:3-8; 81:22-25, 82:1-9).

Response: Plaintiff denies that there was any type of rerolled cigar or other marijuana in the cup holder of the vehicle. Beckwith Decl. ¶ 6 ("there was not

a 'blunt,' 'rolled cigar,' or other marijuana in the cup holder of the car"); Exh. F at 53:23-24 (denying presence of marijuana).

22.    On the Date of the Incident, and prior to March 31, 2021, Unlawful Possession of Marijuana ("UPM") was a criminal violation under New York Penal Law Section 221.05.

<u>Response</u>: Plaintiff admits.

23.    Despite the marijuana found in the vehicle, Plaintiff asserted that the Defendant Officers did not find anything illegal inside of the vehicle. (Exh. F, 51:17-20).

<u>Response</u>: Plaintiff denies that Defendants found any type of marijuana in the cup holder of the vehicle. Beckwith Decl. ¶ 20; Exhibit F, 53:23-24.

24.    Detective Irvine explained that Plaintiff had been pulled over because of the aforementioned traffic infractions that Defendant Officers had observed (Exh. D, 34:15-20; Exh. E, 16: 6-10; *see also* ¶¶ 8, 11-12, above).

<u>Response</u>: Plaintiff denies. When the officers approached his car, Plaintiff asked Irvine why he had been stopped. In response, Irvine did not mention any alleged traffic infractions. Instead, he questioned Plaintiff in an accusatory and aggressive manner about whether he had any drugs or weapons in the car. Beckwith Decl. ¶ 20; Exhibit F, 47:18-21.

## PLAINTIFF RESISTS ARREST

25. Detective Irvine then requested Plaintiff's driver's license, proof of insurance for the Vehicle, and the Vehicle's registration. (Exh. E, 16:14-18, 18:20-21; Exh. F, 47:2-4; Exh. G, 8:22-25).

Response: Plaintiff admits.

26. Plaintiff began to frantically look for the paperwork Detective Irvine had requested and asked why he had been pulled over. Detective Irvine then again explained the reasons for the traffic stop, i.e., the multiple VTL violations. (Exh. B, SYR003073; Exh. E, 19:1-5, 19:10-15).

Response: Plaintiff denies that he was acting "frantically," Beckwith Decl. ¶ 5, or that Irvine mentioned anything about traffic violations Beckwith Decl. ¶ 20; Exhibit F, 47:18-21.

27. Plaintiff exhibited overly excited behavior and was breathing heavily at this time. (Exh. E, 20:2-11; Exh. G, 9:1-2).

Response: Plaintiff denies that he was breathing heavily, or that he demonstrated any "overly excited behavior," given the officers' aggressive and inappropriate questioning of him. Beckwith Decl. ¶ 5 ("At this point, I was not acting frantically or breathing heavily. And while I was angry and annoyed, I would not say that I was 'overly' excited, given the officers' aggressive and inappropriate questioning of me").

28. Plaintiff told the Defendant Officers that he had been drinking but was "good to drive." (Exh. A, SYR003080; Exh. B, SYR003073;).

Response: Plaintiff denies that he had been drinking or that there was alcohol on his breath. Beckwith Decl. ¶ 6 ("I had not had a single alcoholic drink... there was no odor of alcohol coming from my breath, and I never told the officers that I had been drinking"); Exh. F at 39:4-6 (denying drinking).

29.    Although he would much later deny drinking alcohol that night and early morning hours before the Date of the Incident, Plaintiff had an unmistakable odor of alcohol coming from his breath after the Vehicle was pulled over. (Exh. E, 20:12-14; 38:2-3).

Response: Plaintiff denies that there was any order of alcohol coming from his breath. *See* Response to SOMF ¶ 28, *supra*.

30.    In response to his requests, Plaintiff provided Detective Irvine with an Onondaga County's Sheriff's identification. (Exh. B, SYR003073; Exh. E, 19:5-7).

Response: Plaintiff admits.

31.    When Detective Irvine asked Plaintiff if he had a driver's license, Plaintiff responded that he did not have a valid license because it was suspended due to his failure to pay child support. (Exh. B, SYR003073; Exh. D, 28:11-14, Exh. E, 22:10-12; Exh. F, 40:19-20, 47:13-16; Exh. G, 10:1-3, 58:5-6;).

Response: Plaintiff admits.

32.    Detective Irvine then explained to Plaintiff that he needed to exit the Vehicle because he did not have a license and because there was marijuana and open alcoholic beverage containers in the car (Exh. B, SYR003073; Exh. E, 22:13-15).

Response: Plaintiff admits that he was ordered to exit the vehicle and that there was an open alcoholic container in the vehicle, but denies that he was told that there was marijuana in the vehicle. Beckwith Decl. ¶ 20 (denying presence of marijuana in car); Exh. F at 53:23-24 (denying presence of marijuana).

33.    Officer Breen concurred with observations made by Detective Irvine and Detective Irvine's assessments that Plaintiff needed to exit the Vehicle for the aforesaid reasons. (Exh. D, 34:2-6, 34:17-20, 35:4-21; *see also* ¶ 28-33, above).

Response: Plaintiff denies that he was ordered to exit the vehicle "for the aforesaid reasons," as he denies he was drinking, that he stated he was drinking, that there was alcohol on his breath, that there was an odor of marijuana in the car, or that officers observed marijuana in the cup holder of the vehicle. *See* Response to SOMF ¶¶ 19, 23, 28, 29, 32 *supra*.

34.    While Detective Irvine spoke with Plaintiff, Officer Breen spoke with Ms. Johnson. (Exh. A, SYR003080; Exh. D, 27:24-25).

Response: Plaintiff admits.

35.    Ms. Johnson was intoxicated and holding a cup containing a mixed alcoholic beverage between her legs as she sat in the front passenger seat of the Vehicle, which she handed to Officer Breen. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. K, SYR003040; Exh. D, 27:24-25, 28:1-2, 29:19-24; Exh. E, 22:18-23; Exh. G, 9:8-14, 81:13-22).

Response: Plaintiff admits.

36.    Officer Breen smelled the drink in Ms. Johnson's cup and confirmed it was a liquor based alcoholic beverage. (Exh. A, SYR003080).

Response: Plaintiff admits.

37.    Ms. Johnson advised Officer Breen that the Vehicle belonged to her and that she allowed Plaintiff to drive because she was too drunk to do so. (Exh. A, SYR003080; Exh. D, 27:12-23; Exh. E, 26:24-25, 27:1-3; Exh. F, 40:21; Exh. G, 38:9-11, 39:14-15, 83:3-4).

Response: Plaintiff admits.

38.    Officer Breen did not question Plaintiff or Ms. Johnson regarding whether they had any firearms in the Vehicle. (Exh. D, 36:16-19, 37:2-4).

Response: Plaintiff admits.

39.    Neither of the Defendant Officers questioned Plaintiff regarding whether he had a curfew. (Exh. D, 36:16-19, 37:2-4; Exh. E, 68:1-3).

Response: Plaintiff denies that neither officer questioned him about having a curfew, since Officer Irvine questioned Plaintiff about having a curfew. Beckwith Decl. ¶ 4 ("Irvine also mentioned something about my being on probation or parole, and about my being out past my curfew"); Exh. F at 46:16-25 (testifying about curfew questioning).

40.    Officer Breen had observed Plaintiff holding an item in his right hand which was closed into a fist so that Officer Breen could not see what the object was. (Exh. A, SYR003080).

<u>Response</u>: Plaintiff denies balling his fist or reaching behind his back. Beckwith Decl. ¶ 9 ("At no point before exiting the car did I ball my fist, hide my hands, swing my hand toward either officer, or reach behind me or into my waistband"); Exh. F at 50:15-20 (denying reaching behind back).

41.    Plaintiff's right hand was balled-up between his upper right leg and the center console of the vehicle as if to hide something in the back of his pants, which caused Officer Breen to become concerned. (Exh. D, 28:17-23, 32:24-25, 104:16-17, 28:22-25).

<u>Response</u>: Plaintiff denies. *See* Response to SOMF ¶ 40, *supra*.

42.    Detective Irvine also independently observed Plaintiff reach his right hand behind his back towards his waistband and began "digging" behind his back. (Exh. I, SYR002470; Exh. E, 28:2-5, 14-18).

<u>Response</u>: Plaintiff denies, since he never reached his hand behind his back. *See* Response to SOMF ¶ 40, *supra*.

43.    For approximately one minute, Plaintiff failed to comply with command to exit the Vehicle and continued digging behind his back while Officer Breen ordered him to show his hands. (Exh. D, 33:23-25; Exh. E, 28:19-24; Exh. I, SYR002468).

<u>Response</u>: Plaintiff admits that he initially failed to comply with Defendants' command that he exit the vehicle, but denies that he ever dug behind his back or that Breen ordered him to show his hands. Beckwith Decl. ¶ 9 ("At no point before exiting the car did I ball my fist, hide my hands, swing my hand toward

either officer, or reach behind me or into my waistband"); Exh. F at 50:15-20 (denying reaching behind back).

44.    Detective Irvine instructed Plaintiff to step out of the Vehicle. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. G, 10:10-12).

Response: Plaintiff admits.

45.    Plaintiff told the officers to go run or check "his shit" and that he did not have to get out of the vehicle, even though Plaintiff had admitted that his driver's license was suspended. (Exh. A, SYR003080; Exh. B, SYR003073; Exh. D, 33:23-25; Exh. E, 29:8-11; Exh. G, 10:6-14; *see also* ¶ 31, above).

Response: Plaintiff admits.

46.    Plaintiff did not comply and did not feel that he had to comply with the request to step out of the Vehicle. (Exh. F, 49:13-16, 49:23-25, 50:1; Exh. L, SYR002506).

Response: Plaintiff admits.

47.    Officer Breen then went from the passenger's side of the vehicle to the driver's side to assist Detective Irvine in explaining to Plaintiff what was happening and plead with Plaintiff to exit the Vehicle. (Exh. A, SYR003081; Exh. D, 36:12-13, 38:9-12; Exh. E, 29:12-16; Exh. G, 10:16-18, 83:9-16).

Response: Plaintiff admits, except denies that Breen or Irvine ever "explained" to Plaintiff what was happening, or "plead" with Plaintiff to exit the vehicle. Instead, Plaintiff asserts only that he was "ordered" to exit the vehicle.

Beckwith Decl. ¶ 9 ("At some point I was ordered to get out of the car"); Exh. F at 49:13-16 (describing being ordered, not asked, to exit vehicle).

48.    As the encounter progressed, it became apparent to Officer Breen, despite his efforts, that Plaintiff was not going to comply with Defendant Officers commands. (Exh. A, SYR003081; Exh. I, SYR002464; Exh. D, 34:7-10, 38:15-17).

Response: Plaintiff admits.

49.    Plaintiff told Officer Breen "fuck you" and reiterated that he was not getting out of the Vehicle. (Exh. A, SYR003081; Exh. D, 38:20-22, 48:4-7, 48:11-13, 48:15-18).

Response: Plaintiff admits.

50.    Officer Breen then advised Plaintiff that he was under arrest and again stated that Plaintiff needed to step out of the Vehicle. (Exh. A, SYR003081; Exh. D, 38:22-24; Exh. G, 85:19-24).

Response: Plaintiff admits.

51.    Detective Irvine attempted to open Plaintiff's door from the outside, but the door was locked, so he reached into the Vehicle through the open window and unlocked the door before proceeding to open it. (Exh. A, SYR003081; Exh. B, SYR003073; Exh. D, 38:25, 39:1-3, 41:20-25, 42:1, 43:4-9; Exh. E, 29:16-22; Exh. G, 10:19-20).

Response: Plaintiff admits.

52.    Once Detective Irvine opened the door, he continued to command Plaintiff to show his hands. (Exh. A, SYR003081; Exh. B, SYR003073; Exh. E, 30:12-13).

<u>Response</u>: Plaintiff denies that Irvine ever commanded him to show his hands. Beckwith Decl. ¶ 9 ("At no point before exiting the car did I ball my fist, hide my hands, swing my hand toward either officer, or reach behind me or into my waistband. At no time did either officer direct me to show them my hands"); Exh. F at 50:15-20 (describing interaction without mention of commands to show hands).

53.    Detective Irvine observed that Plaintiff had a sandwich bag with a tan substance in the bottom in his hand. (Exh. B, SYR003074; Exh. E, 30:14-18).

<u>Response</u>: Plaintiff denies possessing or attempting to hand Johnson any sandwich bag. Beckwith Decl. ¶ 16 ("I was never in possession of this bag of so-called drugs"); Exh. F at 50:6-7 (denying possession of bag); Beckwith Decl. ¶ 10 ("I never attempted to hand anything to Johnson inside the car").

54.    Plaintiff reached across the center console towards Ms. Johnson's seat in an attempt to hand her the sandwich bag containing the tan substance, which she did not take. (Exh. B, SYR003074; Exh. E, 31:5-6, 31:14-19, 32:2-5, 33:8-14).

<u>Response</u>: Plaintiff denies. *See* Response to SOMF ¶ 53, *supra*.

55.    Based upon his observations, training, and experience with prior drug arrests, Detective Irvine believed that the substance in the bag was possibly heroin. (Exh. B, SYR003074; Exh. E, 35:1-13).

<u>Response</u>: Plaintiff denies, to the extent that Defendants imply that Plaintiff was ever in possession of the bag. Beckwith Decl. ¶ 16.

56.    Plaintiff then reached behind his back with the item and his hand, which as a result was no longer within Detective Irvine's view. (Exh. B, SYR003074; Exh. E, 30:19-23, 33:1-3; Exh. G, 10:23-24).

Response: Plaintiff denies that he ever reached behind his back with his hand. Beckwith Decl. ¶ 9 ("At no point...did I...reach behind me or into my waist-band"); Exh. F at 50:15-20 (denying reaching behind back).

57.    Detective Irvine continued commanding Plaintiff to show his hands before Plaintiff then turned his body left in his seat to face the driver's side door of the Vehicle. (Exh. E, 35:17-25).

Response: Plaintiff denies that Irvine ever commanded him to show his hands. Beckwith Decl. ¶ 9 ("At no time did either officer direct me to show them my hands").

58.    Plaintiff's right hand remained behind his back while he then swung his left arm upward toward Officer Breen, which he could only reasonably interpret was an attempt to strike him. (Exh. A, SYR003081; Exh. D, 42:10-14, 43:18-20).

Response: Plaintiff denies that he ever reached behind his back or that he swung his arm toward Breen. Beckwith Decl. ¶ 9 ("At no point before exiting the car did I...swing my hand toward either officer, or reach behind me"); Exh. F at 50:15-20 (denying reaching behind back or making threatening movements).

59.    Defendant Officers were concerned that Plaintiff had either a firearm or other dangerous contraband, so Officer Breen grabbed Plaintiff's left arm in an

attempt to remove Plaintiff from the vehicle, which was unsuccessful. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 42:7-9, 42:15-19, 43:14-20, 44:4-6; Exh. E, 36:7-13, 37:8-10; Exh. G, 11:5-7).

> <u>Response</u>: Plaintiff admits that while attempting to exit the vehicle, he was grabbed, but denies that he engaged in any conduct that would reasonably have caused the officers concern that he had either a firearm or other dangerous contraband. Beckwith Decl. ¶ 9 (denying any suspicious movements); Exh. F at 50:15-20 (same).

60.    Defendant Officers both had drawn their service weapons, but once Officer Breen realized that Detective Irvine had already drawn his firearm, Officer Breen re-holstered his firearm and drew his taser. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 42:24-25, 43:1-3, 44:1-3; Exh. E, 36:7-9, 36:19-23; Exh. G, 11:7-9, 11:18-20, 84:8-18).

> <u>Response</u>: Plaintiff admits.

61.    Officer Breen yelled "taser, taser, taser" and deployed one cartridge with the probes striking Plaintiff's chest and stomach. (Exh. A, SYR003081 Exh. B, SYR003074;).

> <u>Response</u>: Plaintiff admits.

62.    However, the taser was not effective in incapacitating Plaintiff because he was still able to speak and move. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 45:9-23, 46:8-14; Exh. E, 38:19-21; Exh. G, 11:20).

> <u>Response</u>: Plaintiff admits.

63.    Plaintiff then turned towards the Defendant Officers and asked if they were "serious," referencing Officer Breen's deployment of his taser. (Exh. A, SYR003081; Exh. D, 45:24-25, 48:13-14).

Response: Plaintiff admits.

64.    Defendant Officers then grabbed Plaintiff, removed him from the Vehicle and then onto the ground. (Exh. A, SYR003081; Exh. D, 46:3-5, 47:18-20, 49:20-23, Exh. E, 38:12-15; Exh. G, 11:23-25).

Response: Plaintiff admits.

65.    Officer Breen then yelled "he's got dope," referring to Plaintiff. (Exh. A, SYR003081).

Response: Plaintiff denies that Breen yelled "he's got dope" when first encountering Plaintiff. Beckwith Decl. ¶¶ 13-16 (describing sequence where Breen accused Plaintiff of possessing drugs only after three searches failed to locate any drugs); Exh. F at 51:4-13, 66:10-68:2 (same). Breen accused Plaintiff of possessing drugs only after three searches–one by Irvine, and then two by Breen–failed to locate any drugs on Plaintiff. Beckwith Decl. ¶¶ 13-16; Exh. F, 51:4-13, 66:10 to 68:2.

66.    When Plaintiff was on the ground, Detective Irvine reiterated that Plaintiff was indeed under arrest, to which Defendant Officers commanded Plaintiff to place his hands behind his back and to stop resisting (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 50:18-21; Exh. E, 39:15-18).

Response: Plaintiff denies, and asserts that the only time he offered any resistance to a search was during the *third* search, when Breen made contact with Plaintiff's genitals and the area around his anus. Beckwith Decl. ¶ 13 ("I was shocked at this last search, and felt violated...I also attempted to stop any further violation of me by twisting my body and tightening up my buttocks. This is the only point at which I 'resisted' or was noncompliant with any of the searches of me").

67.    Still, Plaintiff would not comply with these commands and instead continued his to kick, thrash, and push the Officers in an attempt to get away, and, ultimately, prevent the Officers from taking him into custody. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 50:22-24, 53:14-15, 53:17-20; Exh. E, 39:2-10, 39:12-18; Exh. G, 85:7-16).

Response: Plaintiff denies that he ever kicked or thrashed, or pushed the officers. Beckwith Decl. ¶ 18 ("I never 'kicked' or 'flailed' during the encounter, 'pushed' or 'wrestled' with either officer").

68.    Plaintiff wrestled with Officers and attempted to get back up while the officers attempted to place him in handcuffs (Exh. D, 49:3-8, 50:1-6, 51:14-19, 52:15-19; Exh. E, 39:5-10).

Response: Plaintiff denies that he ever wrestled with either officer. Beckwith Decl. ¶ 18 ("I never...wrestled with either officer").

69.    At one point, Plaintiff was on top of Officer Breen. (Exh. D, 52:2-9). Officer Breen and Plaintiff were grabbing at and rolling over each other. *See id*.

<u>Response</u>: Plaintiff denies that he ever was on top of Breen, or that he ever grabbed Breen. Beckwith Decl. ¶ 18 ("I never...'grabbed' either officer, nor was on top of either officer").

70.     While wrestling with the Officers, Plaintiff stated that he was related to Police Chief Fowler, that he had previously testified against murderers, and that he could "drop" officers a gun. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 50:7-14; Exh. E, 39:20-23; Exh. G, 12:1-4, 85:7-13).

<u>Response</u>: Plaintiff denies this statement in its entirety. *See* Beckwith Decl. ¶ 18; *id.* at ¶ 24 ("I never told the officers that I was related to Police Chief Fowler, that I had previously testified against murderers, or that I could 'drop' officers a gun").

71.     Plaintiff kept putting his left arm underneath his body, but, ultimately, Detective Irvine was able to place one of Plaintiff's hands in handcuffs while Detective Irvine handcuffed his other hand. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 50:23-25, 51:1-4; Exh. G, 12:4-10, 86:4-7). The Officers then linked those handcuffs together. *See id*.

<u>Response</u>: Plaintiff admits that he was placed in handcuffs, but denies that he kept putting his left arm underneath his body. Beckwith Decl. ¶ 17 ("At no time was I wrestling with either of the officers, nor did I keep putting either of my arms underneath my body").

72.    The Officers' struggle with Plaintiff to place him in handcuffs from the time he was removed from the vehicle lasted approximately one to two minutes. (Exh. D, 51:5-9; Exh. E, 40:2-4; Exh. G, 12:11-15).

Response: Plaintiff denies that he struggled while officers placed him in hand-cuffs. Beckwith Decl. ¶ 20 ("I was handcuffed only after Breen falsely claimed to have recovered drugs from my waistband, and I was standing up at that time and did not struggle with the officers").

**PLAINTIFF CONTINUES TO RESIST ARREST WHILE OFFICERS CONDUCT SEARCH**

73.    Plaintiff's kicking and flailing caused his pants and underwear to be pushed down, exposing most of his buttocks. (Exh. B, SYR003074; Exh. D, 58:7-9; 58:12-14, 59:1-13; 60:12-16, 62:12-23; Exh. E, 49:15-19; Exh. G, 13:1-3).

Response: Plaintiff denies that he kicked or flailed, and asserts that his pants and underwear were pulled down by Breen during the invasive search. Beck-with Decl. ¶¶ 18-19 ("I never 'kicked' or 'flailed'...My pants and underwear did not come down because of any of my actions. Instead, Breen pulled them down during his search of me"); Exh. F at 67:3 (describing Breen pulling down pants).

74.    While handcuffed, Plaintiff continued trying to reach his hand into the same area of his waistband that he had while inside of the Vehicle. (Exh. D, 58:4-7).

Response: Plaintiff denies that he ever reached his hand into his waistband. Beckwith Decl. ¶ 9 ("At no point...did I...reach behind me or into my waist-band").

75.    When the Officers stood Plaintiff up after placing him in handcuffs, they observed a bag that was half-exposed at the top of the waistline of Plaintiff's underwear. (Exh. B, SYR003074; Exh. D, 63:9-23; Exh. E, 47:17-21, 49:25, 50:1; Exh. G, 13:3-6).

Response: Plaintiff denies that he ever was in possession of the bag, either in his waistband or any other area of his body. Beckwith Decl. ¶ 16 ("I was never in possession of this bag of so-called drugs"); Exh. F at 50:6-7 (denying possession of bag).

76.    The bag appeared to be the same one that Plaintiff had attempted to hand to Ms. Johnson inside of his vehicle, that is a sandwich bag containing the tan substance. (Exh. E, 50:2-5).

Response: Plaintiff denies that he ever was in possession of the bag, much less than he attempted to hand the bag to Johnson. Beckwith Decl. ¶¶ 10, 16; Exh. F at 50:6-7.

77.    After Plaintiff was in handcuffs, Detective Irvine and another officer began walking Plaintiff over to the Patrol Vehicle to search him pursuant to his lawful arrest and to place him in the rear of the Patrol Vehicle. (Exh. B, SYR003074; Exh. D, 56:14-16, 57:10-11; Exh. E, 43:9-1544:14-19).

Response: Plaintiff denies that he was searched *after* he was placed in handcuffs. Beckwith Decl. ¶ 20; Exh. F at 56:15-17 (describing sequence of events, showing searches occurred before handcuffing).

78. Once at the Patrol Vehicle, Detective Irvine removed the sandwich bag from between Plaintiff's underwear waistband by grabbing the sandwich bag from the outside of the waistband. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. I, SYR002466-SYR002467; Exh. D, 65:6-12; Exh. E, 47:9-12, 50:15-17; Exh. G, 13:6-9).

Response: Plaintiff denies that he ever was in possession of the bag, either in his waistband or any other area of his body. Beckwith Decl. ¶ 16 ("I was never in possession of this bag of so-called drugs"); Exh. F at 50:6-7 (denying possession of bag).

79. Due to Officers' concerns that Plaintiff may have secreted a weapon behind his back, Detective Irvine frisked the outside of Plaintiff's pants and his pockets. (Exh. E, 57:21-24, 58:9-18).

Response: Plaintiff admits that Irvine frisked him at one point, but denies that he engaged in any conduct that would reasonably have caused the officers concern that he had either a firearm or other dangerous contraband. Beckwith Decl. ¶ 9 (describing non-threatening behavior).

80. Detective Irvine then attempted to further frisk Plaintiff's legs by sweeping his hands up one side of his legs and down the other. (Exh. D, 66:1-4, 75:14-16, 81:12-20, 83:23-25, 84:1-2, 101:14-18; Exh. E, 45:20-24, 47:9-16, 57:21-24; Exh. F, 76:19-22; Exh. G, 13:9-15). Plaintiff began moving his body and thrusting his hips and groin up against the Patrol Vehicle, swearing at, and threatening, the Officers, which included threats to sue Officer Breen and Detective Irvine and kill them and their families. *See id.*

<u>Response</u>: Plaintiff admits that Irvine frisked him at one point, and admits swearing at and threatening to sue the officers, but denies threatening to kill their families. Plaintiff also admits that he twisted his body when Breen conducted the third, invasive search of him. However, Plaintiff denies that he began moving his body and thrusting his hips and groin up against the Patrol Vehicle while Irvine frisked him. Beckwith Decl. ¶ 13 ("I was completely compliant during this search"); *id*. at ¶23; Exh. F at 66:1 (describing compliance during Irvine's search).

81.    Detective Irvine instructed Plaintiff to stop moving and stay still. (Exh. E, 46:4-11). Plaintiff was noncompliant. *See id*.

<u>Response</u>: Plaintiff denies that he resisted or was noncompliant at any point when he was being searched by Irvine. Beckwith Decl. ¶ 13 ("I was completely compliant during this search, so Irvine never had to tell me, nor did he tell me, to 'stay still'"); Exh. F at 66:1 (describing compliance during Irvine's search).

82.    Detective Irvine was the only officer to search Plaintiff, and he only searched Plaintiff this one time. (Exh. E, 46:18-19, 60:25, 61:1-5).

<u>Response</u>: Plaintiff admits that Irvine only searched him once, but denies that Irvine was the only officer to search him. After Irvine's first search of Plaintiff, Breen searched Plaintiff twice. Beckwith Decl. ¶¶ 11-13 (describing sequence of three searches—one by Irvine followed by two by Breen); Exh. F at 66:10-68:8 (same).

83.    At no point did Detective Irvine place his hand between Plaintiff's underwear and his pants or in the area of Plaintiff's anus. (Exh. D, 79:6-8, 79:12-15; Exh. E, 50:18-19; Exh. G, 75:9-12, 88:4-7).

<u>Response</u>: Plaintiff admits.

84.    At no point did Defendant Officers conduct a cavity search. (Exh. G, 75:13-21, 87:19-22). Defendant Officers acted in conformity with the Syracuse Police Department's ("SPD's") policies and training, and it would have been against their training and rules to do so. *See id.*

> <u>Response</u>: Plaintiff admits that it would have been against the officers' training and rules to conduct a cavity search, but denies that the officers acted in conformity with SPD's policies and training. Specifically, *Breen* made contact with Plaintiff's genitals and with the area around his anus, *see* Beckwith Decl. ¶ 13 ("This search [by Breen] included going inside my underwear against my bare skin, making contact with my penis and testicles, and also with the area around my anus"), which properly can be characterized as a "cavity search."[2]

85.    A search typically does not consist of searching under an individual's underwear or sensitive parts of their body unless there was a weapon located there, which was not the case in this incident. (Exh. D, 46:13-19, 77:1-4, 79:1-4).

---

[2] *See Nourse v. Cty. of Jefferson*, 2018 U.S. Dist. LEXIS 79733, at *2 n.2 (N.D.N.Y. 2018) ("The parties have employed the terms 'strip search' and 'visual cavity search' somewhat interchangeably. As the Second Circuit has explained, "(1) a 'strip search' occurs when a suspect is required to remove his clothes; (2) a 'visual body cavity search' is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a 'manual body cavity search' occurs when the police put anything into a suspect's body cavity, or take anything out.') (citing *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013)).

<u>Response</u>: Plaintiff admits.

86.    There was also no reason for officers to conduct a search of those areas because Plaintiff was going to be transported to booking where employees of the On-ondaga County Justice Center ("Justice Center") would conduct a more thorough search that included individual's underwear or sensitive parts of their body. (Exh. D, 79:17-21).

<u>Response</u>: Plaintiff admits.

87.    The bag recovered from Plaintiff appeared to be a clear sandwich bag with loose rice in the bottom containing two smaller knotted bags, one containing a tan powder that appeared to be cocaine and the other bag containing a chunky beigey white substance that appeared to be cocaine or crack cocaine ("Bag")—based on the training and experience of the Officers. (Exh. A, SYR003081; Exh. B, SYR003074; Exh. D, 66:15-21, 95:13-15, 96:5-15; Exh. E, 7-18; Exh. G, 13:18-25; Exh. J, pg. 3-11).

> <u>Response</u>: Plaintiff denies that any bag was recovered from him. *See* Responses
> to SOMF ¶¶ 54-55, 75-76, 78, *supra*; *see also* Beckwith Decl. ¶ 16 ("I was never
> in possession of this bag of so-called drugs"); Exh. F at 50:6-7 (denying posses-
> sion of bag).

88.    After Plaintiff was searched, he was placed in the back of the officers' Patrol Vehicle. (Exh. D, 67:19-23).

<u>Response</u>: Plaintiff admits.

89.    Officer Breen did not observe any other searches of Plaintiff take place aside from the initial recovery of the Bag. (Exh. D, 70:25, 71:1-7).

<u>Response</u>: Plaintiff denies that Breen did not observe any searches of Plaintiff other than the initial search conducted by Irvine, since Breen conducted two subsequent searches of Plaintiff. Beckwith Decl. ¶¶ 12-13 (describing Breen's two searches after Irvine's search); Exh. F at 66:10-68:8 (describing sequence of searches). Plaintiff further denies that any bag was recovered from him during any of the searches. *See* Response to SOMF ¶ 87, *supra*.

90.    Plaintiff did not make any complaints to Officer Breen regarding any pain. (Exh. D, 84:8-15).

<u>Response</u>: Plaintiff admits.

91.    After Plaintiff was placed into custody and searched, Officer Breen then turned his attention back to Ms. Johnson and went to the passenger side of the Vehicle where he conducted a pat frisk of Ms. Johnson. (Exh. D, 56:17-21, 65:12-14; Exh. G, 86:12-17). Officer Breen then called to for a female SPD officer to search Ms. Johnson. *See id*.

<u>Response</u>: Plaintiff admits.

### CONTENTS OF PLAINTIFF'S BAG FIELD TEST POSITIVE FOR CONTROLLED SUBSTANCES

92.    Within a couple of minutes of recovering the Bag, Detective Irvine handed it to Officer Breen. (Exh. D, 95:3-5; Exh. E, 53:4-9).

<u>Response</u>: Plaintiff denies that Irvine handed to Breen any bag that had been recovered from Plaintiff. Beckwith Decl. ¶ 16 ("I was never in possession of this bag of so-called drugs"); Exh. F at 50:6-7 (denying possession of bag); *see* Response to SOMF ¶ 87, *supra*.

93.    Officer Breen then conducted a field test of the suspected drugs recovered from Plaintiff in the Bag, while standing between the open door and front seat of his police vehicle. (Exh. A, SYR003081; Exh. D, 86:18-20, 93:24-25, 94:1-2, 94:14-19; Exh. G, 14:18-24, 87:3-7).

Response: Plaintiff denies that Breen conducted a field test of any drugs recovered from Plaintiff in a bag, as no drugs or bags were recovered from Plaintiff. *See* Response to SOMF ¶ 87, *supra*.

94.    Detective Irvine witnessed the field test. (Exh. E, 54:3-5).

Response: Plaintiff denies that Irvine witnessed Breen conducted a field test of any drugs recovered from Plaintiff in a bag, as no drugs or bags were recovered from Plaintiff. *See* Response to SOMF ¶ 87, *supra*.

95.    In accordance with his training and hundreds of prior filed tests, Officer Breen conducted a test of the substance in each of the smaller baggies within the Bag with a 904B Reagent test and a Meckes reagent field test by:

      a.  first, putting on gloves,

      b.  taking the small, included wand, placing it into the bag of suspected drugs,

      c.  placing, with a sample, back into the test kit pouch,

      d.  resealing the kit,

      e.  popping the tubules inside the kit, and

      f.  agitating to determine a positive or negative reaction.

(Exh. A, SYR003081; Exh. D, 87:1-18, 96:18-25, 97:1-3; Exh. E, 54:7-12).

Response: Plaintiff denies that Breen conducted a field test of any drugs recovered from Plaintiff in a bag, as no drugs or bags were recovered from Plaintiff. *See* Response to SOMF ¶ 87, *supra*.

96.    The 904B Reagent test for cocaine showed a chemical reaction with blue underneath pink, indicating a positive result for cocaine. (Exh. A, SYR003081; Exh. I, SYR002466; Exh. D, 97:4-8, 97:17-18, 97:22-25; Exh. G, 13:25, 14:1-2, 87:9-11).

Response: Plaintiff denies that any field tests conducted by Breen could have tested positive for cocaine, as the subsequent laboratory tests conducted by the SPD proved negative for any controlled substance. (Exh. U - Lab Report). Moreover, Breen testified at his deposition that he had no explanation for how his field test could have been positive, when a subsequent laboratory test of the same substance was negative. (Exh. D, 98:4 to 99:7).

97.    The Meckes Reagent field test for heroin resulted in the liquid turning green, which also indicated a positive result for heroin (Exh. A, SYR003081; Exh. I, SYR002467; Exh. D, 97:9-16, 97:17-21; Exh. G, 14:2-3, 87:9-11).

Response: Plaintiff denies that any field tests conducted by Breen could have tested positive for heroin, as the subsequent laboratory tests conducted by the SPD proved negative for any controlled substance. (Exh. U - Lab Report). Moreover, Breen testified at his deposition that he had no explanation for how his field test could have been positive, when a subsequent laboratory test of the same substance was negative. (Exh. D, 98:4 to 99:7).

98.    Officer Breen demonstrated the field test kits to SPD Officer Christopher Buske because he was on field training at the time of the incident. (Exh. D, 86:1-6, 94:5-6, 10-13).

Response: Plaintiff admits.

99.    Office Breen then showed the positive field test kits to Detective Irvine. (Exh. B, SYR003074; Exh. D, 94:8-10).

Response: Plaintiff denies that the field tests were positive. *See* Response to SOMF ¶¶ 96-97, *supra.*

100.    Officer Breen labeled the evidence bags that contained the contents of the Bag, which were positively field-tested, and submitted the items to be stored in evidence. (Exh. A, SYR003081; Exh. D, 100:20-24; Exh. M).

Response: Plaintiff admits that Breen submitted labeled evidence bags, but denies that the contents of the bags tested positive for any controlled substance. *See* Response to SOMF, ¶¶ 96-97, *supra.*

101.    Detective Irvine opened the marijuana blunt to test its contents with a 908 Duquenois Levine Field test kit which yielded a positive result for THC. (Exh. B, SYR003074; Exh. D, 115:23-25, 116:1-6; Exh. E, 54:22-25, 55:1-2; Exh. G, 16:16-21).

Response: Plaintiff denies that Irvine field tested any marijuana that was recovered from Plaintiff, or from the vehicle that Plaintiff was operating. Beckwith Decl. ¶ 20; Exh. F at 53:23-24 (denying presence of marijuana).

102.    Even after being placed in custody, Plaintiff continued to berate and threaten the Defendant Officers. (Exh. D, 40:23-25, 41:1).

31

<u>Response</u>: Plaintiff admits.

103.    As a result, Plaintiff was charged with two counts of criminal possession of a controlled substance ("CPCS") in the third degree ("CPCS 3rd"), CPCS in the fourth degree ("CPCS 4th"), CPCS in the seventh degree ("CPCS 7th"), unlawful possession of marijuana ("UPM"), resisting arrest, obstructing governmental administration in the second degree ("OGA 2nd"), tampering with physical evidence, aggravated unlicensed operation ("AUO") and various traffic offenses (collectively "Initial Charges") under DR 16-444978. (Exh. A, SYR003083; Exh. B, SYR003072, SYR003075; Exh. D, 111:24-24, 112:1-4 Exh. N, SYR003077-SYR003078; Exh. O, SYR002471-SYR002477).

<u>Response</u>: Plaintiff admits that he was charged with the various crimes enumerated by Defendants, but denies that any of these charges were "[a]s a result" of Plaintiff having committed any of those crimes. Beckwith Decl. ¶ 16 ("I was never in possession of this bag of so-called drugs"); Beckwith Decl. ¶ 6 (denying presence of marijuana or drinking).

104.    Ms. Johnson was also issued a ticket for having an open container of alcohol in the Vehicle. (Exh. P, SYR003076).

<u>Response</u>: Plaintiff admits.

105.    SPD conducted a use of force investigation, as a matter of policy, wherein Plaintiff spoke with SPD Sergeant Angela Mahar while on scene of his arrest and stated that he was not injured. (Exh. L, SYR002506).

<u>Response</u>: Plaintiff admits that when Sgt. Mahar arrived at the scene, he initially stated that he was not "injured," per se, but that he immediately reported to the sergeant that he was "strip searched" (Exh. L, SYR002506) and that Breen had conducted an "invasive search" of him. Beckwith Decl. ¶ 22 ("At some point after I was arrested, a police supervisor arrived at the scene, and I told her about Breen's final invasive search of me"). Then, after he calmed down a little and was in the police car, Plaintiff complained about his "rectum area, my asshole area. I told the officers it was burning and—I told everyone it was burning and I need to go to the hospital. I told the sergeant. She slammed the door on me." Exh. F at 72:15-19.

### PLAINTIFF TRANSPORTED TO JUSTICE CENTER AND HANDED OVER TO THE CUSTODY OF ONONDAGA COUNTY

106.    The Officers then transported Plaintiff to the Justice Center. (Exh. C, SYR001098; Exh. D, 107:3-4; Exh. E, 66:13-15; Exh. G, 87:14-15).

<u>Response</u>: Plaintiff admits.

107.    During the drive to the Justice Center, Plaintiff continued to threaten to sue the Officers and kill them and their families (Exh. D, 107:5-16; Exh. E, 64:16-20).

<u>Response</u>: Plaintiff admits that he continued to threaten to sue the officers, but denies that he ever threatened to kill them or their families. Beckwith Decl. ¶ 23 ("While I acknowledge that I cursed at the officers and threatened to sue them, I never threatened to kill them or their families"); Exh. F at 72:15-19 (describing only complaining about pain and needing hospital).

108.    Plaintiff never made any complaints regarding the nature of the search to either of the Defendant Officers, and Officer Breen never heard Plaintiff make any complaints regarding the nature of the search. (Exh. D, 107:17-21, 108:15-18; Exh. E, 61:17-20).

Response: Plaintiff denies, and asserts that during Breen's final search, Plaintiff stated to Breen "get away from my balls" and/or "get out of there." Beckwith Decl. ¶ 13 ("I was shocked at this last search, and felt violated, and yelled out something like 'get away from my balls' and/or 'get out of there'"); Exh. F at 67:3-8 (describing protestations during search).

109.    Some time after Plaintiff was in custody, Defendant Officers learned that he was on federal probation. (Exh. D, 37:18-24).

Response: Plaintiff denies that the officers first learned of Plaintiff's probationary status after he was in custody. Before he was placed in custody, Irvine stated that Plaintiff was on probation or parole. Beckwith Decl. ¶ 4 ("He also mentioned something about my being on probation or parole").

110.    Upon arrival at the Justice Center, Defendant Officers escorted Plaintiff into the Justice Center where he continued to act irate and verbally confrontational. (Exh. D, 108:1-2).

Response: Plaintiff admits.

111.    Defendant Officers turned Plaintiff over to the Onondaga County Sheriff's Deputies in their Corrections Division at the Justice Center who searched and processed Plaintiff. (Exh. D, 108:6-14).

<u>Response</u>: Plaintiff admits.

112.    Officer Breen and Detective Irvine then went next door to the Public Safety Building to begin their paperwork regarding Plaintiff's arrest. (Exh. D, 109:1-4).

<u>Response</u>: Plaintiff admits.

113.    Only after Plaintiff was out of their custody did both of the Officers learn that Plaintiff complained to the Justice Center of alleged pain around the area of his anus. (Exh. E, 62:3-11).

<u>Response</u>: Plaintiff denies that the officers first learned about Plaintiff's complaint of pain around his anus area after he was out of their custody. Beckwith Decl. ¶ 13 (describing complaints during search). When he was in the police car, Plaintiff complained about his "rectum area, my asshole area. I told the officers it was burning and–I told everyone it was burning and I need to go to the hospital. I told the sergeant. She slammed the door on me." Exh. F at 72:15-19.

114.    Plaintiff arrived at the Justice Center at approximately 4:10 a.m. on September 6, 2016. (Exh. Q, SYR003028).

<u>Response</u>: Plaintiff admits.

115.    Upon being booked Plaintiff was strip searched by Onondaga County Sheriff's Deputy ("Deputy") Perry. (Exh. Q, SYR003031).

<u>Response</u>: Plaintiff admits.

116.    Plaintiff was then seen at the Justice Center by nurse Natalie Harriss at approximately 11:14 a.m. (Exh. Q, SYR003028, SYR003031).

Response: Plaintiff admits.

117.    Following his evaluation by nurse Harriss, Plaintiff was transported to the Upstate University Hospital ("Upstate") by Deputy Gratien and Deputy Hagenmayer. (Exh. Q, SYR003028).

Response: Plaintiff admits.

### TREATMENT AT UPSTATE UNIVERSITY HOSPITAL

118.    Plaintiff arrived at Upstate at approximately 1:12 p.m. on September 6, 2016. (Exh. R, SYR005690).

Response: Plaintiff admits.

119.    Plaintiff reported to Dr. Jacob T. Frier ("Dr. Frier") that "last night, he was being booked by an arresting police officer" and that the officer searched for drugs around his genitals and, in the process, scratched him around his anus. (Exh. R, SYR005694).

Response: Plaintiff admits.

120.    Plaintiff denied "rectal entry by the officer." (Exh. R, SYR005694).

Response: Plaintiff admits.

121.    Plaintiff reported having two out of ten stinging pain around his anus with blood streaks after wiping. (Exh. R, SYR005694).

Response: Plaintiff denies recalling, nor does he believe, that he ever reported pain at the level of two out of ten, and asserts that he stated that he had pain at the

36

level of seven out of ten. Beckwith Decl. ¶ 25 ("At the hospital, I stated that I had pain at the level of '7' out of '10.' I do not recall, nor do I believe, that I ever told any-one that I had pain at the level of '2' out of '10'").

122.    Plaintiff was diagnosed with an "abrasion of [his] buttocks **excluding** anus." (Exh. R, SYR005690) (emphasis supplied).

Response: Plaintiff admits that the hospital record contains the aforemen-tioned entry, but also asserts that the record elsewhere notes "1:2 superficial abrasions **just left of the anus,**" and further includes an anatomical diagram depicting the abrasions immediately next to the anus. (Exh. R, SYR005696) (emphasis supplied),

123.    The abrasion did not extend beyond the dermis and no bleeding was noted. Plaintiff also did not have any injury to his anus or genitals. (Exh. R, SYR005697).

Response: Plaintiff admits.

124.    Plaintiff also requested a sexual assault evaluation for which sexual as-sault nurse examiner ("SANE") Nurse Maureen Garvey ("Nurse Garvey") responded. (Exh. R, SYR005697-SYR005698).

Response: Plaintiff admits.

125.    Nurse Garvey spoke with Plaintiff, who stated that he "just wanted to make sure his injuries were documented." (Exh. R, SYR005698).

Response: Plaintiff admits.

126.    Plaintiff denied any anal penetration. (Exh. R, SYR005698).

Admit

127.    Despite telling Dr. Frier that his pain was a two out of ten, he told Nurse Garvey that his paint was a seven out of ten. (Exh. R, SYR005698).

Response: Plaintiff denies recalling, nor does he believe, that he ever reported pain at the level of two out of ten, and asserts that he stated that he had pain at the level of seven out of ten. *See* Response to SOMF ¶ 121, *supra* ("Plaintiff denies recalling, nor does he believe, that he ever reported pain at the level of two out of ten, and asserts that he stated that he had pain at the level of seven out of ten.") (citing Beckwith Decl. ¶ 25).

128.    Plaintiff declined to have further pictures taken of his alleged injuries and declined SANE care. (Exh. R, SYR005698).

Response: Plaintiff admits.

129.    Plaintiff was given hydrocortisone cream to apply to the abrasion on his buttock, but refused to have medical staff apply the cream prior to discharge. (Exh. R, SYR005693, SYR005698).

Response: Plaintiff admits.

130.    When Plaintiff returned to the Justice Center from the hospital, he was again seen by a nurse there and cleared to be housed. (Exh. Q, SYR003028).

Response: Plaintiff admits.

### GRAND JURY PROCEEDINGS AND INDICTMENTS

131.    On September 9, 2016, Plaintiff's federal probation officer, Paul Brandofino, filed for the issuance of a warrant because Plaintiff had violated the

conditions of his parole by testing positive for cocaine on April 1, 2016, and being arrested on September 6, 2016 (Exh. S. SYR009129-SYR009130).

<u>Response</u>: Plaintiff admits.

132.    That same day, an Onondaga County Grand Jury ("Grand Jury") was convened to consider the Initial Charges against Plaintiff (Exh. G, SYR00001; Centra Decl., ¶6).

<u>Response</u>: Plaintiff admits.

133.    On September 9, 2016, and September 20, 2016, Detective Irvine testified before the Grand Jury regarding Plaintiff's arrest and the Initial Charges. (Irvine Decl. ¶ 9-12).

<u>Response</u>: Plaintiff admits.

134.    On September 20, 2016, Officer Breen testified before the Grand Jury regarding Plaintiff's arrest and the Initial Charges. (Irvine Decl. ¶ 9-11).

<u>Response</u>: Plaintiff admits.

135.    Defendant Officers were not present for the testimony of any other witnesses, other than their own testimony, before the Grand Jury. (Irvine Decl. ¶ 13; Breen Decl. ¶ 12).

<u>Response</u>: Plaintiff admits.

136.    Plaintiff elected to testify before the Grand Jury and signed a waiver of immunity. (Exh. G, 30:9-13, 34:1-8; Centra Decl. ¶7).

<u>Response</u>: Plaintiff admits.

137.    Prior to signing the waiver of immunity, Plaintiff indicated that he understood the waiver to mean that "anything I say could be held against me." (Exh. G, 26:20-23).

Response: Plaintiff admits.

138.    Both Plaintiff's criminal defense attorney, Anthony Belletier and Assistant District Attorney Joseph Centra ("ADA Centra") reiterated to Plaintiff that he could be prosecuted for anything about which he may testify about before the Grand Jury. (Exh. G, 28:18-24).

Response: Plaintiff admits.

139.    Plaintiff testified at the Grand Jury that he did not possess "anything," including crack cocaine or heroin, and that "I've never possessed these drugs," but that an officer "slid his and in my pants and rectum to see if I have anything." (Exh. G, 42:8-10, 52:11-16, 53:15).

Response: Plaintiff admits the substance of these statements, but objects to Defendants' editorial liberties. Specifically, Plaintiff testified, "**I** never possessed these drugs, sir" (Exh. G. 53:13), and not, as represented by Defendants, "**I've** never possessed these drugs," the latter statement presumably intended to suggest that Plaintiff denied ever having possessed these types of drugs in his life.

140.    Plaintiff further testified before the Grand Jury that that:

> during this search when they had me on the hood they searched me three times. They did a pat down. They did a cavity search. They did another cavity search. They violated my civil rights. They violated my rights. Basically,

they had me out there naked doing a cavity search. Two officers searched me that day, too. Like two officers searched me that night. One held me down on the hood of the car, bent over facedown. The other one was shaking my legs out, shaking my pants out, going in my ass, my rectum and my testicle area. (Exh. G, 64:22-25, 65:1-9).

Response: Plaintiff admits.

141. When questioned why he believed the officer would plant drugs on him, Plaintiff stated he did not "know the reason for him planting that one me at all" and that the officer "probably planted that so he could check the car." (Exh. G, 54:9-10, 54:14-15).

Response: Plaintiff admits testifying to that at the Grand Jury, but objects to Defendants' editorial liberties, which presumably are intended to suggest that any claim that the officers planted drugs on Plaintiff to coverup their malfeasance in connection with their improper stop is a recent fabrication. Plaintiff's full answer to the question as to why officers might have planted drugs reads as follows:

> Sir, I don't know the reason behind - - I could say a lot of different things. I don't know the reason for him planting that on me at all, sir. **Maybe because he knows that he fucked up the process of his stop. The stop was unwarranted or whatever it was**. I didn't have anything. He was looking for guns or whatever he was looking for. He probably planted that so he could check the car. I don't know but I know that the whole stop was wrong. In my history of being pulled over, going to jail and, you know it was kind of like he was looking for something that I didn't have."

Exh. G, 54:8-19 (emphasis added).

142.    Plaintiff denied having marijuana but admitted that there were open containers of alcohol in the vehicle. (Exh. G, 49:22-25).

Response: Plaintiff admits.

143.    Ms. Johnson also waived immunity and testified before the Grand Jury. (Exh. G, 101:7-12, 106:22-23, 107:14-15, 109:18-25, 110:1-7). Ms. Johnson testified that she had "a little visual" of what occurred but she was so drunk that she could not remember what exactly occurred. *See id*.

Response: Plaintiff admits that Johnson testified that, due to her intoxication, she "couldn't remember exactly," but once again objects to Defendants' editorial liberties, which involve citing selectively to Johnson's testimony to suggest that Johnson was not in a position to offer any relevant testimony at the Grand Jury. Johnson actually testified that there were aspects of the event that she could recall, including that Plaintiff complained during the search, "get out my balls or get out something, get out, get out…." (Exh. G., 107:6-8).

144.    On September 22, 2016, the Grand Jury voted a true bill on all counts of the Initial Charges presented to it. (Exh. G, 118:5-7; Centra Decl. ¶ 10).

Response: Plaintiff admits.

145.    Based upon Plaintiff's statements to the Grand Jury, ADA Centra reviewed the New York State Penal Law, the evidence available to him, and his file to determine whether he had a basis to charge Plaintiff with Perjury in the first degree ("Perjury 1st"). (Centra Decl. ¶ 8).

<u>Response</u>: Plaintiff admits that Centra relied upon those factors in his decision to charge Plaintiff with perjury. However, Centra also relied upon the statements by Irvine and Breen that they recovered cocaine and heroin from Plaintiff after observing the drugs inside a plastic bag that was protruding in plain view from Plaintiff's waistband, and that they never conducted any type of invasive search of Plaintiff.

146.    After a brief break, ADA Centra returned to the Grand Jury and stated "Now that you voted on that charge I'll you ask [sic] to consider one more charge. That charge is perjury in the first degree against Davonne Beckwith." (Exh. G. 119:3-6; Centra Decl. ¶ 11).

<u>Response</u>: Plaintiff admits.

147.    ADA Centra believed, and still believes, that he had the requisite probable cause to present the charge of Perjury 1st to the Grand Jury. (Centra Decl. ¶ 15).

<u>Response</u>: Plaintiff admits that Centra affirms as much, but denies that Centra's purported belief, which is self-serving, is at all material to the central issue in this case, which is whether the officers knowingly provided false information to Centra.

148.    The Grand Jury voted a true bill on the charge of perjury in the first degree ("Perjury 1st") as well. (Exh. T, SYR001190-1192; Exh. G, 120:17-20; Centra Decl. ¶ 11).

<u>Response</u>: Plaintiff admits.

149.    Between the Grand Jury's vote on the Initial Charges and the vote on the Perjury 1st charge, ADA Centra did not speak to Defendant Officers. (Centra Decl. ¶ 12).

> Response: Plaintiff admits only that Centra states in his declaration that, during that interval, **"[t]o the best of my recollection**…I did not speak to Officer Breen or Detective Irvine." (Centra Decl. ¶ 12) (emphasis added). In light of the somewhat equivocal nature of this statement, and the fact that eight years have elapsed since Centra presented these charges to the Grand Jury, the trier of fact is entitled to conclude that Centra is not certain whether he spoke with Breen or Irvine during that interval.

150.    Defendant Officers were not informed about the content of Plaintiff's testimony before the Grand Jury prior to Plaintiff's indictment. (Irvine Decl. ¶ 14; Breen Decl. ¶ 13).

> Response: Plaintiff admits only that each officer states in his declaration that **"[t]o the best of my recollection**, I was never informed as to the content of Plaintiff's testimony before the Grand Jury prior to his indictment." (Irvine Decl. ¶ 14; Breen Decl. ¶ 13) (emphasis added). In light of the somewhat equivocal nature of this statement, the fact that eight years have elapsed since Plaintiff testified at the Grand Jury, and the fact that Irvine and Breen omit the phrase "to the best of my recollection" from several other statements contained in their declarations, the trier of fact is entitled to conclude that Irvine

and Breen are uncertain as to whether they were informed about the content of Plaintiff's testimony.

151.    Defendant Officers were not present when the Grand Jury voted on the Initial Charges or the charge of Perjury 1st. (Irvine Decl. ¶ 13; Breen Decl. ¶ 12).

Response: Plaintiff admits.

152.    Defendant Officers did not learn that the charge of Perjury 1st had been submitted to the Grand Jury until after their testimony. (Irvine Decl. ¶ 15; Breen Decl. ¶ 14).

Response: Plaintiff admits only that each officer states in his declaration that "**I was later informed** subsequent to my testimony that the DA's Office asked the Grand Jury to consider an additional charge of perjury in the first degree…" (Irvine Decl. ¶ 15; Breen Decl. ¶ 14), but denies that Defendants have submitted any evidence, either in the officers' declarations or otherwise, that the officers did not know prior to their testimony that the DA was considering an additional charge of perjury.

153.    Detective Officers did not initiate Plaintiff's prosecution for Perjury 1st. (Centra Decl. ¶ 13; Irvine Decl. ¶ 16; Breen Decl. ¶ 15).

Response: This is a conclusion of law, to which no response is required herein. *Ramsay-Nobles v. Keyser*, 2019 U.S. Dist. LEXIS 147693, at *8-9 (S.D.N.Y. 2019) ("Statement 12 is a pure conclusion of law, which does not belong in a Rule 56.1 statement and so will be ignored."); *Giguere v. Racicot*, 2002 U.S. Dist. LEXIS 3400, at *6 n.1 (N.D.N.Y. 2002) (noting that "conclusions of law" are not

considered by the court in a 7.1 Statement). Nevertheless, Plaintiff disputes that the officers did not initiate his prosecution for perjury, and addresses that issue in his Memorandum of Law.

154.  Detective Officers did not request, encourage, pressure, or insist that the District Attorney's Office ("DA's Office") charge Plaintiff with perjury (Centra Decl. ¶ 13; Irvine Decl. ¶ 16; Breen Decl. ¶ 15).

> <u>Response</u>: Plaintiff denies that the officers did not "encourage" the DA's office to charge Plaintiff with perjury. The officers' intentionally false statements that they recovered cocaine and heroin from Plaintiff after observing the drugs inside a plastic bag that was protruding in plain view from Plaintiff's waist-band, and that they never conducted any type of invasive search of Plaintiff, provided ample encouragement to the DA. *Cf.* Beckwith Decl. ¶¶ 13, 16 (describing invasive search by Breen and denying possession of any drugs); Exh. F at 50:6-7 (denying possession of bag), 67:3-8 (describing invasive nature of search).

155.  Prior to Plaintiff's indictment, Detective Irvine had only one conversation with the DA's Office regarding Plaintiff's arrest, which lasted approximately 10 minutes. (Irvine Decl. ¶ 17).

> <u>Response</u>: Plaintiff admits only that Irvine states in his declaration, with even greater equivocality than the phrase "to the best of my recollection," that **"I only recall** having one conversation lasting approximately 10 minutes with the DA's Office regarding my involvement in Plaintiff's Arrest."  (Irvine Decl.

¶ 17) (emphasis added). In light of the somewhat equivocal nature of this statement, the fact that eight years have elapsed since Plaintiff's indictment, and the fact that Irvine omits the phrases "to the best of my recollection" and "I only recall" from several other statements contained in his declaration, the trier of fact is entitled to conclude that Irvine had more than one such conversation with the DA's office regarding his involvement in Plaintiff's arrest.

156.    Prior to Plaintiff's indictment, Officer Breen had only one conversation with the DA's Office regarding Plaintiff's arrest, which lasted approximately 15 minutes. (Breen Decl. ¶ 16).

Response: Plaintiff admits only that Breen states in his declaration, with even greater equivocality than the phrase "to the best of my recollection," that **"I only recall** having one conversation lasting approximately 10 minutes with the DA's Office regarding my involvement in Plaintiff's Arrest."  (Breen Decl. ¶ 16) (emphasis added). In light of the somewhat equivocal nature of this statement, the fact that eight years have elapsed since Plaintiff's indictment, and the fact that Breen omits the phrases "to the best of my recollection" and "I only recall" from several other statements contained in his declaration, the trier of fact is entitled to conclude that Breen had more than one such conversation with the DA's office regarding his involvement in Plaintiff's arrest.

157.    At no point during Defendant Officers' conversations with the DA's Office was the possibility of Plaintiff being charged with perjury discussed or even mentioned. (Irvine Decl. ¶ 19; Breen Decl. ¶ 17).

<u>Response</u>: Plaintiff admits only that the officers represent in their declarations that during their conversations with the DA's Office, the possibility of Plaintiff being charged with perjury was never discussed or even mentioned. However, conspicuous by its absence in the declaration of ADA Centra is any similar denial that the possibility of Plaintiff being charged with perjury was ever discussed or mentioned between the officers and the DA's Office.

158.    ADA Centra presented the charge of Perjury 1st to the Grand Jury based upon his sole discretion as a prosecutor with the District Attorney's Office. (Centra Decl. ¶ 13).

<u>Response</u>: Plaintiff admits, but maintains that Centra's discretion was informed, in part, by the false statements made to him by the officers.

159.    Plaintiff has acknowledged that it was The People (i.e., through the DA's Office), not the Syracuse Police Department, that charged him with perjury. (Exh. F, 78:23-25, 80:11-21).

<u>Response</u>: Plaintiff admits that he acknowledged at his deposition that it was The People (i.e., through the DA's Office), and not the Syracuse Police Department, that "charged" him with perjury, but denies that this acknowledgment by a lay person is at all relevant to the issues raised in Defendants' motion.

160.    On January 31, 2017, the Wallie Howard, Jr, Center for Forensic Sciences produced a report indicating that no controlled substances were found in the bags recovered from Plaintiff containing the chunky material or the powder (Exh. U, SYR006670).

Response: Plaintiff admits that Mr. Howard produce a report indicating that no controlled substances were found in the bags that were tested, but denies the suggestion that the report indicated that the bags were recovered from Plaintiff (Exh. U, SYR006670), and further denies that the bags were recovered from Plaintiff. *See* Response to SOMF ¶ 87, *supra*.

161.    On February 3, 2017, the drug charges were dismissed. (Exh. V, 2:9-18).

Response: Plaintiff admits.

162.    Plaintiff would later admit that he had previous experience selling cocaine. (Exh. F, 58:11-16).

Response: Plaintiff admits.

163.    Plaintiff would also later admit that when Plaintiff had sold cocaine previously, he did not test what he believed to be cocaine for purity to verify its authenticity. (Exh. F, 64:7-13).

Response: Plaintiff admits only that, in response to questioning by defense counsel during his deposition, Plaintiff agreed that he never tested cocaine for its "purity." The words "authenticity" or "authentic" were never used either in the question, or the answer. The apparent purpose of Defendants' editorial liberty in drafting Statement 163 is to suggest that Plaintiff had previously sold substances purporting to be cocaine, but which in fact were not "authentic" cocaine, thus implying that on September 6, 2016 Plaintiff had in his possession substances that appeared to be cocaine, but were in fact not authentic.

**PLAINTIFF'S JURY TRIAL AND CONVICTION BY A JURY OF HIS PEERS**

164.    Plaintiff's criminal jury trial ("Trial") commenced on May 30, 2017, as to the charges of Perjury 1st, resisting arrest, and obstruction of governmental administration (Exh. W, 1:1).

Response: Plaintiff admits.

165.    Plaintiff elected to testify as the defendant at his Trial. (Exh. W, 308:17-19).

Response: Plaintiff admits.

166.    Plaintiff during his testimony at the Trial attempted to walk back his Grand Jury testimony by stating that he had meant that Officer Breen had "swiped" his anus when he initially told the Grand Jury that "the officer slid his hand in my pants and rectum." (Exh. W, 309:21-25, 310:1-6).

Response: Plaintiff admits that he testified at trial that "the officers slid his hand in my pants and rectum," but denies that such testimony constituted an attempt to "walk back" his Grand Jury testimony. *See* Beckwith Decl. ¶ 26 ("During this incident, and during my testimony before the Grand Jury, I did not really know whether there was any difference between the word 'anus' and the word 'rectum.' Therefore, it is inaccurate, and unfair, to claim that I gave inconsistent testimony when I used slightly different words to describe the areas where Breen searched me.").

50

167.    Plaintiff also deviated from his Grand Jury testimony at Trial to state that Officer Breen searched his "rectum area" and not in fact his in rectum. (Exh. F, 76:8-13; Exh. W, 359:13-18).

Response: Plaintiff denies. *See* Response to SOMF ¶ 166, *supra*.

168.    On June 1, 2017, the Trial jury convicted Plaintiff of perjury in the first degree and resisting arrest. (Exh. X, SYR001137, Exh. Y, SYR002865).

Response: Plaintiff admits.

169.    The jury found that Plaintiff was guilty of perjury for four specific statements which were:

   a.  "He went in my rectum, slid his hand in my pants and rectum to see if I have anything. He stood me up,"

   b.  "after he just did three searched on me, did a cavity search and everything he didn't find nothing,"

   c.  "I never possessed these drugs, sir," and

   d.  "I don't know the reason for him planting that on me at all, sir."

(Exh. Y, SYR002865)

Response: Plaintiff admits.

170.    Plaintiff was sentenced on June 30, 2017, as a second felony offender to two to four years in prison. (Exh. Z, 9:11-12).

Response: Plaintiff admits.

171.    At sentencing, Defendant asked if he could be sentenced to the Williard drug treatment facility. (Exh. F, 82:24-25; Exh, Z, 6:6-8).

Response: Plaintiff admits.

172.    On May 2, 2018, Plaintiff admitted to violating his federal parole by us-

ing cocaine in April 2016, and he was sentenced to eight months in federal custody

followed by a 24-month period of supervised release. (Exh. AA, SYR009133-

SYR009135).

Response: Plaintiff admits.

173.    After his release from federal prison, Plaintiff once again violated the

terms of his supervised release when he admitted to testing positive for cocaine in

May 2019. He was sentenced to an additional 12 months in prison (Exh. AA,

SYR009169-SYR009170).

Response: Plaintiff admits.

174.    On April 24, 2020, the Appellate Division Fourth Judicial Department

reversed only Plaintiff's conviction for perjury in the first degree because "the People

failed to prove, beyond a reasonable doubt, that any of his allegedly perjurious state-

ments to the grand jury were actually false."  In doing so it included the following

quote; "'[a]lthough the People may have proved that defendant is probably guilty, the

burden of proof in a criminal action is, of course, much higher than probable cause."

(Exh. BB, SYR001114-SYR001115).

Response: Plaintiff admits, but denies the suggestion that the Appellate Divi-

sion expressed its opinion that the People may have proved that Beckwith was

probably guilty. Instead, the Appellate Division, in a unanimous decision,

found that Beckwith's conviction was against the weight of the evidence, and

merely quoted language from an earlier case in which the majority opined that the People may have proved that that defendant *in that case* was probably guilty, but stressed that "probably guilty" is not enough to convict. The entire quote in *Beckwith* reads as follows:

> ***As we recently observed in analogous circumstances***, "[a]lthough the People may have proved that defendant is probably guilty, the burden of proof in a criminal action is, of course, much higher than probable cause; the prosecution is required to prove a defendant's guilt beyond a reasonable doubt, and the evidence in this case does not meet that high standard."

*People v. Beckwith*, 182 A.D.3d 995, 996, 120 N.Y.S.3d 905, 906 (4th Dep't 2020) (emphasis added) (citing *People v. Carter,* 158 A.D.3d 1105, 1106, 70 N.Y.S.3d 661, 662 (4th Dep't 2018)).[3]

---

[3] In *People v. Carter*, unlike here, there was much evidence pointing to the Defendants' guilt. Indeed, two Justices dissented in *Carter,* finding that the jury's verdict was not "against the weight of the evidence." *Id*. at 1114. Here, the only evidence of Plaintiff's guilt was the uncorroborated say-so of the two arresting officers.

### PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE

1.     At the time Plaintiff was stopped by the officers, all of the lights on the car were working properly, and Plaintiff had not failed to properly stop at a stop sign or to properly signal before turning. Beckwith Decl. ¶ 2 ("All of the lights on Johnson's car were working properly...I had not failed to properly stop at a stop sign or to properly signal before turning"); Exh. F at 80:25-81:4 (testifying traffic tickets were "thrown out").

2.     When the officers approached the car, Plaintiff asked Irvine why he had been stopped. In response, Irvine did not mention any alleged traffic infractions. Instead, he questioned Plaintiff in an accusatory and aggressive manner about whether he had any drugs or weapons in the car. Beckwith Decl. ¶ 3 (describing initial interaction where "Irvine did not mention any alleged traffic infractions" but instead "questioned me in an accusatory and aggressive manner"); Exh. F at 47:18-21 (describing questioning about drugs and weapons). Plaintiff truthfully answered "no," and an argument then followed, wherein Plaintiff expressed his annoyance at the officers for having been pulled over for no reason. At some point during the argument, Plaintiff also cursed at the officers, and one or both of the officers threatened to physically harm Plaintiff. Beckwith Decl. ¶ 3.

3.     Officer Irvine also asked Plaintiff for his license and registration. In response, Plaintiff told Irvine that his license was suspended, but he provided Irvine with other identification. Plaintiff told Irvine that he was driving because Johnson was drunk and in no condition to drive, but that he had not had anything to drink.

Plaintiff also kept asking why he had been pulled over in the first place, but Irvine again responded only by asking Plaintiff about drugs or weapons. Irvine also mentioned something about Plaintiff being on probation or parole, and about his being out past his curfew, which was not true. *See* Beckwith Decl. ¶ 4; Exh. F at 46:16-25 (describing interaction about curfew).

4.     At that point, Plaintiff was not acting franticly or breathing heavily. And while he was angry and annoyed, he was not "overly" excited, given the officers' aggressive and inappropriate questioning of him. Beckwith Decl. ¶ 5 ("At this point, I was not acting franticly or breathing heavily. And while I was angry and annoyed, I would not say that I was 'overly' excited").

5.     There was not a "blunt," "rolled cigar," or other marijuana in the cup holder of the car, nor to Plaintiff's knowledge in any other area of the car. Also, neither Johnson nor Plaintiff had smoked marijuana that day or the prior evening, and there was no smell of marijuana in the car. Also, while Johnson had been drinking, and was holding an open container of alcohol inside the car, Plaintiff had not had a single alcoholic drink. Therefore, there was no odor of alcohol coming from Plaintiff's breath, and Plaintiff never told the officers that he had been drinking. Beckwith Decl. ¶ 6; Exh. F at 39:4-6 (denying drinking); *id.* at 53:23-24 (denying presence of marijuana).

6.     At some point Plaintiff was ordered to get out of the car. However, he initially refused, because he was afraid of the officers, due to their aggressive manner. Plaintiff told the officers that he wanted them to call a supervisor before he got

out of the car. Beckwith Decl. ¶ 7 ("I initially refused, because I was afraid of the officers, due to their aggressive manner. I told the officers that I wanted them to call a supervisor before I got out of the car").

7.    At some point during the encounter Plaintiff asked Johnson to use her cell phone to record what was happening. However, Johnson was unable to do so, and Plaintiff tried to use her phone to start the recording. The officers then pointed guns at Plaintiff, and then he was tased by one of the officers. After that, Plaintiff decided that he had to exit the car. He began to do so, but was then pulled out of the car by the officers. Beckwith Decl. ¶ 8 ("The officers then pointed guns at me, and then I was tased by one of the officers. After that, I decided that I had to exit the car. I began to do so, but was then pulled out of the car by the officers").

8.    At no point before exiting the car did Plaintiff ball his fist, hide his hands, swing his hand toward either officer, or reach behind him or into his waistband. At no time did either officer direct Plaintiff to show them his hands. Beckwith Decl. ¶ 9 ("At no point before exiting the car did I ball my fist, hide my hands, swing my hand toward either officer, or reach behind me or into my waistband. At no time did either officer direct me to show them my hands"); Exh. F at 50:15-20 (denying reaching behind back or making threatening movements).

9.    Plaintiff never attempted to hand anything to Johnson inside the car. Beckwith Decl. ¶ 10 ("I never attempted to hand anything to Johnson inside the car").

10.    After Plaintiff was pulled out of the car, he was brought to the front of the police vehicle, where Irvine conducted a search of him. Plaintiff was completely compliant during this search, so Irvine never had to tell Plaintiff, nor did he tell him, to "stay still." Beckwith Decl. ¶ 11 ("I was completely compliant during this search, so Irvine never had to tell me, nor did he tell me, to 'stay still'").

11.    During his search, Irvine did not find any weapons, drugs, or other contraband on Plaintiff, because he did not have any on him. Irvine then told Breen that Plaintiff was "clean." Beckwith Decl. ¶ 12 ("During his search, Irvine did not find any weapons, drugs, or other contraband on me, because I did not have any on me. Irvine then told Breen that I was 'clean'"). However, Breen was not satisfied, and he insisted on searching Plaintiff again. *Id.* at ¶ 13 ("Breen then conducted a more extensive search of me…")

12.    Breen then conducted a more extensive search of Plaintiff, but again did not recover anything. *See id.* ("Breen then conducted a more extensive search of me, but again did not recover anything").

13.    Breen seemed angry at not having recovered anything from this second search, and he then put on some gloves and conducted an even more invasive search of Plaintiff. This search included going inside Plaintiff's underwear against his bare skin, making contact with Plaintiff's penis and testicles, and also with the area around Plaintiff's anus. Beckwith Decl. ¶ 13 ("[H]e then put on some gloves and conducted an even more invasive search...including going inside my underwear against

my bare skin, making contact with my penis and testicles, and also with the area around my anus").

14.    Plaintiff was shocked at this last search, and felt violated, and yelled out something like "get away from my balls" and/or "get out of there," but Breen kept searching Plaintiff there. Plaintiff also attempted to stop any further violation of him by twisting his body and tightening up his buttocks. *See id.* ("I was shocked at this last search, and felt violated, and yelled out something like 'get away from my balls' and/or 'get out of there'... I also attempted to stop any further violation of me by twisting my body and tightening up my buttocks") This is the only point at which Plaintiff "resisted" or was noncompliant with any of the searches of him.

15.    During Grand Jury proceedings, Johnson testified that, while Plaintiff was being searched, she heard Plaintiff say "get out my balls or get out something, get out, get out," and at another point, "get out of my pants." (Exh. G., 107:6-8).

16.    After this third search of Plaintiff, Breen still did not find anything. Beckwith Decl. ¶ 14 ("After this third search, Breen still did not find anything").

17.    After this third search, Plaintiff threatened to sue Breen, and also cursed at him again. *Id.* at ¶ 15 ("After this third search, I threatened to sue Breen, and also cursed at him").

18.    Breen then went inside his police car. He then came out, reached around Plaintiff's waistband, and announced (falsely) that he found a bag containing drugs. However, Plaintiff was never in possession of this bag of so-called drugs. *Id.* at ¶ 16 ("Breen then went inside his police car. He then came out, reached

around my waistband, and announced (falsely) that he found a bag containing

drugs. However, I was never in possession of this bag of so-called drugs"); Exh. F at

50:6-7 (denying possession of bag).

19.    At no time was Plaintiff wrestling with either of the officers, nor did he

keep putting either of his arms underneath his body. Beckwith Decl. ¶ 17 ("At no

time was I wrestling with either of the officers, nor did I keep putting either of my

arms underneath my body").

20.    Plaintiff never "kicked" or "flailed" during the encounter, "pushed" or

"wrestled" with either officer, "grabbed" either officer, nor was on top of either of-

ficer; nor did he ever reach into his waistband. *Id.* at ¶ 18 ("I never 'kicked' or

'flailed' during the encounter, 'pushed' or 'wrestled' with either officer, 'grabbed' ei-

ther officer, nor was on top of either officer"); Exh. F at 50:15-20 (denying reaching

into waistband).

21.    Plaintiff's pants and underwear did not come down because of any of

his actions. Instead, Breen pulled them down during his search of Plaintiff. Beck-

with Decl. ¶ 19 ("My pants and underwear did not come down because of any of my

actions. Instead, Breen pulled them down during his search of me"); Exh. F at 67:3

(describing Breen pulling down pants).

22.    Plaintiff was handcuffed only after Breen falsely claimed to have recov-

ered drugs from his waistband, and Plaintiff was standing up at that time and did

not struggle with the officers. Beckwith Decl. ¶ 20 ("I was handcuffed only after

Breen falsely claimed to have recovered drugs from my waistband, and I was standing up at that time and did not struggle with the officers").

23.     After Irvine's initial search of Plaintiff, that failed to reveal any drugs, weapons, or other contraband, Irvine never searched Plaintiff again. However, Irvine was present during the other searches by Breen, and did nothing to stop Breen. *Id.* at ¶ 21 ("After Irvine's initial search of me, that failed to reveal any drugs, weapons, or other contraband, Irvine never searched me again. However, Irvine was present during the other searches by Breen, and did nothing to stop Breen").

24.     Syracuse Police Sergeant Angela Mahar, who arrived at the scene of Plaintiff's arrest and spoke with him after guns had been pointed at him and after he had been tased, prepared a SPD Use of Force Report in which she documented that Plaintiff "immediately" complained to her that the officers "strip searched him in the street and planted drugs on him." (Exh. L, SYR002506); *see* Beckwith Decl. ¶ 22 ("At some point after I was arrested, a police supervisor arrived at the scene, and I told her about Breen's final invasive search of me").

25.     Records from the emergency room of Upstate University Hospital, where Plaintiff was taken following his arrest, include the following entry by the examining physician: "Per patient, the officer was searching for drugs around his genitals, and in the process, the officers scratched the patient 'in several places' around [his anus]." (alterations in original). (Exh. R, SYR005694).

26.     The E.R. record also noted the following finding from a physical examination of Plaintiff: "1:2 superficial abrasions just left of the anus." *Id.* at SYR005696.

60

27.     The E.R. physician who examined Plaintiff testified at Plaintiff's criminal trial that, while the type of abrasions he found on Plaintiff could have been caused by various factors, they also were consistent with "trauma" and "sexual assault." Exh. W2 at 378:11-12 (SYR001908) ("[A]n injury in this particular area for this can, A, be trauma, which could certainly be sexual assault.").

28.     Fingerprint Testing by the SPD of the plastic bag that the officers claimed they recovered from Plaintiff after he attempted to secrete it in his waistband, and of smaller plastic bags within that bag, failed to reveal any fingerprints. Exh. W2 at 290:23-291:2, 294:13-15 (SYR002285-86, SYR002289) (David Tate, a forensic scientist with the Onondaga County Center for Forensic Sciences, testifying that he was unable to locate any latent fingerprints on the bags).

29.     Laboratory tests performed by the Syracuse Police Department after Plaintiff was indicted revealed that the substances in the bags allegedly recovered from Plaintiff tested negative for any controlled substance. (Exh. U, SYR006670).

30.     While Plaintiff cursed at the officers and threatened to sue them, he never threatened to kill them or their families. Beckwith Decl. ¶ 23 ("While I acknowledge that I cursed at the officers and threatened to sue them, I never threatened to kill them or their families").

31.     Plaintiff never told the officers that he was related to Police Chief Fowler, that he had previously testified against murderers, or that he could "drop" officers a gun. *Id.* at ¶ 24 ("I never told the officers that I was related to Police Chief

Fowler, that I had previously testified against murderers, or that I could 'drop' officers a gun").

32.     At the hospital, Plaintiff stated that he had pain at the level of "7" out of "10." Plaintiff does not recall, nor does he believe, that he ever told anyone that he had pain at the level of "2" out of "10." *Id.* at ¶ 25 ("At the hospital, I stated that I had pain at the level of '7' out of '10.' I do not recall, nor do I believe, that I ever told anyone that I had pain at the level of '2' out of '10'").

33.     In his official SPD Report of the incident, Exh. A, Breen intentionally made, among other things, the following false representations about the encounter with Plaintiff: (i) Beckwith appeared to be holding an unknown item with his right hand, which he kept close to his side clenched in a fist…."; (ii) Beckwith "brought his right arm into a fighting position; (iii) Beckwith "began reaching into his rear waistband"; (iv) Breen "observed Officer Irvine remove a clear plastic knotted bag containing rice, a clear knotted section of plastic containing a beige chunky substance, and a clear knotted section of plastic containing a tan powder from the rear of Beckwith's waistband"; and (v) Breen tested both substances, and one tested positive for heroin, and the other tested positive for cocaine. (Exh. A, SYR003080-81).

34.     In his official SPD Report of the incident, Breen also intentionally withheld the fact that he had twice searched Plaintiff, that his second search of Plaintiff involved direct contact with Plaintiff's genitals and the area of his anus, and that despite these two searches he failed to recover any drugs. *See id.* (Breen's report making no mention of conducting any searches of Plaintiff prior to recovery

of drugs); Breen Decl. ¶¶ 5-7 (describing only single recovery of drugs from Plaintiff's waistband with no mention of prior searches); Exh. G at 64:22-65:9 (Plaintiff testifying about three separate searches including "cavity search" and officer "going in my ass, my rectum and my testicle area")

35.    In his official SPD Report of the incident, Exh. B, Irvine intentionally made, among other things, the following false representations about the encounter with Plaintiff: (i) "Beckwith quickly shov[ed] his right hand behind his back towards his waistband and started to frantically move said arm in attempts to grab an unknown item; (ii) Beckwith had "in his right hand a large knotted clear plastic sandwich bag containing what appeared to be a large amount of tan substance with [Irvine" believed to be a bag of Heroin; (iii) "Beckwith then shoved his right hand behind his back…." (iv) "When Beckwith was on the ground his pants were positioned under his buttocks and his underwear were positioned halfway down his buttocks. While Beckwith's pants and underwear were in such conditions I did notice a knotted clear plastic sandwich bag positioned between his underwear waistband. Beckwith was then brought to the front of my patrol vehicle and said item was removed." Exh. B, SYR003073-3074; *see* Irvine Decl. ¶¶ 5-7 (describing these events); Exh. G at 42:8-10, 52:11-16, 53:15 (Plaintiff testifying he did not possess "anything," including crack cocaine or heroin).

36.    In his official SPD Report of the incident, Irvine also intentionally withheld the fact that he searched Plaintiff and failed to recover any drugs, and that Breen then searched Plaintiff two additional times and still found nothing. *See*

*id.*; *see also* Exh. G at 64:22-65:9 (Plaintiff testifying about three separate searches, including, "They did a pat down. They did a cavity search. They did another cavity search").

37.     In a Criminal Court Complaint, sworn to by Breen on September 6, 2016, Breen repeated some of the false representations, alleging that Plaintiff possessed a substance in clear plastic that was recovered from the rear of his waistband, and that the substance tested positive for cocaine. (Exh. I, SRY002466)

38.     In another Criminal Court Complaint, sworn to by Breen on September 6, 2016, Breen repeated some of the false representations, alleging that Plaintiff possessed a substance in clear plastic that was recovered from the rear of his waistband, and that the substance tested positive for heroin. (Exh. I, SRY002467)

39.     In yet another Criminal Court Complaint, sworn to by Irvine on September 6, 2016, Irvine repeated some of the false representations, alleging that Plaintiff "did attempt to conceal said evidence behind his back and then successfully did place said items which were contained in a clear knotted section of plastic between his underwear waistband." (Exh. I, SRY002470)

40.     During his testimony before the Grand Jury, Plaintiff recounted the three unsuccessful searches that had been conducted of him, including the third invasive search by Breen, and Breen's subsequent false announcement at the scene that he recovered drugs from Plaintiff's waistband. Exh. G at 64:22-65:9 (testifying that, "during this search when they had me on the hood they searched me three times. They did a pat down. They did a cavity search. They did another cavity

search...Two officers searched me that night...One held me down on the hood of the car, bent over facedown. The other one was shaking my legs out, shaking my pants out, going in my ass, my rectum and my testicle area").

41.     During his testimony before the Grand Jury, Plaintiff did not really know whether there was any difference between the word "anus" and the word "rectum." Beckwith Decl. ¶ 26 ("During this incident, and during my testimony before the Grand Jury, I did not really know whether there was any difference between the word 'anus' and the word 'rectum.' Therefore, it is inaccurate, and unfair, to claim that I gave inconsistent testimony when I used slightly different words to describe the areas where Breen searched me").

42.     After Plaintiff testified, Irvine testified at the Grand Jury, and again falsely represented that no invasive search had been conducted of Plaintiff and that the plastic bag in question had been recovered from Plaintiff after it was observed essentially in plain view protruding from between Plaintiff's pants and underwear. Exh. G at 13:3-6 (Irvine testifying they "observed a bag that was half-exposed at the top of the waistline of Plaintiff's underwear"); Irvine Decl. ¶¶ 9-11 (describing his Grand Jury testimony).

43.     Breen then testified at the Grand Jury, and again falsely represented that no invasive search had been conducted of Plaintiff and that the plastic bag in question had been recovered from Plaintiff after it was observed essentially in plain view protruding from between Plaintiff's pants and underwear. Breen Decl. ¶¶ 9-10 (describing his Grand Jury testimony about the arrest and initial charges).

44. After they testified, Irvine and Breen both learned that Plaintiff was indicted on a charge of perjury. Irvine Decl. ¶ 15 ("I was later informed subsequent to my testimony that the DA's Office asked the Grand Jury to consider an additional charge of perjury in the first degree"); Breen Decl. ¶ 14 (same).

45. Eight months elapsed between Plaintiff's indictment on the perjury charge, and the beginning of Plaintiff's criminal trial. *Compare* Exh. G, SYR000001 (indicted Sep. 22, 2016), *with* Exh. W1, SYR001997 (trial beginning on May 30, 2017).

46. While both Breen and Irvine purport to recalling having only one meeting with the District Attorney prior to their Grand Jury testimony, they do not deny having additional meetings with the DA during the eight months between Plaintiff's indictment and the beginning of Plaintiff's criminal trial. Irvine Decl. ¶ 17 ("I … recall having one conversation lasting approximately 10 minutes with the DA's Office"); Breen Decl. ¶ 16 ("I … recall having one conversation lasting approximately 10 minutes with the DA's Office").

47. While both Breen and Irvine deny that they discussed Plaintiff's perjury charge with the DA *prior* to Plaintiff's indictment, they do not deny having had such conversations with the DA during the eight months between Plaintiff's indictment and the beginning of Plaintiff's criminal trial. Irvine Decl. ¶¶ 17-19; Breen Decl. ¶¶ 16-17 (both only specifically denying discussions about perjury prior to indictment).

48.     Despite knowing that their testimony was being offered to support the charge of perjury against Plaintiff, Irvine and Breen both testified during Plaintiff's trial, and during their testimony again falsely represented that no invasive search had been conducted of Plaintiff and that the plastic bag in question had been recovered from Plaintiff after it was observed essentially in plain view protruding from between Plaintiff's pants and underwear. [cite their trial testimony]

49.     Shortly after this incident, Plaintiff filed a complaint with the Syracuse Citizen Review Board (CRB) about the actions of Officers Irvine and Breen. *See* **Exhibit 2** to the Sivin Decl. ("CRB Records").

50.     After he was indicted for supposedly lying about the improper way that Breen searched him, the CRB issued a report of its investigation of Plaintiff's claims against Irvine and Breen. The report found, among other things, Plaintiff's "testimony in regards to the use of force to be credible," and that "[t]he statements by the two officers are not entirely consistent as to just how and when they discovered the drugs in complaint's underwear." The report also "sustained" Plaintiff's allegation of "Racial Profiling."  And while the report found "insufficient evidence" to sustain the charge of "Improper Search/Seizure" against Officers Irvine, it "sustained" the allegation of "Improper Search/Seizure" against Officers Breen. The CRB also found that while the search of Plaintiff "was not legally a body cavity search…it did qualify as a partial 'strip search," and that the strip search "publicly humiliated the complainant" and "resulted in a minor injury and therefore was inappropriate." CRB Records at PLF000001-10. The SPD further recommended to SPD Chief of Police Frank L.

Fowler that both officers receive retraining "with regard to racial profiling," and recommended that Breen also receive retraining with regard to "proper search techniques." *Id.* at PLF000003-04.

Dated: New York, New York
        December 10, 2024

By s/ Edward Sivin
    Edward Sivin
    Bar Roll Number: 514765
    Sivin, Miller & Roche LLP
    Attorneys for Plaintiff
    20 Vesey Street, Suite 1400
    New York, NY 10007
    Telephone: (212) 349-0300
    E-mail: esivin@sivinandmiller.com